1 | JINA L. CHOI (NY Bar No. 2699718)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
2 |   schneidere@sec.gov
MONIQUE C. WINKLER (Cal. Bar No. 213031)
3 |   winklerm@sec.gov
JASON M. HABERMEYER (Cal. Bar No. 226607)
4 |   habermeyerj@sec.gov
MARC D. KATZ (Cal. Bar No. 189534)
5 |   katzma@sec.gov
JESSICA W. CHAN (Cal. Bar No. 247669)
6 |   chanjes@sec.gov
RAHUL KOLHATKAR (Cal. Bar No. 261781)
7 |   kolhatkarr@sec.gov

8 | Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
9 | 44 Montgomery Street, Suite 2800
San Francisco, CA 94104
10 | (415) 705-2500

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| RAMESH "SUNNY" BALWANI, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### SUMMARY OF THE ACTION

1.    This case involves the fraudulent offer and sale of securities by Theranos, Inc. ("Theranos"), a California company that aimed to revolutionize the diagnostics industry, its Chairman and Chief Executive Officer Elizabeth Holmes, and its former President and Chief Operating Officer, Ramesh "Sunny" Balwani.  The Commission has filed a separate action against Holmes and Theranos.

2.   Balwani, Holmes, and Theranos raised more than $700 million from late 2013 to 2015 while deceiving investors by making it appear as if Theranos had successfully developed a commercially-ready portable blood analyzer that could perform a full range of laboratory tests from a small sample of blood.  They deceived investors by, among other things, making false and misleading statements to the media, hosting misleading technology demonstrations, and overstating the extent of Theranos' relationships with commercial partners and government entities, to whom they had also made misrepresentations.

3.   Balwani, Holmes, and Theranos also made false or misleading statements to investors about many aspects of Theranos' business, including the capabilities of its proprietary analyzers, its commercial relationships, its relationship with the Department of Defense ("DOD"), its regulatory status with the U.S. Food and Drug Administration ("FDA"), and its financial condition.  These statements were made with the intent to deceive or with reckless disregard for the truth.

4.   Investors believed, based on these representations, that Theranos had successfully developed a proprietary analyzer that was capable of conducting a comprehensive set of blood tests from a few drops of blood from a finger.  From Balwani's and Holmes' representations, investors understood that Theranos offered a suite of technologies to (1) collect and transport a fingerstick sample of blood, (2) place the sample on a special cartridge which could be inserted into (3) Theranos' proprietary analyzer, which would generate the results that Theranos could transmit to the patient or care provider.  According to Balwani and Holmes, Theranos' technology could provide blood testing that was faster, cheaper, and more accurate than existing blood testing laboratories, all in one analyzer that could be used outside traditional laboratory settings.

5.   At all times, however, Balwani, Holmes, and Theranos were aware that, in its clinical laboratory, Theranos' proprietary analyzer performed only approximately 12 tests of the over 200 tests on Theranos' published patient testing menu, and Theranos used third-party

1  commercially available analyzers, some of which Theranos had modified to analyze fingerstick

2  samples, to process the remainder of its patient tests.

3       6.  In this action, the Commission seeks an order enjoining Balwani from future

4  violations of the securities laws, requiring Balwani to pay a civil monetary penalty, prohibiting

5  him from acting as an officer or director of any publicly-listed company, and providing other

6  appropriate relief.

7                                **JURISDICTION AND VENUE**

8       7.  The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a)

9  of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and

10  Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act")

11  [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12       8.  This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1)

13  and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d),

14  21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

15       9.  Defendant, directly or indirectly, made use of the means and instrumentalities of

16  interstate commerce or of the mails in connection with the acts, transactions, practices, and

17  courses of business alleged in this complaint.

18       10.  Venue is proper in this District pursuant to Section 22(a) of the Securities Act

19  [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Balwani

20  resides in the District.  In addition, acts, transactions, practices, and courses of business that form

21  the basis for the violations alleged in this complaint occurred in this District.  Defendant met

22  with and solicited prospective Theranos investors in this District, and the relevant offers or sales

23  of securities took place in this District.

24       11.  Under Civil Local Rule 3-2(d), this civil action should be assigned to the San

25  Jose Division, because a substantial part of the events or omissions which give rise to the claims

26  alleged herein occurred in Santa Clara County.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT**

12.     Ramesh "Sunny" Balwani, age 52, of Atherton, California, was the President and Chief Operating Officer of Theranos, Inc. from September 2009 to May 2016.  From 2013 through 2015 (the "relevant time period"), Balwani received a salary of between approximately $99,000 and $200,000.

