JEFFREY B. COOPERSMITH (CA State Bar No. 252819)
KELLY M. GORTON (CA State Bar No. 300978)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111
Telephone:      (415) 276-6500
Facsimile:      (415) 276-6599
Email:          jeffcoopersmith@dwt.com
                kellygorton@dwt.com


Attorneys for Defendant
RAMESH BALWANI

# IN THE UNITED STATES DISTRICT COURT

## NORTHEN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                          Plaintiff,<br><br>     vs.<br><br>RAMESH "SUNNY" BALWANI,<br><br>                          Defendant. | Case No. 5:18-cv-01603-BLF<br><br>**ANSWER TO COMPLAINT** |

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

Defendant Ramesh Balwani ("Defendant" or "Mr. Balwani") hereby responds to the Complaint of Plaintiff Securities and Exchange Commission ("Plaintiff" or "SEC"):

## INTRODUCTION TO ANSWER

Mr. Balwani spent almost seven years and millions of dollars of his own money trying to make Theranos a success. He believed in the company's potential to make healthcare more accessible and affordable through innovations it was developing in the design and manufacturing of diagnostic devices, in laboratory and patient-service software, and with a business model for empowering patients to take control of their own healthcare decisions. Before joining the company, Mr. Balwani personally guaranteed a line of credit of $12 million to Theranos, and provided $7.5 million of his own money for the purchase of Theranos common stock. Mr. Balwani never sold any of his Theranos stock. When Mr. Balwani started working for Theranos, he requested a salary of only $1 and received a modest salary, and he worked tirelessly in an effort to build the company so that it could achieve its long-term vision and create stockholder value. While Theranos did not achieve all of its goals, a failure to execute a business plan is not a fraud. Mr. Balwani neither committed securities fraud nor aided and abetted any other individuals or entities in doing so.

## SUMMARY OF THE ACTION[1]

1.      This case involves the fraudulent offer and sale of securities by Theranos, Inc. ("Theranos"), a California company that aimed to revolutionize the diagnostics industry, its Chairman and Chief Executive Officer Elizabeth Holmes, and its former President and Chief Operating Officer, Ramesh "Sunny" Balwani. The Commission has filed a separate action against Holmes and Theranos.

---

[1] The headings used by the SEC throughout this complaint do not constitute allegations to which an answer is required. To the extent an answer is required, Mr. Balwani denies any allegations that may be contained in such headings.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

ANSWER:  Mr. Balwani denies the allegations of the first sentence of Paragraph 1.  Mr. Balwani is aware from highly inflammatory and improper press statements by the Commission that it filed separate actions against Elizabeth Holmes and Theranos.

2.      Balwani, Holmes, and Theranos raised more than $700 million from late 2013 to 2015 while deceiving investors by making it appear as if Theranos had successfully developed a commercially-ready portable blood analyzer that could perform a full range of laboratory tests from a small sample of blood. They deceived investors by, among other things, making false and misleading statements to the media, hosting misleading technology demonstrations, and overstating the extent of Theranos' relationships with commercial partners and government entities, to whom they had also made misrepresentations.

ANSWER:  Mr. Balwani denies the allegations of Paragraph 2.

3.      Balwani, Holmes, and Theranos also made false or misleading statements to investors about many aspects of Theranos' business, including the capabilities of its proprietary analyzers, its commercial relationships, its relationship with the Department of Defense ("DOD"), its regulatory status with the U.S. Food and Drug Administration ("FDA"), and its financial condition. These statements were made with the intent to deceive or with reckless disregard for the truth.

ANSWER:  Mr. Balwani denies the allegations of Paragraph 3.

4.      Investors believed, based on these representations, that Theranos had successfully developed a proprietary analyzer that was capable of conducting a comprehensive set of blood tests from a few drops of blood from a finger. From Balwani's and Holmes' representations, investors understood that Theranos offered a suite of technologies to (1) collect and transport a fingerstick sample of blood, (2) place the sample on a special cartridge which could be inserted into (3) Theranos' proprietary analyzer, which would generate the results that Theranos could transmit to the patient or care provider. According to Balwani and Holmes, Theranos' technology

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

could provide blood testing that was faster, cheaper, and more accurate than existing blood testing laboratories, all in one analyzer that could be used outside traditional laboratory settings.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 4, and he therefore denies those allegations.  Mr. Balwani admits that Theranos's vision was to revolutionize the blood testing industry with faster, cheaper, and more accurate testing, including but not limited to performing tests with proprietary analyzers.  Except as specifically admitted, Mr. Balwani denies the allegations of the third sentence of Paragraph 4.

5.     At all times, however, Balwani, Holmes, and Theranos were aware that, in its clinical laboratory, Theranos' proprietary analyzer performed only approximately 12 tests of the over 200 tests on Theranos' published patient testing menu, and Theranos used third-party commercially available analyzers, some of which Theranos had modified to analyze fingerstick samples, to process the remainder of its patient tests.

ANSWER:  Mr. Balwani admits that Theranos validated approximately 12 assays on a version of its proprietary analyzer in its clinical laboratory and admits that Theranos developed proprietary modifications to enable high-throughput commercially available analyzers to process small-volume capillary blood samples.  Mr. Balwani admits that Theranos used commercially available analyzers to process venous blood samples and other matrices (such as urine cultures) for tests not yet available on Theranos's proprietary technology.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 5.

6.     In this action, the Commission seeks an order enjoining Balwani from future violations of the securities laws, requiring Balwani to pay a civil monetary penalty, prohibiting him from acting as an officer or director of any publicly-listed company, and providing other appropriate relief.

ANSWER:  Mr. Balwani denies that the Commission is entitled to any relief in this action.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

**JURISDICTION AND VENUE**

7.      The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

ANSWER:  The allegations of Paragraph 7 are legal conclusions to which no answer is required.

8.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

ANSWER:  The allegations of Paragraph 8 are legal conclusions to which no answer is required.  To the extent an answer is required, Mr. Balwani admits that this Court has subject-matter jurisdiction over this action.

9.      Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

ANSWER:  The allegations of Paragraph 9 are legal conclusions to which no answer is required.  To the extent that an answer is required, Mr. Balwani denies that he used any such means and instrumentalities to engage in any of the wrongful or illegal conduct alleged in the complaint.

10.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Balwani resides in the District. In addition, acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Defendant met with and

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

solicited prospective Theranos investors in this District, and the relevant offers or sales of securities took place in this District.

ANSWER:  The first sentence of Paragraph 10 is a legal conclusion to which no response is required.  Mr. Balwani admits the allegations of the second sentence of Paragraph 10. Regarding the third sentence of Paragraph 10, Mr. Balwani denies that any violations occurred in this district or anywhere else.  Regarding the fourth sentence of Paragraph 10, Mr. Balwani admits that he conducted Theranos business in this district including meeting with investors.  Mr. Balwani denies the allegations of the third and fourth sentences of Paragraph 10 to the extent they suggest that any interaction Mr. Balwani had with investors was in violation of the securities laws.

11.    Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Jose Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Santa Clara County.

ANSWER:  The allegations of Paragraph 11 are legal conclusions to which no answer is required.  To the extent a response is required, Mr. Balwani admits that Theranos conducted business in Santa Clara County, but denies the allegations of Paragraph 11 to the extent they suggest that any securities law violations occurred in such county.

**DEFENDANT**

12.    Ramesh "Sunny" Balwani, age 52, of Atherton, California, was the President and Chief Operating Officer of Theranos, Inc. from September 2009 to May 2016. From 2013 through 2015 (the "relevant time period"), Balwani received a salary of between approximately $99,000 and $200,000.