**OTHER RELEVANT INDIVIDUAL AND ENTITY**

13.     Elizabeth Holmes, age 34, of Los Altos Hills, California, is the Chief Executive Officer ("CEO") and Chairman of the Board of Theranos, Inc.

14.     Theranos, Inc. is a Delaware corporation, with its principal place of business in Newark, California.  During the relevant time period, Theranos' principal place of business was in Palo Alto, California and its sole managing executives were Holmes and Balwani.

**FACTUAL ALLEGATIONS**

**A.     Background**

15.     Elizabeth Holmes founded Theranos, a diagnostics company, in 2003 after leaving college during her second year.  Holmes had a vision of developing new diagnostic technologies, with a focus on small sample testing and easier access to testing results for prevention and earlier diagnosis.

16.     For the first five years of its existence, before Balwani joined Theranos, Theranos focused its efforts on developing its proprietary analyzer, the Theranos Sample Processing Unit, or "TSPU," to analyze blood taken from a fingerstick and on assisting pharmaceutical companies with their clinical trials.  The earliest generation TSPU was a small point-of-care device that was capable of performing only a few tests.  A point-of-care device can be used to obtain results near where patients provide samples, such as medical offices.

17.     In 2009, as Theranos was on the verge of running out of money, Holmes turned to her then-boyfriend Balwani, who guaranteed a line of credit for the company.  Balwani joined the company and became its President and COO that same year.

18.     From the time that Balwani joined Theranos until his departure in 2016, Theranos had no other senior managing executives besides Holmes and Balwani.  Holmes generally focused on device innovation, board interaction, and strategic relationships, while Balwani concentrated on developing software for Theranos' technology and managing personnel and operations.  Still, they collaborated closely with each other and made decisions about the company together.

**B.     In 2010, Theranos Decided to Pursue the Retail Clinical Laboratory Space Even Though Its Analyzer Was Not Commercially Ready**

19.     Theranos spent years in research and development to develop an earlier-generation TSPU.  The earlier-generation TSPU was designed to perform only one method of testing—immunochemistries—and could process only one sample at a time.  In 2009, Balwani and Holmes turned the company's efforts towards developing a new version of the TSPU, which they hoped would one day be able to perform a broader range of laboratory testing by incorporating additional methods of testing.  They later referred to this version of the TSPU as the miniLab.

20.     In early 2010, even though the miniLab was not commercially ready, Balwani and Holmes decided to focus on the retail clinical laboratory market by pursuing contracts with a large national pharmacy chain ("Pharmacy A") and a large national grocery chain ("Grocery A").  Their vision was to place miniLabs at designated "Patient Service Centers" in retail stores so that patients could get their diagnostic tests performed while shopping.

21.     In connection with discussions about a potential partnership with Pharmacy A, Holmes approved and, copying Balwani, provided presentations and other written materials to Pharmacy A executives representing that Theranos had the ability to conduct a broad range of tests on its proprietary analyzer, including general chemistry tests, wellness tests, and some predictive and diagnostic health tests (which involved methods beyond immunochemistries).  These materials stated that Theranos would be ready to begin blood testing on its proprietary analyzer at Pharmacy A stores by the fourth quarter of 2010.

22.     Balwani and Holmes also told Pharmacy A executives that Theranos could conduct hundreds of blood tests through fingerstick (or the puncture of a finger), that its testing could be conducted in a rapid timeframe (in less than one hour), and that it could be offered for a reasonable price (much less than Theranos' competitors).  Balwani also showed a Pharmacy A executive a prototype of one of Theranos' analyzers, which he represented was being used on military helicopters.

23.     Based on these representations, Pharmacy A executives thought that the miniLab was capable of performing, in a clinical lab setting, a wide range of the tests offered by traditional laboratories.  For example, Balwani and Holmes told Pharmacy A that it could, on its analyzer – the miniLab – perform approximately 90 percent of the tests that a large, traditional central lab could perform.  In July 2010, Pharmacy A entered into a contract with Theranos to roll out Theranos' service to Pharmacy A stores.

24.     Balwani and Holmes also made similar statements to Grocery A.  They told Grocery A's then-CEO that Theranos had successfully miniaturized the conventional laboratory. Balwani also was present when Holmes told Grocery A's then-CEO that Theranos' analyzers were being deployed in the battlefield.  Based on these representations, in September 2010, Grocery A contracted with Theranos to offer Theranos patient testing in Grocery A stores.