ANSWER:  Mr. Balwani admits that he is 52 years old and lives in Atherton, California. Mr. Balwani further admits that he served as President and Chief Operating Officer of Theranos, Inc. and that his salary at Theranos was $99,000 in 2009 and increased to $200,000 only in 2015. Except as specifically admitted, Mr. Balwani denies the allegations in Paragraph 12.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

**OTHER RELEVANT INDIVIDUAL AND ENTITY**

13.     Elizabeth Holmes, age 34, of Los Altos Hills, California, is the Chief Executive Officer ("CEO") and Chairman of the Board of Theranos, Inc.

ANSWER:  On information and belief, Mr. Balwani admits the allegations of Paragraph 13.

14.     Theranos, Inc. is a Delaware corporation, with its principal place of business in Newark, California. During the relevant time period, Theranos' principal place of business was in Palo Alto, California and its sole managing executives were Holmes and Balwani.

ANSWER:  Mr. Balwani admits the allegations of the first sentence of Paragraph 14, and further admits that Theranos' principal place of business was in Palo Alto, California during the time period the Complaint's allegations describe.  Mr. Balwani denies the remaining allegations of Paragraph 14.

**FACTUAL ALLEGATIONS**

A.     **Background**

15.     Elizabeth Holmes founded Theranos, a diagnostics company, in 2003 after leaving college during her second year. Holmes had a vision of developing new diagnostic technologies, with a focus on small sample testing and easier access to testing results for prevention and earlier diagnosis.

ANSWER:  On information and belief, Mr. Balwani admits the allegations of the allegations of Paragraph 15.

16.     For the first five years of its existence, before Balwani joined Theranos, Theranos focused its efforts on developing its proprietary analyzer, the Theranos Sample Processing Unit, or "TSPU," to analyze blood taken from a fingerstick and on assisting pharmaceutical companies with their clinical trials. The earliest generation TSPU was a small point-of-care device that was

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

capable of performing only a few tests. A point-of-care device can be used to obtain results near where patients provide samples, such as medical offices.

ANSWER:  Mr. Balwani admits that when he joined the company, he became aware that Theranos had been working to develop the Theranos Sample Processing Unit ("TSPU"), among other things.  Mr. Balwani further admits that early versions of the TSPU were designed to serve as point-of-care devices.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 16.

17.    In 2009, as Theranos was on the verge of running out of money, Holmes turned to her then-boyfriend Balwani, who guaranteed a line of credit for the company. Balwani joined the company and became its President and COO that same year.

ANSWER:  Mr. Balwani admits that he joined Theranos in 2009, and earlier that same year, he personally guaranteed a line of credit for Theranos. Mr. Balwani further admits that at that time he and Ms. Holmes had a personal relationship.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 17.

18.    From the time that Balwani joined Theranos until his departure in 2016, Theranos had no other senior managing executives besides Holmes and Balwani. Holmes generally focused on device innovation, board interaction, and strategic relationships, while Balwani concentrated on developing software for Theranos' technology and managing personnel and operations. Still, they collaborated closely with each other and made decisions about the company together.

ANSWER:  Mr. Balwani admits that he left Theranos in 2016, but otherwise denies the allegations of the first sentence of Paragraph 18.  With regard to third sentence of Paragraph 18, Mr. Balwani admits that he and Ms. Holmes worked closely together to further the business of Theranos and build shareholder value. Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 18.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

**B.** **In 2010, Theranos Decided to Pursue the Retail Clinical Laboratory Space Even Though Its Analyzer Was Not Commercially Ready**

19.     Theranos spent years in research and development to develop an earlier-generation TSPU. The earlier-generation TSPU was designed to perform only one method of testing—immunochemistries—and could process only one sample at a time. In 2009, Balwani and Holmes turned the company's efforts towards developing a new version of the TSPU, which they hoped would one day be able to perform a broader range of laboratory testing by incorporating additional methods of testing. They later referred to this version of the TSPU as the miniLab.

ANSWER:  Mr. Balwani admits that Theranos spent years doing research and development in connection with its proprietary technology.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 19, and also specifically denies the SEC's characterizations of the difference between the different TSPU versions and names.

20.     In early 2010, even though the miniLab was not commercially ready, Balwani and Holmes decided to focus on the retail clinical laboratory market by pursuing contracts with a large national pharmacy chain ("Pharmacy A") and a large national grocery chain ("Grocery A"). Their vision was to place miniLabs at designated "Patient Service Centers" in retail stores so that patients could get their diagnostic tests performed while shopping.

ANSWER:  Mr. Balwani admits that in 2010, Theranos entered into contracts with Walgreens and Safeway.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 20.

21.     In connection with discussions about a potential partnership with Pharmacy A, Holmes approved and, copying Balwani, provided presentations and other written materials to Pharmacy A executives representing that Theranos had the ability to conduct a broad range of tests on its proprietary analyzer, including general chemistry tests, wellness tests, and some predictive and diagnostic health tests (which involved methods beyond immunochemistries). These materials

8

stated that Theranos would be ready to begin blood testing on its proprietary analyzer at Pharmacy A stores by the fourth quarter of 2010.

ANSWER:  Mr. Balwani admits that Theranos had various communications with Walgreens regarding a potential partnership. Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 21.

22.    Balwani and Holmes also told Pharmacy A executives that Theranos could conduct hundreds of blood tests through fingerstick (or the puncture of a finger), that its testing could be conducted in a rapid timeframe (in less than one hour), and that it could be offered for a reasonable price (much less than Theranos' competitors). Balwani also showed a Pharmacy A executive a prototype of one of Theranos' analyzers, which he represented was being used on military helicopters.

ANSWER:  Mr. Balwani denies the allegations of the first sentence of Paragraph 22 as they apply to him, and lacks knowledge or information sufficient to form a belief as to the truth of those allegations as they apply to any other individual, and therefore denies those allegations.  Mr. Balwani denies the allegations in the second sentence of Paragraph 22.

23.    Based on these representations, Pharmacy A executives thought that the miniLab was capable of performing, in a clinical lab setting, a wide range of the tests offered by traditional laboratories. For example, Balwani and Holmes told Pharmacy A that it could, on its analyzer – the miniLab – perform approximately 90 percent of the tests that a large, traditional central lab could perform. In July 2010, Pharmacy A entered into a contract with Theranos to roll out Theranos' service to Pharmacy A stores.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 23, and he therefore denies those allegations.  Mr. Balwani denies the allegations of the second sentence of Paragraph 23 as they apply to him, and lacks knowledge or information sufficient to form a belief as to the truth of those allegations as they apply to any other individual, and therefore denies those allegations.  Mr.

9

Balwani admits that Theranos and Walgreens entered into a contract in July 2010. That contract is a document, which speaks for itself.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 23.

24.     Balwani and Holmes also made similar statements to Grocery A. They told Grocery A's then-CEO that Theranos had successfully miniaturized the conventional laboratory. Balwani also was present when Holmes told Grocery A's then-CEO that Theranos' analyzers were being deployed in the battlefield. Based on these representations, in September 2010, Grocery A contracted with Theranos to offer Theranos patient testing in Grocery A stores.

ANSWER:  Mr. Balwani denies the allegations of the first sentence of Paragraph 24 as they apply to him, and lacks knowledge or information sufficient to form a belief as to the truth of those allegations as they apply to any other individual, and therefore denies those allegations.  Mr. Balwani admits that he believed then and believes today that Theranos had invented technology that had the capacity to perform conventional laboratory functions, and further admits that communicated this belief to the then-CEO of Safeway.  Except as specifically admitted, Mr. Balwani denies the allegations in the second sentence of Paragraph 24 as they apply to him, and lacks knowledge or information sufficient to form a belief as to the truth of those allegations as they apply to any other individual, and therefore denies those allegations.  Mr. Balwani denies the allegations of the third sentence of Paragraph 24.  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the fourth sentence of Paragraph 24, and therefore denies those allegations.