**C.     In 2013, On the Eve of the Pharmacy A Launch, Theranos Began Modifying Commercially-Available Analyzers and Running Misleading Demonstrations**

25.     Between 2010 and 2013, Theranos continued to work on developing its miniLab with an eye towards launching its services in Pharmacy A and Grocery A stores.

26.     In 2011, Pharmacy A executives raised concerns it had with Theranos' regulatory strategy, and told Balwani and Holmes that Theranos might need to obtain FDA approval for its miniLab and certify each of its stores as a laboratory in order for the analyzers to be used in Pharmacy A stores.

27.     Based on these concerns, in 2012, Theranos and Pharmacy A agreed to modify their original contract to reflect a roll-out of Theranos' service in two phases.  In the first phase,

before Theranos received regulatory approvals for its analyzers, patient samples would be transported from Pharmacy A stores to centralized laboratories operated by Theranos and tested on Theranos' miniLab there.  Theranos opened and operated two centralized laboratories to test patient samples collected from Pharmacy A stores.  In the second phase, after Theranos had received the necessary regulatory approvals, Theranos' retail offering at Pharmacy A would be performed on miniLabs placed in Pharmacy A stores.

28.     But as September 2013 approached – the date for the launch of the first phase of the roll out of Theranos services in Pharmacy A stores – it became clear to Balwani and Holmes that the miniLab would not be ready.  At the time, Theranos had not fully integrated other testing methods into the miniLab and had not completed the scientific verification steps needed to make any of its blood tests available on the miniLab for patient testing.  As a result, Balwani and Holmes made the decision to use Theranos' earlier-generation TSPUs, which could only be used to perform immunochemistries, for patient testing.

29.     In order to offer a broader range of fingerstick tests at Pharmacy A, Balwani and Holmes asked Theranos' engineers in July 2013 to modify third-party analyzers from commercial manufacturers so they could analyze fingerstick samples.  Theranos scientists spent the two months leading up to the retail launch preparing as many fingerstick tests as possible on the third-party analyzers, which could typically process only venous samples.

30.     Balwani and Holmes never told Pharmacy A and Grocery A about Theranos' technological challenges.  For instance, in July and August 2013, Theranos coordinated technology demonstrations for various Pharmacy A executives in advance of the retail launch. Holmes, with Balwani's knowledge, instructed Theranos employees to place both earlier generation TSPUs and miniLabs in a demonstration room where Theranos collected fingerstick samples from Pharmacy A executives.  Instead of using these machines to process the tests on these samples, and unbeknownst to the Pharmacy A executives, Theranos used the modified third-party machines to process a portion of the tests.

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2800
SAN FRANCISCO, CA 94104 l (415) 705-2500

31.     Based on Balwani's and Holmes' presentations, Pharmacy A executives understood that the blood from their demonstration samples would be tested on Theranos' miniLabs.  Balwani never told the executives that Theranos was actually testing some of their blood on modified third-party analyzers.

32.     At the end of 2013, Pharmacy A agreed to accelerate a portion of a $100 million "innovation fee" to help Theranos broaden its roll-out of services to Pharmacy A stores.  Unbeknownst to Pharmacy A, Theranos was scaling its retail offering by relying on third-party analyzers.

33.     Balwani never told anyone at Pharmacy A that Theranos used third-party analyzers, including those that had been modified to test fingerstick blood.  He also never told Pharmacy A that Theranos was using third-party analyzers to perform the majority of its testing.  If Pharmacy A had known that Theranos was using third-party analyzers for a majority of its patient testing, it would not have accelerated the payment of the innovation fee.

34.     Balwani and Holmes also denied there were problems with Theranos' technology in discussions with Grocery A.  For example, in response to a question about a rumor that Theranos was facing technological challenges with its proprietary analyzers, Balwani and Holmes assured Grocery A's General Counsel that there was no technological problem with the analyzers and that the TSPU was capable of performing 90 percent of the blood tests typically requested by doctors for their patients.

35.     Balwani also instructed Theranos' laboratory employees to use code names to refer to third-party analyzers in its laboratory information systems, ensuring that even other Theranos employees would not know that Theranos was using third-party analyzers to conduct a portion of its patient testing.