**C.     In 2013, On the Eve of the Pharmacy A Launch, Theranos Began Modifying Commercially-Available Analyzers and Running Misleading Demonstrations**

25.     Between 2010 and 2013, Theranos continued to work on developing its miniLab with an eye towards launching its services in Pharmacy A and Grocery A stores.

ANSWER:  Mr. Balwani admits that between 2010 and 2013, Theranos continued to work on developing and improving its technology, including the TSPU and continued to work on

DAVIS WRIGHT TREMAINE LLP

developing its relationship with Walgreens and Safeway.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 25.

26.     In 2011, Pharmacy A executives raised concerns it had with Theranos' regulatory strategy, and told Balwani and Holmes that Theranos might need to obtain FDA approval for its miniLab and certify each of its stores as a laboratory in order for the analyzers to be used in Pharmacy A stores.

ANSWER:  Mr. Balwani admits that Theranos and Walgreens executives discussed whether individual wellness centers would need to obtain regulatory approval to operate TSPUs at such centers, among other topics.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 26.

27.     Based on these concerns, in 2012, Theranos and Pharmacy A agreed to modify their original contract to reflect a roll-out of Theranos' service in two phases. In the first phase, before Theranos received regulatory approvals for its analyzers, patient samples would be transported from Pharmacy A stores to centralized laboratories operated by Theranos and tested on Theranos' miniLab there. Theranos opened and operated two centralized laboratories to test patient samples collected from Pharmacy A stores. In the second phase, after Theranos had received the necessary regulatory approvals, Theranos' retail offering at Pharmacy A would be performed on miniLabs placed in Pharmacy A stores.

ANSWER:  Mr. Balwani admits that Theranos and Walgreens agreed to a two-phase roll-out of Theranos' services, wherein Phase One involved testing of patient samples in centralized laboratories and Phase Two involved placement of analyzers in Walgreens locations with any necessary regulatory approval.  Mr. Balwani further admits that Theranos opened and operated two centralized laboratories.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 27.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

28.     But as September 2013 approached – the date for the launch of the first phase of the roll out of Theranos services in Pharmacy A stores – it became clear to Balwani and Holmes that the miniLab would not be ready. At the time, Theranos had not fully integrated other testing methods into the miniLab and had not completed the scientific verification steps needed to make any of its blood tests available on the miniLab for patient testing. As a result, Balwani and Holmes made the decision to use Theranos' earlier-generation TSPUs, which could only be used to perform immunochemistries, for patient testing.

ANSWER:  Mr. Balwani admits that prior to rolling out services with Walgreens, Theranos decided to begin validating assays on a third-generation version of the TSPU for its initial retail launch as it continued development of a fourth-generation version of the TSPU. Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 28.

29.     In order to offer a broader range of fingerstick tests at Pharmacy A, Balwani and Holmes asked Theranos' engineers in July 2013 to modify third-party analyzers from commercial manufacturers so they could analyze fingerstick samples. Theranos scientists spent the two months leading up to the retail launch preparing as many fingerstick tests as possible on the third-party analyzers, which could typically process only venous samples.

ANSWER:  Mr. Balwani admits that Theranos developed novel and proprietary modifications to high-throughput commercially available analyzers to enable those devices to process small-volume samples.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 29.

30.     Balwani and Holmes never told Pharmacy A and Grocery A about Theranos' technological challenges. For instance, in July and August 2013, Theranos coordinated technology demonstrations for various Pharmacy A executives in advance of the retail launch. Holmes, with Balwani's knowledge, instructed Theranos employees to place both earlier generation TSPUs and miniLabs in a demonstration room where Theranos collected fingerstick samples from Pharmacy A executives. Instead of using these machines to process the tests on these samples, and

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

unbeknownst to the Pharmacy A executives, Theranos used the modified third-party machines to process a portion of the tests.

ANSWER:  Mr. Balwani admits that Theranos gave technology demonstrations for various Walgreens executives in 2013, and that such demonstrations included TSPUs.  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 30, and he therefore denies those allegations.  Except as specifically admitted, Mr. Balwani denies the allegations in Paragraph 30.

31.    Based on Balwani's and Holmes' presentations, Pharmacy A executives understood that the blood from their demonstration samples would be tested on Theranos' miniLabs.  Balwani never told the executives that Theranos was actually testing some of their blood on modified third-party analyzers.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 31, and he therefore denies those allegations.  Mr. Balwani admits that Theranos did not disclose its proprietary modifications of third-party analyzers to third parties because of the company's business strategy to scrupulously protect these modifications as trade secrets.  Except as specifically admitted, Mr. Balwani denies the allegations in Paragraph 31.

32.    At the end of 2013, Pharmacy A agreed to accelerate a portion of a $100 million "innovation fee" to help Theranos broaden its roll-out of services to Pharmacy A stores.  Unbeknownst to Pharmacy A, Theranos was scaling its retail offering by relying on third-party analyzers.

ANSWER:  Mr. Balwani admits that Walgreens accelerated a portion of the parties' contractually-agreed innovation fee in late 2013.  Except as specifically admitted, Mr. Balwani, denies the allegations in Paragraph 32.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

33.     Balwani never told anyone at Pharmacy A that Theranos used third-party analyzers, including those that had been modified to test fingerstick blood. He also never told Pharmacy A that Theranos was using third-party analyzers to perform the majority of its testing. If Pharmacy A had known that Theranos was using third-party analyzers for a majority of its patient testing, it would not have accelerated the payment of the innovation fee.

ANSWER:  Mr. Balwani admits that Theranos did not disclose its proprietary modifications of third-party analyzers to third parties, because of the company's business strategy to scrupulously protect these modifications as trade secrets. Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 33.

34.     Balwani and Holmes also denied there were problems with Theranos' technology in discussions with Grocery A. For example, in response to a question about a rumor that Theranos was facing technological challenges with its proprietary analyzers, Balwani and Holmes assured Grocery A's General Counsel that there was no technological problem with the analyzers and that the TSPU was capable of performing 90 percent of the blood tests typically requested by doctors for their patients.

ANSWER:  Mr. Balwani denies the allegations of Paragraph 34 as they apply to him, and lacks knowledge or information sufficient to form a belief as to the truth of those allegations as they apply to any other individual, and therefore denies those allegations.

35.     Balwani also instructed Theranos' laboratory employees to use code names to refer to third-party analyzers in its laboratory information systems, ensuring that even other Theranos employees would not know that Theranos was using third-party analyzers to conduct a portion of its patient testing.

ANSWER:  Mr. Balwani admits that Theranos, as is common practice in business, used internal names to refer to modified third-party analyzers in its laboratory information system as part of the company's efforts to keep the company's trade secrets confidential.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 35.

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

36.     From its retail launch in September 2013 to the time it closed its clinical laboratories in 2016, Theranos never used its miniLab for patient testing in its clinical laboratory. Theranos conducted – at its height –12 tests using the earlier-generation TSPU, and processed about 50 to 60 tests using the modified third-party analyzers. Theranos processed the remaining 100-plus tests it offered at Pharmacy A using the same types of industry standard technology as other traditional laboratories, or sent tests out to third-party laboratories.

ANSWER:  Mr. Balwani admits that for clinical lab use Theranos validated approximately 12 assays on a version of its TSPU and approximately 60 assays using proprietary methods on its modified third-party analyzers, and that the company's business strategy was to scrupulously protect those modifications as trade secrets.  Mr. Balwani admits that Theranos used commercially available analyzers to process venous blood samples and other matrices (such as urine cultures) for tests not yet available on Theranos's proprietary technology.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 36.