36.     From its retail launch in September 2013 to the time it closed its clinical laboratories in 2016, Theranos never used its miniLab for patient testing in its clinical laboratory.  Theranos conducted – at its height –12 tests using the earlier-generation TSPU, and processed about 50 to 60 tests using the modified third-party analyzers.  Theranos processed the remaining

100-plus tests it offered at Pharmacy A using the same types of industry standard technology as other traditional laboratories, or sent tests out to third-party laboratories.

**D.      Starting in September 2013, Theranos Began Publicly Touting Theranos' Proprietary Analyzers in Interviews with the Media, Notwithstanding Theranos' Use of Commercially-Available Analyzers for Patient Testing**

37.      From 2013 to 2014, Theranos and Holmes emerged into the spotlight by issuing a press release touting the launch of its retail offering with Pharmacy A and granting a number of media interviews for articles that Holmes later used to solicit investors.  In September 2013, Theranos announced a partnership with Pharmacy A to offer a "new lab testing service through Pharmacy A pharmacies nationwide."  By going to a Pharmacy A store in Palo Alto, California, the first location to offer Theranos testing, consumers could "complete any clinician-directed lab tests with as little as a few drops of blood and results available in a matter of hours."

38.      Around the same time, Holmes sat down with a reporter for the *Wall Street Journal* purportedly to discuss the state of Theranos' business.  A *Wall Street Journal* article accompanying the Pharmacy A launch announcement stated:

> The secret that hundreds of employees are now refining involves devices that automate and miniaturize more than 1,000 laboratory tests, from routine blood work to advanced genetic analyses.  Theranos' processes are faster, cheaper, and more accurate than the conventional methods and require only microscopic blood volumes, not vial after vial of the stuff.

39.      Additional articles written after interviews with Holmes continued to raise Theranos' public profile and tout its technological capabilities.  An April 2014 *Wired* article stated that "[i]nstead of vials of blood – one for every test needed – Theranos requires only a pinprick and a drop of blood.  With that they can perform hundreds of tests, from standard cholesterol checks to sophisticated genetic analyses."

40.      Similarly, a June 2014 *Fortune* article noted that "[Theranos] currently offers more than 200 – and is ramping up to offer more than 1,000 – of the most commonly ordered blood diagnostic tests, all without the need for a syringe."  *Fortune* also distinguished Theranos

from other blood testing companies because "Theranos [] does not buy any analyzers from third parties."  In contrast to the large traditional blood analyzers that occupied whole rooms, Theranos' proprietary analyzers "look[ed] like large desktop computer towers."

41.    Balwani knew, or was reckless in not knowing, that the *Fortune* article contained misstatements about Theranos' technology.  Nevertheless, Balwani discussed the *Fortune* article with investors but failed to correct the misstatements, instead commenting that the article provided a favorable boost to Theranos' public image.

42.    Balwani did not correct the false or misleading statements in the articles that were published between 2013 and 2015.  In fact, in some instances, as Balwani knew, or was reckless in not knowing, Theranos provided to potential investors some of the articles containing untrue or misleading statements.

**E.    Beginning in 2013, Balwani, Holmes, and Theranos Raised Over $700 Million from Investors**

43.    In late 2013, Theranos had approximately $30 million in cash and short-term securities, which would fund the company's operations for only a few months.  As Balwani and Holmes knew, Theranos needed cash to continue spending money on research and development to advance the miniLab, which at that time was not ready for commercial use.

44.    From late 2013 to 2015, Balwani, Holmes, and Theranos raised over $700 million from investors in two financing rounds.  These investors believed – based on false and misleading statements by Balwani and Holmes – that Theranos had successfully developed a proprietary analyzer that could conduct the full range of laboratory testing from a small sample of blood.

**1.    The Investor Solicitation Process Generally Included a Face-to-Face Meeting, a Technology Demonstration, and a Binder of Materials**

45.    After an introduction to Holmes, potential investors would typically meet face-to-face with Holmes, and at times, Balwani.  During this meeting, which normally took place at Theranos' headquarters, Holmes described her vision for the company, including her motivation

to develop a technology that could perform blood testing on small samples – spurred by her own fear of needles – and her larger desire to provide cheaper, faster, and more accurate laboratory testing so that diagnoses of serious conditions and diseases could take place sooner.