**D.      Starting in September 2013, Theranos Began Publicly Touting Theranos' Proprietary Analyzers in Interviews with the Media, Notwithstanding Theranos' Use of Commercially-Available Analyzers for Patient Testing**

37.     From 2013 to 2014, Theranos and Holmes emerged into the spotlight by issuing a press release touting the launch of its retail offering with Pharmacy A and granting a number of media interviews for articles that Holmes later used to solicit investors. In September 2013, Theranos announced a partnership with Pharmacy A to offer a "new lab testing service through Pharmacy A pharmacies nationwide." By going to a Pharmacy A store in Palo Alto, California, the first location to offer Theranos testing, consumers could "complete any clinician-directed lab tests with as little as a few drops of blood and results available in a matter of hours."

ANSWER:  Mr. Balwani admits that Theranos issued press releases and that Theranos representatives spoke with news outlets relating to its relationship with Walgreens.  Mr. Balwani admits that the second and third sentences of Paragraph 37 purport to quote one such press release.

Those press releases are documents that speak for themselves.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 37.

38.     Around the same time, Holmes sat down with a reporter for the *Wall Street Journal* purportedly to discuss the state of Theranos' business. A *Wall Street Journal* article accompanying the Pharmacy A launch announcement stated:

> The secret that hundreds of employees are now refining involves devices that automate and miniaturize more than 1,000 laboratory tests, from routine blood work to advanced genetic analyses. Theranos' processes are faster, cheaper, and more accurate than the conventional methods and require only microscopic blood volumes, not vial after vial of the stuff.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 38, and he therefore denies those allegations.  Mr. Balwani admits that the second sentence of Paragraph 38 purports to quote an article from the *Wall Street Journal*.  That article is a document that speaks for itself.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 38.

39.     Additional articles written after interviews with Holmes continued to raise Theranos' public profile and tout its technological capabilities. An April 2014 *Wired* article stated that "[i]nstead of vials of blood – one for every test needed – Theranos requires only a pinprick and a drop of blood. With that they can perform hundreds of tests, from standard cholesterol checks to sophisticated genetic analyses."

ANSWER:  Mr. Balwani admits that various news outlets published articles about Theranos.  Mr. Balwani admits that the second sentence of Paragraph 39 purports to quote one such article.  That article is a document that speaks for itself.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 39.

40.     Similarly, a June 2014 *Fortune* article noted that "[Theranos] currently offers more than 200 – and is ramping up to offer more than 1,000 – of the most commonly ordered blood diagnostic tests, all without the need for a syringe." *Fortune* also distinguished Theranos from

16

DAVIS WRIGHT TREMAINE LLP

other blood testing companies because "Theranos [] does not buy any analyzers from third

parties." In contrast to the large traditional blood analyzers that occupied whole rooms, Theranos'

proprietary analyzers "look[ed] like large desktop computer towers."

ANSWER:  Mr. Balwani admits that various news outlets published articles about

Theranos.  Mr. Balwani admits that Paragraph 40 purports to quote one such article.  That article

is a document that speaks for itself.  Except as specifically admitted, Mr. Balwani denies the

allegations of Paragraph 40.

41.     Balwani knew, or was reckless in not knowing, that the *Fortune* article contained

misstatements about Theranos' technology. Nevertheless, Balwani discussed the *Fortune* article

with investors but failed to correct the misstatements, instead commenting that the article provided

a favorable boost to Theranos' public image.

ANSWER:  The first sentence in Paragraph 41 contains legal conclusions to which no

response is required.  To the extent is required, Mr. Balwani denies the allegations in the first

sentence of Paragraph 41. Mr. Balwani denies the allegations of the second sentence of Paragraph

41.

42.     Balwani did not correct the false or misleading statements in the articles that were

published between 2013 and 2015. In fact, in some instances, as Balwani knew, or was reckless in

not knowing, Theranos provided to potential investors some of the articles containing untrue or

misleading statements.

ANSWER:  Mr. Balwani denies the allegations of the first sentence of Paragraph 42.  The

second sentence of Paragraph 42 contains legal conclusions to which no response is required.  To

the extent a response is required, Mr. Balwani denies those allegations.

DAVIS WRIGHT TREMAINE LLP

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

**E.      Beginning in 2013, Balwani, Holmes, and Theranos Raised Over $700 Million from Investors**

43.      In late 2013, Theranos had approximately $30 million in cash and short-term securities, which would fund the company's operations for only a few months. As Balwani and Holmes knew, Theranos needed cash to continue spending money on research and development to advance the miniLab, which at that time was not ready for commercial use.

ANSWER:  Mr. Balwani admits that as of approximately December 2013, Theranos had approximately $37 million in cash and short-term securities.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 43.

44.      From late 2013 to 2015, Balwani, Holmes, and Theranos raised over $700 million from investors in two financing rounds. These investors believed – based on false and misleading statements by Balwani and Holmes – that Theranos had successfully developed a proprietary analyzer that could conduct the full range of laboratory testing from a small sample of blood.

ANSWER:  Mr. Balwani admits that between 2013 and 2015, highly sophisticated and experienced investors and business partners invested a total of more than $700 million in Theranos.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 44.

**1.      The Investor Solicitation Process Generally Included a Face-to-Face Meeting, a Technology Demonstration, and a Binder of Materials**

45.      After an introduction to Holmes, potential investors would typically meet face-to-face with Holmes, and at times, Balwani. During this meeting, which normally took place at Theranos' headquarters, Holmes described her vision for the company, including her motivation to develop a technology that could perform blood testing on small samples – spurred by her own fear of needles – and her larger desire to provide cheaper, faster, and more accurate laboratory testing so that diagnoses of serious conditions and diseases could take place sooner.

ANSWER:  Mr. Balwani admits that potential partners and investors typically met with Ms. Holmes, and that he also met with potential business partners and investors.  On information and belief, Mr. Balwani admits that Ms. Holmes discussed Theranos and its vision with potential

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

1    partners and investors.  Except as specifically admitted, Mr. Balwani denies the allegations of

2    Paragraph 45.

3

4         46.     This initial meeting was often followed by a purported demonstration of Theranos'

5    proprietary analyzers, the TSPU, and the miniLab. In several instances, potential investors would

6    be taken by Balwani and Holmes to a different room to view Theranos' desktop computer-like

7    analyzers. A phlebotomist would arrive to draw their blood through fingerstick, using a

8    nanotainer, a Theranos-developed collection device. Then the sample was either inserted into the

9    TSPU or taken away for processing. Based on what they saw, potential investors believed that

10   Theranos had tested their blood on either an earlier-generation TSPU or the miniLab. As Balwani

11   knew, however, Theranos often actually tested their blood on third-party analyzers, because

12   Theranos could not conduct all of the tests it offered prospective investors on its proprietary

13   analyzers.

14        ANSWER:  Mr. Balwani admits that on some occasions potential partners and investors

15   requested or were invited for demonstrations, which at times included the method for taking

16   fingerstick samples with a proprietary small-volume capillary sample collection device called the

17   Capillary Tube Nanotainer.  Mr. Balwani further admits that blood samples were tested in various

18   ways at Theranos, but never as part of an effort to mislead anyone.  Mr. Balwani lacks knowledge

19   or information sufficient to form a belief as to the truth of the allegations in the fifth sentence of

20   Paragraph 46, and he therefore denies those allegations.  Except as specifically admitted, Mr.

21   Balwani denies the allegations of Paragraph 46.

22

23        47.     As Balwani knew, or was reckless in not knowing, Theranos also sent investors a

24   binder of background materials, which Holmes instructed employees to compile. In addition to

25   incorporation documents and shareholder agreements, the typical investor binder included (1) a

26   cover letter drafted and signed by Holmes; (2) a company overview slide deck presentation; (3)

27   reports of clinical trials work Theranos performed with its pharmaceutical companies;(4) financial

28   projections; and (5) articles and profiles about Theranos, including the 2013 and 2014 articles

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

from The *Wall Street Journal*, *Wired*, and *Fortune* that were written after Holmes provided them with interviews. These materials were important to investors in considering whether to invest in Theranos.