46.     This initial meeting was often followed by a purported demonstration of Theranos' proprietary analyzers, the TSPU, and the miniLab.  In several instances, potential investors would be taken by Balwani and Holmes to a different room to view Theranos' desktop computer-like analyzers.  A phlebotomist would arrive to draw their blood through fingerstick, using a nanotainer, a Theranos-developed collection device.  Then the sample was either inserted into the TSPU or taken away for processing.  Based on what they saw, potential investors believed that Theranos had tested their blood on either an earlier-generation TSPU or the miniLab.  As Balwani knew, however, Theranos often actually tested their blood on third-party analyzers, because Theranos could not conduct all of the tests it offered prospective investors on its proprietary analyzers.

47.     As Balwani knew, or was reckless in not knowing, Theranos also sent investors a binder of background materials, which Holmes instructed employees to compile.  In addition to incorporation documents and shareholder agreements, the typical investor binder included (1) a cover letter drafted and signed by Holmes; (2) a company overview slide deck presentation; (3) reports of clinical trials work Theranos performed with its pharmaceutical companies; (4) financial projections; and (5) articles and profiles about Theranos, including the 2013 and 2014 articles from *The Wall Street Journal*, *Wired*, and *Fortune* that were written after Holmes provided them with interviews.  These materials were important to investors in considering whether to invest in Theranos.

> **2.     Balwani and Holmes Made a Series of False or Misleading Statements to Investors That Confirmed the Company's Public Narrative**

48.     Balwani and Holmes made statements to investors about the status of Theranos' technology, historical contracts, commercial relationships, regulatory strategy, and financial

1  performance that were consistent with the public image they were promoting of Theranos as a

2  company that was revolutionizing the diagnostics industry.

3        a.      **Balwani and Holmes Represented That Theranos'**
4                **Proprietary Analyzer Was Capable of Conducting the Full**
                 **Range of Testing When It Could Not**
5

6        49.      Balwani and Holmes represented to investors that Theranos' miniLab was

7  capable of processing a full range of laboratory tests.  For instance, they told one investor that

8  Theranos' proprietary analyzer could process over 1,000 Current Procedural Terminology

9  ("CPT") codes and that Theranos had developed a technological solution for an additional 300

10  CPT codes.  In 2014, Balwani told an investor that Theranos had between 150 and 200

11  fingerstick tests operating in its clinical lab.

12        50.      Theranos' company overview presentation, which Balwani sent to a potential

13  investor, also echoed these same statements.  Under a slide titled "Same Tests, A Whole New

14  approach" and featuring a picture of a fingerprick and Theranos collection device, the

15  presentation included the statement "Theranos runs any test available in central laboratories, and

16  processes all sample types."

17        51.      But Theranos' analyzers never performed comprehensive testing or processed

18  1,000 CPT codes, nor did Theranos ever offer between 150 and 200 fingerstick tests in its

19  clinical lab.  In fact, as Balwani knew, or was reckless in not knowing, Theranos' clinical lab

20  used the TSPU only to perform 12 of the tests offered to patients.

21        52.      In addition to not disclosing the use of third-party analyzers to conduct the

22  demonstrations, Balwani's and Holmes' actions made it appear as if Theranos' proprietary

23  analyzer had more extensive capabilities than it actually did.  When potential investors tried out

24  Theranos' services by bringing a physician's laboratory requisition to a Pharmacy A store,

25  Holmes, with Balwani's knowledge, instructed Theranos employees to remove certain tests from

26  the order if Theranos was unable to perform those tests using a fingerstick collection.

27

28

53.     This conduct led investors to believe that Theranos' proprietary analyzers were broadly in use by Theranos and that they produced results on a broader range of tests than they actually did.   Investors would not have invested had they known Theranos' promises about its ability to run a broad range of tests were untrue and that the TSPU was being used to run only a limited number of tests in its lab.  When presenting to investors, Balwani knew, or was reckless in not knowing, that the miniLab was not presently capable of processing a full range of laboratory tests.

54.     Balwani's statements about the capabilities of Theranos' proprietary analyzer were important to potential investors because the technology was a basis of their investments.

**b.      Balwani and Holmes Stated That Theranos Manufactured All of Its Own Analyzers When It Actually Used Third-Party Analyzers to Run the Majority of Its Tests**

55.     Balwani and Holmes also represented to investors that Theranos manufactured all of its own analyzers, when Theranos had in fact only manufactured its own TSPUs.  For instance, Balwani and Holmes told one investor that Theranos used its own analyzer equipment and did not buy analyzer equipment from third parties.  Balwani and Holmes explained to another investor that 100 percent of Theranos' analyzers were manufactured in Theranos' facility in Newark, California.