ANSWER:  The first sentence of Paragraph 47 contains legal conclusions to which no response is required.  To the extent an answer is required, Mr. Balwani admits that certain investors received packets of information that were not compiled by Mr. Balwani.  Except as specifically admitted, Mr. Balwani denies the allegations in the first and second sentences of Paragraph 47.  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 47, and he therefore denies those allegations.  Except as specifically admitted, Mr. Balwani denies the remaining allegations of Paragraph 47.

### 2. Balwani and Holmes Made a Series of False or Misleading Statements to Investors That Confirmed the Company's Public Narrative

48.    Balwani and Holmes made statements to investors about the status of Theranos' technology, historical contracts, commercial relationships, regulatory strategy, and financial performance that were consistent with the public image they were promoting of Theranos as a company that was revolutionizing the diagnostics industry.

ANSWER:  Mr. Balwani admits he made statements to investors on the topics identified in Paragraph 48.  Mr. Balwani further admits that he is aware that Ms. Holmes made statements on similar topics.  Mr. Balwani denies that the allegations of Paragraph 48 fully or accurately describe all such statements made by Mr. Balwani or made by Ms. Holmes with Mr. Balwani's knowledge.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 48.

### a. Balwani and Holmes Represented That Theranos' Proprietary Analyzer Was Capable of Conducting the Full Range of Testing When It Could Not

49.    Balwani and Holmes represented to investors that Theranos' miniLab was capable of processing a full range of laboratory tests. For instance, they told one investor that Theranos'

DAVIS WRIGHT TREMAINE LLP

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

proprietary analyzer could process over 1,000 Current Procedural Terminology ("CPT") codes and that Theranos had developed a technological solution for an additional 300 CPT codes. In 2014, Balwani told an investor that Theranos had between 150 and 200 fingerstick tests operating in its clinical lab.

ANSWER:  Mr. Balwani denies the allegations in Paragraph 49 as they apply to him; as they apply to any other individual, Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and he therefore denies those allegations.

50.    Theranos' company overview presentation, which Balwani sent to a potential investor, also echoed these same statements. Under a slide titled "Same Tests, A Whole New approach" and featuring a picture of a fingerprick and Theranos collection device, the presentation included the statement "Theranos runs any test available in central laboratories, and processes all sample types."

ANSWER:  Mr. Balwani admits that Paragraph 50 purports to quote a document sent to a potential investor.  That document speaks for itself.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 50.

51.    But Theranos' analyzers never performed comprehensive testing or processed 1,000 CPT codes, nor did Theranos ever offer between 150 and 200 fingerstick tests in its clinical lab. In fact, as Balwani knew, or was reckless in not knowing, Theranos' clinical lab used the TSPU only to perform 12 of the tests offered to patients.

ANSWER:  Mr. Balwani admits that in the clinical lab setting the TSPU did not process 1000 CPT codes and did not perform between 150-200 fingerstick tests.  The second sentence in Paragraph 51 contains legal conclusions to which no response is required.  Except as specifically admitted, Mr. Balwani denies the allegations in Paragraph 51.

52.    In addition to not disclosing the use of third-party analyzers to conduct the demonstrations, Balwani's and Holmes' actions made it appear as if Theranos' proprietary

DAVIS WRIGHT TREMAINE LLP

analyzer had more extensive capabilities than it actually did. When potential investors tried out Theranos' services by bringing a physician's laboratory requisition to a Pharmacy A store, Holmes, with Balwani's knowledge, instructed Theranos employees to remove certain tests from the order if Theranos was unable to perform those tests using a fingerstick collection.

ANSWER:  Mr. Balwani denies the allegations of Paragraph 52.

53.     This conduct led investors to believe that Theranos' proprietary analyzers were broadly in use by Theranos and that they produced results on a broader range of tests than they actually did. Investors would not have invested had they known Theranos' promises about its ability to run a broad range of tests were untrue and that the TSPU was being used to run only a limited number of tests in its lab. When presenting to investors, Balwani knew, or was reckless in not knowing, that the miniLab was not presently capable of processing a full range of laboratory tests.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 53, and he therefore denies those allegations.  The third sentence in Paragraph 53 contains legal conclusions to which no response is required.  To the extent a response is required, Mr. Balwani denies the allegations in the third sentence of paragraph 53, and specifically denies the SEC's characterization of the "miniLab."

54.     Balwani's statements about the capabilities of Theranos' proprietary analyzer were important to potential investors because the technology was a basis of their investments.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 54, and he therefore denies those allegations.

     **b.**    **Balwani and Holmes Stated That Theranos Manufactured All of Its Own Analyzers When It Actually Used Third-Party Analyzers to Run the Majority of Its Tests**

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

55.     Balwani and Holmes also represented to investors that Theranos manufactured all of its own analyzers, when Theranos had in fact only manufactured its own TSPUs. For instance, Balwani and Holmes told one investor that Theranos used its own analyzer equipment and did not buy analyzer equipment from third parties. Balwani and Holmes explained to another investor that 100 percent of Theranos' analyzers were manufactured in Theranos' facility in Newark, California.

ANSWER:  Mr. Balwani admits that Theranos manufactured 100 percent of its TSPUs, among other devices.  Except as specifically admitted, Mr. Balwani denies the allegations in Paragraph 55 as they apply to him; as they apply to any other individual, Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and he therefore denies those allegations.

56.     The company overview presentation, which Balwani provided to at least one investor, also showed pictures of the TSPU and miniLab under the heading "Theranos Systems," but excluded pictures of the third-party analyzers Theranos was using.

ANSWER:  Mr. Balwani admits that Paragraph 56 purports to quote a document sent to a potential investor.  That document speaks for itself.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 56.

57.     Finally, the *Fortune* article – which Balwani received and discussed with an investor – stated that "Theranos [] does not buy any analyzers from third parties."

ANSWER:  Mr. Balwani admits that Paragraph 57 purports to quote a news article.  That article speaks for itself.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 57.

58.     These statements gave potential investors the impression that Theranos was only using its own TSPUs and miniLabs for patient testing.

DAVIS WRIGHT TREMAINE LLP

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 54, and he therefore denies those allegations.

59.    As Balwani knew, or was reckless in not knowing, statements that Theranos manufactured all of its analyzers were false or misleading in light of Theranos' broad use of third-party analyzers. Theranos conducted the majority of its testing using third-party analyzers.

ANSWER:  The first sentence of Paragraph 59 contains legal conclusions to which no response is required.  To the extent a response is required, Mr. Balwani denies the allegations of Paragraph 59.  Mr. Balwani admits that there were periods of time when more than 50 percent of Theranos' testing was conducted on third-party devices.

60.    Theranos' capability to run the full range of laboratory testing on its proprietary analyzer was a key competitive advantage potential investors considered when deciding whether to invest in the company.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 60, and he therefore denies those allegations.

### c.    Balwani and Holmes Made False or Misleading Statements About Theranos' Historical Contracts with the DOD

61.    Balwani and Holmes also made false or misleading statements concerning Theranos' historical business contracts with the DOD. For instance, Balwani provided a presentation to a potential investor that listed the DOD as a "[k]ey deployment" for Theranos.