56.     The company overview presentation, which Balwani provided to at least one investor, also showed pictures of the TSPU and miniLab under the heading "Theranos Systems," but excluded pictures of the third-party analyzers Theranos was using.

57.     Finally, the *Fortune* article – which Balwani received and discussed with an investor – stated that "Theranos [] does not buy any analyzers from third parties."

58.     These statements gave potential investors the impression that Theranos was only using its own TSPUs and miniLabs for patient testing.

59.     As Balwani knew, or was reckless in not knowing, statements that Theranos manufactured all of its analyzers were false or misleading in light of Theranos' broad use of third-party analyzers.  Theranos conducted the majority of its testing using third-party analyzers.

60.     Theranos' capability to run the full range of laboratory testing on its proprietary analyzer was a key competitive advantage potential investors considered when deciding whether to invest in the company.

### c.     Balwani and Holmes Made False or Misleading Statements About Theranos' Historical Contracts with the DOD

61.     Balwani and Holmes also made false or misleading statements concerning Theranos' historical business contracts with the DOD.  For instance, Balwani provided a presentation to a potential investor that listed the DOD as a "[k]ey deployment" for Theranos.

62.     Balwani and Holmes also made other statements that gave potential investors the impression that these historical relationships were meaningful.  Balwani and Holmes told multiple investors that Theranos' technology had been deployed by the DOD in the battlefield and in Afghanistan.  They also told investors that the DOD had deployed Theranos' miniLab on medevac helicopters.

63.     Balwani told one potential investor in late 2013 that 75 percent of Theranos' current revenues were from the military.  Balwani told another potential investor in late 2014 that the company had long-dated contracts with the DOD that would provide future revenue to Theranos.

64.     Balwani knew, or was reckless in not knowing, that these statements were false and misleading.  While Theranos' technology was used in a DOD burn study, it was never deployed by the DOD in the battlefield, in Afghanistan, or on medevac helicopters.  From 2011 to 2014, Theranos had discussions with multiple divisions of the DOD.  However, Theranos generated only approximately $300,000 from three DOD contracts.

65.     Balwani's statements about Theranos' history with the DOD were important to potential investors because these relationships lent legitimacy to Theranos' business and its proprietary analyzer.

1

2

          **d.**     **Balwani and Holmes Told Investors That Theranos' Relationships with Pharmacy A and Grocery A Were Thriving When They Were Stalled**

3        66.     During meetings and in investor binders, Balwani and Holmes described

4 Theranos' thriving relationships with Pharmacy A and Grocery A.  Much of the company

5 overview presentation was dedicated to Theranos' relationship with Pharmacy A, showing

6 pictures of the patient service centers where patients would get their fingers pricked, and a map

7 of the number of Pharmacy A stores across the country that would soon be offering Theranos'

8 blood testing.  Notwithstanding that Balwani managed the Pharmacy A relationship, Balwani

9 represented to numerous investors in late 2014 that Theranos was expected to roll out its retail

10 services to hundreds of Pharmacy A stores in 2015.  This information was also included in

11 financial projections that Balwani drafted for investors that were based on the assumption that

12 Theranos would be rolling out to 800 or 900 stores by year-end 2015.

13        67.     However, by late 2014, while Theranos was raising the bulk of the over $700

14 million it raised during the relevant time period, Balwani was aware that Theranos' retail roll out

15 with Pharmacy A was stalled due to, among other issues, some concerns Pharmacy A executives

16 had with regard to Theranos' performance.

17        68.     In August 2014, a senior Pharmacy A executive told Balwani that patient traffic

18 and fingerstick draw percentages would need to increase in order for the executive to convince

19 Pharmacy A management to roll out Theranos services to more stores.  At a partnership meeting

20 later that month, which Balwani attended, Theranos and Pharmacy A discussed reducing the

21 number of Pharmacy A stores that Theranos services would be rolled out to in 2015 from 500

22 stores to 200.

23        69.     In December 2014, Balwani met with Pharmacy A executives to discuss

24 potentially modifying the parties' relationship to a landlord and tenant model, whereby Theranos

25 would rent space in Pharmacy A stores.  Balwani did not share any of these developments with

26 investors.  Balwani knew, or was reckless in not knowing, that Theranos would not be expanding

27 into Pharmacy A as quickly as he represented it would.