ANSWER:  Mr. Balwani denies the allegations of the first sentence of Paragraph 61 as they apply to him; as they apply to any other individual, Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and he therefore denies those allegations.  Mr. Balwani admits that the second sentence of Paragraph 61 purports to quote a document sent to a potential investor.  That document speaks for itself.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 61.

DAVIS WRIGHT TREMAINE LLP

1

2       62.     Balwani and Holmes also made other statements that gave potential investors the

3 impression that these historical relationships were meaningful. Balwani and Holmes told multiple

4 investors that Theranos' technology had been deployed by the DOD in the battlefield and in

5 Afghanistan. They also told investors that the DOD had deployed Theranos' miniLab on medevac

6 helicopters.

7      <u>ANSWER:</u>  Mr. Balwani lacks knowledge or information sufficient to form a belief as to

8 the truth of the allegations of the first sentence of Paragraph 62, and he therefore denies those

9 allegations.  Mr. Balwani denies the allegations of the second and third sentences of Paragraph 62

10 as they apply to him; as they apply to any other individual, Mr. Balwani lacks knowledge or

11 information sufficient to form a belief as to the truth of those allegations, and he therefore denies

12 those allegations.

13

14       63.     Balwani told one potential investor in late 2013 that 75 percent of Theranos'

15 current revenues were from the military. Balwani told another potential investor in late 2014 that

16 the company had long-dated contracts with the DOD that would provide future revenue to

17 Theranos.

18      <u>ANSWER:</u>  Mr. Balwani denies the allegations of Paragraph 62.

19

20       64.     Balwani knew, or was reckless in not knowing, that these statements were false and

21 misleading. While Theranos' technology was used in a DOD burn study, it was never deployed by

22 the DOD in the battlefield, in Afghanistan, or on medevac helicopters. From 2011 to 2014,

23 Theranos had discussions with multiple divisions of the DOD. However, Theranos generated only

24 approximately $300,000 from three DOD contracts.

25      <u>ANSWER:</u>  The first sentence in Paragraph 64 contains legal conclusions to which no

26 response is required.  To the extent a response is required, Mr. Balwani denies the allegations of

27 the first sentence of Paragraph 64.  Mr. Balwani admits the allegations of the second, third, and

28 fourth sentences of Paragraph 64.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

65.     Balwani's statements about Theranos' history with the DOD were important to potential investors because these relationships lent legitimacy to Theranos' business and its proprietary analyzer.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 65, and he therefore denies those allegations.

### d.    Balwani and Holmes Told Investors That Theranos' Relationships with Pharmacy A and Grocery A Were Thriving When They Were Stalled

66.     During meetings and in investor binders, Balwani and Holmes described Theranos' thriving relationships with Pharmacy A and Grocery A. Much of the company overview presentation was dedicated to Theranos' relationship with Pharmacy A, showing pictures of the patient service centers where patients would get their fingers pricked, and a map of the number of Pharmacy A stores across the country that would soon be offering Theranos' blood testing. Notwithstanding that Balwani managed the Pharmacy A relationship, Balwani represented to numerous investors in late 2014 that Theranos was expected to roll out its retail services to hundreds of Pharmacy A stores in 2015. This information was also included in financial projections that Balwani drafted for investors that were based on the assumption that Theranos would be rolling out to 800 or 900 stores by year-end 2015.

ANSWER:  Mr. Balwani admits that he informed potential partners and investors of Theranos' relationship with Walgreens and Safeway, and on information and belief admits that Ms. Holmes did the same.  Mr. Balwani denies that the allegations of the second sentence of Paragraph 66 fully or accurately describe the referenced presentation, which speaks for itself.  Mr. Balwani further admits that he provided various investors, potential investors, and business partners with a financial modeling tool that contained market-based assumptions, and that he invited many such investors and potential investors to assist Theranos with developing the financial modeling tool.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 66.

1

2         67.     However, by late 2014, while Theranos was raising the bulk of the over $700

3   million it raised during the relevant time period, Balwani was aware that Theranos' retail roll out

4   with Pharmacy A was stalled due to, among other issues, some concerns Pharmacy A executives

5   had with regard to Theranos' performance.

6         ANSWER:  Mr. Balwani denies the allegations of Paragraph 67.

7

8         68.     In August 2014, a senior Pharmacy A executive told Balwani that patient traffic

9   and fingerstick draw percentages would need to increase in order for the executive to convince

10  Pharmacy A management to roll out Theranos services to more stores. At a partnership meeting

11  later that month, which Balwani attended, Theranos and Pharmacy A discussed reducing the

12  number of Pharmacy A stores that Theranos services would be rolled out to in 2015 from 500

13  stores to 200.

14        ANSWER:  Mr. Balwani denies that the first sentence of Paragraph 68 fully or accurately

15  describes an email from a Walgreens executive, which speaks for itself.  Mr. Balwani denies that

16  the second sentence of Paragraph 68 fully or accurately characterizes the referenced meeting or the

17  ongoing discussions between Theranos and Walgreens.

18

19        69.     In December 2014, Balwani met with Pharmacy A executives to discuss potentially

20  modifying the parties' relationship to a landlord and tenant model, whereby Theranos would rent

21  space in Pharmacy A stores. Balwani did not share any of these developments with investors.

22  Balwani knew, or was reckless in not knowing, that Theranos would not be expanding into

23  Pharmacy A as quickly as he represented it would.

24        ANSWER:  Mr. Balwani admits that he met with executives of Walgreens to negotiate a

25  potential landlord-tenant model, admits that he believed that an amended contract incorporating

26  such model would be in the long term interests of Theranos and its investors, and denies any

27  allegation or suggestion that he was required to share the details of those confidential ongoing

28  negotiations with potential partners or investors.  The third sentence in Paragraph 69 contains legal

DAVIS WRIGHT TREMAINE LLP

conclusions to which no response is required.  To the extent a response is required, except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 69.

70.     Balwani also told potential investors in late 2014 that Theranos services would be rolled out in more than 100 Grocery A stores in January 2015. But the relationship with Grocery A had already begun to stall in 2013, during which the parties had started discussing the possibility of modifying the contract so that Theranos would rent space in individual supermarkets. The parties were still engaged in these discussions in 2014.

ANSWER:  Mr. Balwani admits that Theranos and Safeway were engaged in discussions in 2014.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 70.

71.     By August 2014, Grocery A and Theranos ceased to be in communication with one another. Nevertheless, when meeting with investors in the fall of 2014, Balwani continued to discuss Theranos' relationship with Grocery A to investors. Balwani knew, or was reckless in not knowing, that his statements about Theranos' relationship with Grocery A were false or misleading.

ANSWER:  Mr. Balwani denies the allegations of the first two sentences of Paragraph 71. The third sentence in Paragraph 71 contains legal conclusions to which no response is required. To the extent a response is required, Mr. Balwani denies those allegations.

72.     The statements made by Balwani about the status of the Pharmacy A and Grocery A relationships were important to investors because these contracts gave potential investors confidence that Theranos' technologies were commercially ready. Pharmacy A and Grocery A were also the major drivers of future revenues for the company. In reality, Balwani and Holmes were attempting to renegotiate Theranos' agreements with these retail businesses in light of the delays in rolling out.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 72, and he therefore denies those

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

allegations.  Mr. Balwani admits that Theranos' agreements with Walgreens and Safeway were anticipated to be significant sources of future revenue for the company.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 72.

e.   **Balwani and Holmes Claimed That Theranos Was Not Required to Seek FDA Approval Despite Repeatedly Being Told That Approval Was Necessary for Its Analyzers and Tests**

73.   When speaking to potential investors in late 2013 through 2015, Balwani and Holmes consistently stated that Theranos did not need to obtain approval from the FDA for its miniLab and tests, and instead said that Theranos was applying for FDA approval voluntarily. For instance, Balwani told a potential investor that approval was not required for the miniLab because Theranos was not selling its devices to other companies.