28

70.     Balwani also told potential investors in late 2014 that Theranos services would be rolled out in more than 100 Grocery A stores in January 2015.  But the relationship with Grocery A had already begun to stall in 2013, during which the parties had started discussing the possibility of modifying the contract so that Theranos would rent space in individual supermarkets.  The parties were still engaged in these discussions in 2014.

71.     By August 2014, Grocery A and Theranos ceased to be in communication with one another.  Nevertheless, when meeting with investors in the fall of 2014, Balwani continued to discuss Theranos' relationship with Grocery A to investors.  Balwani knew, or was reckless in not knowing, that his statements about Theranos' relationship with Grocery A were false or misleading.

72.     The statements made by Balwani about the status of the Pharmacy A and Grocery A relationships were important to investors because these contracts gave potential investors confidence that Theranos' technologies were commercially ready.  Pharmacy A and Grocery A were also the major drivers of future revenues for the company.  In reality, Balwani and Holmes were attempting to renegotiate Theranos' agreements with these retail businesses in light of the delays in rolling out.

**e.     Balwani and Holmes Claimed That Theranos Was Not Required to Seek FDA Approval Despite Repeatedly Being Told That Approval Was Necessary for Its Analyzers and Tests**

73.     When speaking to potential investors in late 2013 through 2015, Balwani and Holmes consistently stated that Theranos did not need to obtain approval from the FDA for its miniLab and tests, and instead said that Theranos was applying for FDA approval voluntarily. For instance, Balwani told a potential investor that approval was not required for the miniLab because Theranos was not selling its devices to other companies.

74.     Balwani and Holmes represented to business partners and investors that FDA approval was not necessary because they believed that Theranos' tests were laboratory developed tests ("LDTs"), or tests developed and used inside a clinical laboratory, over which the FDA had

1    historically exercised its enforcement discretion to not require FDA clearance.  However,

2    Balwani and Holmes were told by multiple parties, including Pharmacy A, that the FDA might

3    reject this regulatory strategy because Theranos' miniLab had not previously obtained approval

4    from the FDA.

5        75.    By the time of Theranos' financing round in 2014, FDA representatives told

6    Balwani and Holmes that clearance or approval would be necessary for Theranos' analyzer and

7    tests.  In late 2013 and throughout 2014, FDA representatives met with Balwani and Holmes,

8    and sent letters which Balwani received, stating that they did not believe Theranos was offering

9    LDTs, and that even if Theranos was not selling its miniLab or tests, FDA clearance or approval

10   was necessary.  Based on these communications, Balwani and Holmes agreed to submit all

11   components of Theranos' testing technology to the FDA for clearance or approval.  However,

12   Balwani and Holmes continued to raise additional funds while telling potential investors

13   Theranos was seeking FDA approval voluntarily.  But Balwani knew, or was reckless in not

14   knowing, that FDA approval was necessary for Theranos' analyzer and tests.

15       76.    Balwani's statements that Theranos did not need FDA approval or clearance were

16   important to investors because approval or clearance would have been an obstacle in the

17   company's path to realizing full commercialization.

18         **f.    Balwani and Holmes Told Investors That Theranos Had
     Generated or Would Generate Over $100 Million in Revenues
     in 2014 and That It Was On Track to Make $1 Billion in
     Revenues in 2015, But This Information Had No Basis**

21       77.    Balwani drafted the financial information that Theranos included in the investor

22   binders that projected that Theranos would generate over $100 million in revenues and break

23   even in 2014.  These documents also represented that Theranos expected to generate

24   approximately $1 billion in revenues in 2015.  Balwani told potential investors in October 2014

25   that he had confidence in the year-end 2014 projections, in part because they were already more

26   than nine months into the calendar year.

27

28

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2800
SAN FRANCISCO, CA 94104 | (415) 705-2500

78.     The projections further indicated that Theranos would obtain revenue from several lines of business, including retail pharmacies (Pharmacy A and Grocery A), samples collected from physicians' offices, samples collected from hospitals, and pharmaceutical services.

79.     Some of Theranos' projections, which Balwani provided to potential investors in October 2014, stated Theranos would earn $40 million from pharmaceutical services, $46 million from lab services provided to hospitals, and $9 million from lab services provided to physicians' offices, all by the end of 2014.  In reality, Theranos had no revenues from any of those lines of business.  And Balwani knew that Theranos was not on track to break even in 2014.

80.     Theranos' actual financial performance bore no resemblance to the financial information Balwani shared with investors.  Theranos recorded little more than $100,000 in revenue in 2014 and was nowhere near generating $100 million in revenue by the end of 2014.