ANSWER:  To the extent the allegations in Paragraph 73 apply to him, Mr. Balwani admits that he believed that Theranos did not need approval from the FDA to run TSPUs in its clinical lab, and further admits that Theranos applied for FDA approval or clearance voluntarily. To the extent the allegations in Paragraph 73 apply to any other individual, Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and he therefore denies those allegations.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 73.

74.   Balwani and Holmes represented to business partners and investors that FDA approval was not necessary because they believed that Theranos' tests were laboratory developed tests ("LDTs"), or tests developed and used inside a clinical laboratory, over which the FDA had historically exercised its enforcement discretion to not require FDA clearance. However, Balwani and Holmes were told by multiple parties, including Pharmacy A, that the FDA might reject this regulatory strategy because Theranos' miniLab had not previously obtained approval from the FDA.

ANSWER:  As the allegations in Paragraph 74 apply to him, Mr. Balwani admits that he believed and had a firm basis to believe that FDA approval or clearance was not required for

DAVIS WRIGHT TREMAINE LLP

Theranos to use LDTs in clinical laboratories, and that he discussed this issue with business partners and investors.  Mr. Balwani further admits that he is aware that business partners and investors knew the FDA could take a different position.  As the allegations in Paragraph 74 apply to any other individual, Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and he therefore denies those allegations.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 74.

75.     By the time of Theranos' financing round in 2014, FDA representatives told Balwani and Holmes that clearance or approval would be necessary for Theranos' analyzer and tests. In late 2013 and throughout 2014, FDA representatives met with Balwani and Holmes, and sent letters that Balwani received, stating that they did not believe Theranos was offering LDTs, and that even if Theranos was not selling its miniLab or tests, FDA clearance or approval was necessary. Based on these communications, Balwani and Holmes agreed to submit all components of Theranos' testing technology to the FDA for clearance or approval. However, Balwani and Holmes continued to raise additional funds while telling potential investors Theranos was seeking FDA approval voluntarily. But Balwani knew, or was reckless in not knowing, that FDA approval was necessary for Theranos' analyzer and tests.

ANSWER:  Mr. Balwani admits that he is aware of communications with FDA representatives in which individual FDA employees said that they thought FDA clearance or approval would be necessary for Theranos to use its proprietary testing system under certain conditions, and that there are written communications on this issue, which speak for themselves. Mr. Balwani further admits that to satisfy any concerns such FDA employees might have had, and in an effort to ensure that Theranos engaged in best practices, among other reasons, Theranos voluntarily sought FDA approvals.  Other than as specifically admitted, Mr. Balwani denies the allegations of paragraph 75.

DAVIS WRIGHT TREMAINE LLP

76.     Balwani's statements that Theranos did not need FDA approval or clearance were important to investors because approval or clearance would have been an obstacle in the company's path to realizing full commercialization.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 76, and he therefore denies those allegations.

          **f.**      **Balwani and Holmes Told Investors That Theranos Had Generated or Would Generate Over $100 Million in Revenues in 2014 and That It Was On Track to Make $1 Billion in Revenues in 2015, But This Information Had No Basis**

77.     Balwani drafted the financial information that Theranos included in the investor binders that projected that Theranos would generate over $100 million in revenues and break even in 2014. These documents also represented that Theranos expected to generate approximately $1 billion in revenues in 2015. Balwani told potential investors in October 2014 that he had confidence in the year-end 2014 projections, in part because they were already more than nine months into the calendar year.

ANSWER:  Mr. Balwani admits that he provided potential investors with a financial modeling tool that contained market assumptions including that Theranos could generate substantial revenue going forward, and that he invited many such investors and potential investors to assist Theranos with developing the financial modeling tool.  Those modeling tools are documents that speak for themselves.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 77.

78.     The projections further indicated that Theranos would obtain revenue from several lines of business, including retail pharmacies (Pharmacy A and Grocery A), samples collected from physicians' offices, samples collected from hospitals, and pharmaceutical services.

ANSWER:  Mr. Balwani admits that he provided investors and potential investors with a financial modeling tool that contained market assumptions, and that he invited many such investors and potential investors to assist Theranos with developing the financial modeling tool.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

Various versions of the financial modeling tool included different assumptions.  Some included assumptions that Theranos could generate revenue going forward from retail pharmacies, samples collected from physicians' offices, samples collected from hospitals, and pharmaceutical services. Those modeling tools are documents that speak for themselves.  Except as specifically admitted, Mr. Balwani denies the allegations of paragraph 78.

79.     Some of Theranos' projections, which Balwani provided to potential investors in October 2014, stated Theranos would earn $40 million from pharmaceutical services, $46 million from lab services provided to hospitals, and $9 million from lab services provided to physicians' offices, all by the end of 2014. In reality, Theranos had no revenues from any of those lines of business. And Balwani knew that Theranos was not on track to break even in 2014.

ANSWER:  Mr. Balwani admits that he provided investors and potential investors with a financial modeling tool that contained market assumptions, and that he invited many such investors and potential investors to assist Theranos with developing the financial modeling tool. Various versions of the financial modeling tool included different assumptions.  Those modeling tools are documents that speak for themselves.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 79.

80.     Theranos' actual financial performance bore no resemblance to the financial information Balwani shared with investors. Theranos recorded little more than $100,000 in revenue in 2014 and was nowhere near generating $100 million in revenue by the end of 2014.

ANSWER:  Mr. Balwani denies that he made misrepresentations to investors regarding the company's revenue.  Mr. Balwani lacks knowledge or information sufficient to form a belief as to Theranos' actual 2014 revenues, and he therefore denies those allegations.  Except as specifically admitted, Mr. Balwani denies the allegations of Paragraph 80.

81.     Balwani knew, or was reckless in not knowing, the 2014 revenue projection was baseless. In October 2014, the same month he was providing year-end projected revenue figures

DAVIS WRIGHT TREMAINE LLP

between $120 and $140 million to potential investors, Balwani told Theranos' potential insurers that Theranos was operating at an $8 million to $9 million monthly net loss.

ANSWER:  The first sentence in Paragraph 81 contains legal conclusions to which no response is required.  To the extent a response is required, Mr. Balwani denies those allegations. Mr. Balwani denies the allegations in the second sentence of Paragraph 81.

82.   Balwani also knew, or was reckless in not knowing, that Theranos was using different projections with the third-party valuation firm that Theranos had retained to value the company's common stock. The valuation firm prepared a report dated October 2014, which Balwani received, that analyzed the value of Theranos' common stock based on an assumption that it would recognize approximately $1 million in revenue for 2014 and $110 million for 2015.

ANSWER:  The first sentence in Paragraph 82 contains legal conclusions to which no response is required.  To the extent a response is required, Mr. Balwani denies the allegations in the first sentence of Paragraph 82. Mr. Balwani admits that Theranos used a third-party valuation firm, and that Theranos provided that firm various documents, which speak for themselves.  Mr. Balwani further admits that the third-party valuation firm prepared a report, which is a document that speaks for itself.  Except as specifically admitted, Mr. Balwani denies the allegations in Paragraph 82.

83.   By late 2014, Balwani knew Theranos' roll-outs in Pharmacy A and Grocery A stores were not going as planned. Balwani also knew the company had made limited progress in advancing the other lines of business reflected in the projections. Balwani knew that Theranos had no active discussions with pharmaceutical companies, had partnered with only a handful of hospitals, and had no knowledge of any contracts between Theranos and physicians' offices. Balwani thus also knew, or was reckless in not knowing, that the 2015 $1 billion revenue projections were unreasonable.