81.     Balwani knew, or was reckless in not knowing, the 2014 revenue projection was baseless.  In October 2014, the same month he was providing year-end projected revenue figures between $120 and $140 million to potential investors, Balwani told Theranos' potential insurers that Theranos was operating at an $8 million to $9 million monthly net loss.

82.     Balwani also knew, or was reckless in not knowing, that Theranos was using different projections with the third-party valuation firm that Theranos had retained to value the company's common stock.  The valuation firm prepared a report dated October 2014, which Balwani received, that analyzed the value of Theranos' common stock based on an assumption that it would recognize approximately $1 million in revenue for 2014 and $110 million for 2015.

83.     By late 2014, Balwani knew Theranos' roll-outs in Pharmacy A and Grocery A stores were not going as planned.  Balwani also knew the company had made limited progress in advancing the other lines of business reflected in the projections.  Balwani knew that Theranos had no active discussions with pharmaceutical companies, had partnered with only a handful of hospitals, and had no knowledge of any contracts between Theranos and physicians' offices.

Balwani thus also knew, or was reckless in not knowing, that the 2015 $1 billion revenue projections were unreasonable.

84.     These financial projections were important to investors because they gave the impression that Theranos had already secured contracts to deliver these revenues and that the company's business was growing rapidly.

**F.     Balwani Left Theranos in 2016**

85.     In May 2016, after regulatory inspections of Theranos' clinical laboratories and its manufacturing facility, Balwani left Theranos.

86.     In 2017, Balwani, Holmes, and Theranos settled a lawsuit with an investor that alleged they had committed securities fraud.

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

87.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 86.

88.     By engaging in the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    (a)     Employed devices, schemes, or artifices to defraud;

    (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    (c)     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

89.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

90.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 86.

91.     By engaging in the conduct described above, Defendant directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

        (a)     with scienter, employed devices, schemes, or artifices to defraud;

        (b)     obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

        (c)     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

92.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

**THIRD CLAIM FOR RELIEF**

*Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

93.     The Commission realleges and incorporates by reference paragraphs 1 through 86.

94.     By engaging in the conduct described above, Holmes or Theranos, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

        (a)     Employed devices, schemes, or artifices to defraud;

1

    (b)  Made untrue statements of material facts or omitted to state material facts

2

       necessary in order to make the statements made, in the light of the

3

       circumstances under which they were made, not misleading; and

4

    (c)  Engaged in acts, practices, or courses of business which operated or

5

       would operate as a fraud or deceit upon other persons, including

6

       purchasers and sellers of securities.

7

   95.  By engaging in the acts and conduct alleged above, Defendant knowingly or

8

recklessly provided substantial assistance to Holmes' or Theranos' violations of Section 10(b) of

9

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and

10

thereby aided and abetted such violations, and unless restrained and enjoined, will continue to

11

violate these provisions.

12

13

          **FOURTH CLAIM FOR RELIEF**

14

    *Aiding and Abetting Violations of Section 17(a) of the Securities Act*

15

   96.  The Commission realleges and incorporates by reference paragraphs 1 through

16

86.

17

   97.  By engaging in the conduct described above, Holmes or Theranos directly or

18

indirectly, in the offer or sale of securities, by use of the means or instruments of transportation

19

or communication in interstate commerce or by use of the mails,

20

    (a)  with scienter, employed devices, schemes, or artifices to defraud;

21

    (b)  obtained money or property by means of untrue statements of material

22

       fact or by omitting to state a material fact necessary in order to make the

23

       statements made, in light of the circumstances under which they were

24

       made, not misleading; and

25

    (c)  engaged in transactions, practices, or courses of business which operated

26

       or would operate as a fraud or deceit upon purchasers.

27

28

98.     By engaging in the acts and conduct alleged above, Defendant knowingly or recklessly provided substantial assistance to Holmes' or Theranos' violations of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], and thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate these provisions.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently enjoin Defendant from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### II.

Issue an order requiring Defendant to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### III.

Prohibit Defendant from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

1

**V.**

2      Grant such other and further relief as this Court may determine to be just and necessary.

3

4

5  Dated:  March 14, 2018          Respectfully submitted,

6

7

8           _/s/ Jessica W. Chan_

         JESSICA W. CHAN

9           Attorney for Plaintiff

         SECURITIES AND EXCHANGE COMMISSION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28