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

ANSWER:  Mr. Balwani admits that Theranos and Walgreens had agreed to certain adjustments to their relationship, and that Theranos and Safeway had done the same.  Except as specifically admitted, Mr. Balwani denies the allegations in Paragraph 83.

84.     These financial projections were important to investors because they gave the impression that Theranos had already secured contracts to deliver these revenues and that the company's business was growing rapidly.

ANSWER:  Mr. Balwani lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, and he therefore denies those allegations.

**F.     Balwani Left Theranos in 2016**

85.     In May 2016, after regulatory inspections of Theranos' clinical laboratories and its manufacturing facility, Balwani left Theranos.

ANSWER:  Mr. Balwani admits that there were regulatory inspections of Theranos' clinical laboratories at various times including in 2015.  Mr. Balwani admits he left Theranos in May 2016.  Except as specifically admitted, Mr. Balwani denies the allegations of paragraph 85.

86.     In 2017, Balwani, Holmes, and Theranos settled a lawsuit with an investor that alleged they had committed securities fraud.

ANSWER:  The Order of the Delaware Court of Chancery entered on May 5, 2017 in the case of *Partner Investments, L.P., et al, v. Theranos, Inc., et al,* Case No. 12816-VCL, is a document, which speaks for itself.

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

87.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 86.

ANSWER:  Paragraph 87 requires no additional answer.

DAVIS WRIGHT TREMAINE LLP

88.     By engaging in the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

(a)     Employed devices, schemes, or artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

ANSWER:  The allegations of Paragraph 88 are legal conclusions to which no answer is required.  To the extent an answer is required, Mr. Balwani denies the allegations of Paragraph 88.

89.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

ANSWER:  The allegations of Paragraph 89 are legal conclusions to which no answer is required.  To the extent an answer is required, Mr. Balwani denies the allegations of Paragraph 89.

**SECOND CLAIM FOR RELIEF**

*Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

90.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 86.

ANSWER:  Paragraph 90 requires no additional answer.

DAVIS WRIGHT TREMAINE LLP

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

91.     By engaging in the conduct described above, Defendant directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

    (a)    with scienter, employed devices, schemes, or artifices to defraud;

    (b)    obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (c)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

ANSWER:  The allegations of Paragraph 91 are legal conclusions to which no answer is required.  To the extent an answer is required, Mr. Balwani denies the allegations of Paragraph 91.

92.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

ANSWER:  The allegations of Paragraph 92 are legal conclusions to which no answer is required.  To the extent an answer is required, Mr. Balwani denies the allegations of Paragraph 92.

## THIRD CLAIM FOR RELIEF

*Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

93.     The Commission realleges and incorporates by reference paragraphs 1 through 86.

ANSWER:  Paragraph 93 requires no additional answer.

94.     By engaging in the conduct described above, Holmes or Theranos, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    (a)    Employed devices, schemes, or artifices to defraud;

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF

DAVIS WRIGHT TREMAINE LLP

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

<u>ANSWER:</u>  The allegations of Paragraph 94 are legal conclusions to which no answer is required.  To the extent an answer is required, Mr. Balwani denies the allegations of Paragraph 94.

95.     By engaging in the acts and conduct alleged above, Defendant knowingly or recklessly provided substantial assistance to Holmes' or Theranos' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate these provisions.

<u>ANSWER:</u>  The allegations of Paragraph 95 are legal conclusions to which no answer is required.  To the extent an answer is required, Mr. Balwani denies the allegations of Paragraph 95.

**FOURTH CLAIM FOR RELIEF**

*Aiding and Abetting Violations of Section 17(a) of the Securities Act*

96.     The Commission realleges and incorporates by reference paragraphs 1 through 86.

<u>ANSWER:</u>  Paragraph 96 requires no additional answer.

97.     By engaging in the conduct described above, Holmes or Theranos directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

(a)     with scienter, employed devices, schemes, or artifices to defraud;

(b)     obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the

37

1    statements made, in light of the circumstances under which they were made,

2    not misleading; and

3         (c)    engaged in transactions, practices, or courses of business which operated or

4    would operate as a fraud or deceit upon purchasers.

5    <u>ANSWER</u>:  The allegations of Paragraph 97 are legal conclusions to which no answer is

6    required.  To the extent an answer is required, Mr. Balwani denies the allegations of Paragraph 97.

7

8    98.    By engaging in the acts and conduct alleged above, Defendant knowingly or

9    recklessly provided substantial assistance to Holmes' or Theranos' violations of Section 17(a) of

10   the Securities Act [15 U.S.C. §§ 77q(a)], and thereby aided and abetted such violations, and unless

11   restrained and enjoined, will continue to violate these provisions.

12   <u>ANSWER</u>:  The allegations of Paragraph 98 are legal conclusions to which no answer is

13   required.  To the extent an answer is required, Mr. Balwani denies the allegations of Paragraph 98.

14

15   **PRAYER FOR RELIEF**

16   The Prayer for Relief is legal conclusions to which no answer is required.  To the extent an

17   answer is required, Mr. Balwani denies that the Commission is entitled to any relief.

18

19   **AFFIRMATIVE DEFENSES**

20   Mr. Balwani alleges the following affirmative defenses.  By alleging these affirmative

21   defenses, Mr. Balwani does not concede that he bears the burden of proof or persuasion on any of

22   these issues.  Mr. Balwani reserves the right to supplement, amend, or modify these affirmative

23   defenses based on information obtained during the course of this litigation.

24   **FIRST AFFIRMATIVE DEFENSE**

25   Plaintiff's claims fail in whole or in part because they do not state a cause of action upon

26   which relief can be granted.

27   **SECOND AFFIRMATIVE DEFENSE**

28   Plaintiff fails to allege fraud with specificity.

DAVIS WRIGHT TREMAINE LLP

38

DAVIS WRIGHT TREMAINE LLP

### THIRD AFFIRMATIVE DEFENSE

Plaintiff fails to plead scienter with specificity.

### FOURTH AFFIRMATIVE DEFENSE

Mr. Balwani acted at all times in good faith and without knowledge of, reckless disregard for, or intent to engage in any supposed wrongdoing.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by Mr. Balwani's good faith reliance on the advice of experts, advisors, and consultants.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in part by the relevant statutes of limitation.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by investors, potential investors, and business partners' independent knowledge of facts relating to the topics alleged in the Complaint.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part because any damages alleged were caused by persons, conditions, or events beyond the control of Mr. Balwani.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims for equitable relief are barred because the alleged conduct occurred wholly in the past and is unlikely to be repeated.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

1    DATED this 20th day of April 2018.

2                                         Respectfully submitted,

3                                         DAVIS WRIGHT TREMAINE LLP

4

5                                         By:   s/ *Jeffrey B. Coopersmith*
                                          Jeffrey B. Coopersmith (CSB#252819)
6                                         1201 Third Avenue, Suite 2200
                                          Seattle, WA 98101
7                                         Telephone: (206) 757-8020
                                          Facsimile: (206) 757-7020
8                                         Email: jeffcoopersmith@dwt.com

9                                         Kelly M. Gorton (CSB#300978)
                                          505 Montgomery Street, Ste. 800
10                                        San Francisco, CA 94111
                                          Telephone: (415) 276-6500
11                                        Facsimile: (415) 276-6599
                                          Email: kellygorton@dwt.com
12

13                                        Attorneys for Defendant
                                          Ramesh Balwani
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANSWER TO COMPLAINT
Case No. 5:18-cv-01603-BLF