# EXHIBIT J

2005 WL 3636362 (N.D.Tex.) (Trial Motion, Memorandum and Affidavit)
United States District Court, N.D. Texas,
Dallas Division.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Mark KELLY, Chad Latvaaho, Martin S. Angel, and John R. Buck, Defendants.

Case No. 304 CV 2098-M.
November 9, 2005.

**Plaintiff Securities and Exchange Commission's Memorandum of
Points and Authorities In Opposition to Defendants' Motion to Stay**

TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1
PROCEDURAL BACKGROUND ..................................................................... 2
LEGAL ARGUMENT ................................................................................. 7
I. DEFENDANTS' STAY MOTION COMES TOO LATE IN THE LITIGATION ....................... 7
II. DEFENDANTS' FIFTH AMENDMENT RIGHTS DO NOT REQUIRE A STAY OF THE COMMISSION'S INSIDER TRADEING ACTION .................................................... 9
A. The Absence of Indictments Supports Denying the Stay Motion ............................ 10
B. Civil Enforcement Actions By Regulators Should Not Be Stayed ........................... 11
C. Defendants' Interviews Undermine Their Fifth Amendment Claims ......................... 13
III. THE PUBLIC INTEREST FAVORS REJECTING THE STAY MOTION .......................... 14
IV. THE COURT SHOULD REFUSE TO ISSUE A PROTECTIVE ORDER ........................... 16
CONCLUSIONS ....................................................................................... 17

TABLE OF AUTHORITIES
CASES
*Barrett v. Acevedo,* 169 F.3d 1155 (8th Cir. 1999) ........................................... 14
*Baxter v. Palmigiana,* 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976) ... 12
*Federal Savings & Loan Ins. Corp. v. Molinaro,* 889 F.2d 899 (9th Cir. 1989) . 10, 13
*Harrison v. U.S.,* 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968) ........ 13
*Hernandez v. Fincher,* 2005 U.S. Dist. LEXIS 7694 (N.D. Tex. April 29, 2005) ..................................................................................... 2, 10, 11
*Keating v. Office of Thrift Supervision,* 45 F.3d 322 (9th Cir. 1995) ................ 2, 11, 12
*S.E.C. v. Dresser Industries, Inc.,* 628 F.2d 1368 (D.C. Cir.), *cert. denied,* 449 U.S. 993, 101 S. Ct. 529, 66 L. Ed. 2d 289 (1980) ......................................... 10, 12
*S.E.C. v. First Financial Group of Texas, Inc.,* 659 F.2d 660 (5th Cir. 1981) ... 2, 12
*S.E.C. v. Grossman,* 121 F.R.D. 207 (S.D.N.Y. 1987) ................................... 12
*S.E.C. v. Horowitz & Ullman, P.C.,* 1982 W.L. 1576 (N.D. Ga. 1982)) .......... 12
*S.E.C. v. Musella,* 38 Fed. R. Serv. 2d 426 (S.D.N.Y. 1983) .......................... 12
*S.E.C. v. Zimmerman,* 854 F. Supp. 896 (N.D. Ga. 1993) .............................. 12
*Standard Sanitary Manufacturing Co. v. U.S.,* 226 U.S. 20, 33 S. Ct. 9, 57 L. Ed. 107 (1912) ..................................................................................... 11
*United States v. Kordel,* 397 U.S. 1, 90 S. Ct. 763, 25 L. Ed. 2d 1 (1970) ........ 11
STATUTES
15 U.S.C. § 78ff............................................................................... 15
15 U.S.C. § 78u-1(a)........................................................................ 15
15 U.S.C. § 78u-1(d)(3).................................................................... 15
OTHER AUTHORITIES

H.R. Rep. No. 355, 98th Cong. 1st Sess. (1983), *reprinted in* 1984 U.S. Code    2, 16
Cong. & Ad. News 2274 ...............................................................................

## INTRODUCTION

In February 2005, this Court set a jury trial date of April 10, 2006. The Court did so after defendants Mark Kelly, Martin S. Angel and John R. Buck (collectively, ""Defendants") failed to raise any scheduling issues arising from the possibility of criminal indictments. Supporting Declaration of John S. Yun (""Yun Declaration"), Exhibit 2 at „ 10. When it set the trial date, the Court plainly warned that it ""is only under truly extraordinary circumstances that the Court will reset the trial date." Scheduling Order, „ 14 (bolding provided) (Yun Declaration, Exhibit 3).

Yet now, despite their earlier acquiescence, Defendants seek to vacate the trial date, as well as further discovery and pretrial deadlines, by moving to stay this proceeding indefinitely. Because indictments were apparently threatened in December 2004, the proper time for this motion was back in January 2005 before discovery took place and the trial date was set. But rather than filing this motion earlier, Defendants waited until after they took significant discovery and until their depositions were noticed.

In playing the ""waiting game," Defendants apparently hoped to use this civil case to conduct the discovery that they could not take in any criminal proceeding. Defendants' tactical decision to complete *their* discovery before seeking a stay is inherently inequitable: After reaping the benefits of this civil litigation, Defendants cannot escape the corollary burdens of facing discovery and trial. Because Defendants voluntarily chose to pursue this litigation, this Court should make them live with their decision by refusing to stay this proceeding.

The Fifth Amendment concerns identified in Defendants' motion papers cannot justify a stay in any event. It is well-established that ""a defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." *Keating v. Office of Thrift Supervision,* 45 F.3d 322, 326 (9th Cir.1995) (holding that civil enforcement action should not be stayed while criminal action was pending). Additionally, concerns about invoking a Fifth Amendment privilege are ""not entitled to significant weight" when no indictments are pending. *Hernandez v. Fincher,* 2005 U.S. Dist. LEXIS 7694 at *6 (N.D. Tex. April 29, 2005) (denying stay motion in a civil case). That is especially true given Defendants' prior decision to give voluntary interviews during the Commission's investigation, rather than maintaining their silence.

While Defendants' Fifth Amendment concerns carry little weight, the Commission's and the public's interests favor the prompt resolution of this case. *S.E.C. v. First Financial Group of Texas, Inc.,* 659 F.2d 660, 666-67 (5th Cir. 1981) (upholding district court's refusal to stay a Commission action during the pendency of a grand jury investigation). Congress has given the Commission the task of maintaining investor confidence in the securities markets by vigorously pursuing those who profited by trading on material, nonpublic information. *See* H.R. Rep. No. 355, 98th Cong. 1st Sess. 7-8 (1983) (proposing Insider Trading Sanctions Act of 1984 (""ITSA") to restore investor confidence by creating treble civil penalties for insider trading), *reprinted in* 1984 U.S. Code Cong. & Ad. News 2274, 2280-81. The Commission fulfils that task by actively prosecuting insider trading cases such as this one. As a result, a stay of proceedings would undermine the Commission's role in maintaining public confidence and the public interest in a prompt resolution of insider trading cases. The Court should therefore deny Defendants' stay motion.

## PROCEDURAL BACKGROUND

The Securities and Exchange Commission (""Commission") filed this action against Mark Kelly (""Kelly"), Chad Latvaaho (""Latvaaho"), Martin S. Angel (""Angel") and John R. Buck (""Buck") on September 28, 2004. Yun Declaration, Exhibit 1. The Commission alleges that in 2002, Kelly was the chief financial officer of Auto One Finance (""Auto One"). *Id.,* „ 1. During early May 2002, Auto One instructed Kelly to participate in a due diligence session

by Citibank, FSB (""Citibank") relating to a contemplated acquisition of Auto One's parent, Golden State Bancorp
(""Golden State"). *Id.*

On May 9, 2002, Kelly allegedly told his long-time friend, Angel, that Golden State was being acquired. *Id.,* „ 13. Angel
then purchased 330 Golden State call option contracts that had an expiration date of the third Friday in June 2002.
*Id.,* „ 14. Angel also told Buck, who was a good friend of Kelly and Angel, about the acquisition. *Id.,* „ 15. Buck then
purchased 150 Golden State call option contracts and 2000 Golden State common stock shares for himself. *Id.* He also
purchased 34,000 Golden State common stock shares for investment accounts that he managed. *Id.*

Kelly also allegedly told his friend, Latvaaho, about the acquisition on May 9, 2002. *Id.,* „ 16. Latvaaho then purchased
100 Golden State call option contracts with a June 2002 expiration date. *Id.*

After Citibank announced the proposed acquisition of Golden State on May 21,2002, the price of Golden State's shares
rose eight percent the next day. *Id.,* „ 18. Angel sold his Golden State call option contracts for a net profit on $62,437.
*Id.* Buck sold his Golden State call option contracts and shares for a net profit of $49,076. *Id.* Buck also sold the Golden
State shares in the two accounts managed by him for a net profit of$106,601. *Id.* Latvaaho sold his Golden State call
option contracts for a net profit of $30,857. *Id.*

Prior to filing the Complaint, the Commission conducted an investigation into Angel's, Buck's and Latvaaho's purchases
of Golden State securities just before the Citibank acquisition. Angel and Buck provided unsworn, but recorded,
telephonic interviews to the staff attorneys for the Commission in May and October 2002. Declaration of Kevin M.
Gross (""Gross Declaration"), „„ 2-3 and Attachments 1 and 2. Kelly provided an unsworn interview in December 2003
at the offices of the United States Attorney in Dallas. *Id.,* „ 5. Subsequently, when the Commission asked to take their
sworn investigative testimony, Angel and Buck provided the Commission with a stipulation stating that they intended
to refuse to answer any investigative questions based upon their Fifth Amendment Privilege against self-incrimination.

The Commission settled its claims against Latvaaho shortly after filing the Complaint. In December 2004, Kelly's counsel
apparently met with the Office of the United States Attorney, and were informed that an indictment was possible. Gary A.
Udashen Affidavit. On January 4, 2005, counsel for the Commission and remaining defendants held their early meeting
by telephone to discuss disclosure and scheduling issues. Subsequently, on January 19, 2005, counsel submitted their
joint report to the Court. Yun Declaration, Exhibit 2. In the joint report, the parties recommended a jury trial date of
March 27, 2006 and a discovery cut-off of October 1, 2005. *Id.,* „„ 8, 10. No special scheduling issues or problems were
identified for the Court's consideration. *Id.,* „„ 15-17.

The Court then issued the Scheduling Order on February 18,2005. Yun Declaration, Exhibit 3. The Court set a trial
date of April 10, 2006, and directed that ""[a]ny potential conflicts which can now be contemplated must be called to the
attention of the Court in writing within ten (10) days of the date of this Order.'' *Id.,* „ 1 (bolding provided). The Court
also set a discovery cut-off of October 3, 2005, subject to the parties' extension upon prompt written notice to the Court.
*Id.,* „ 10. The Court furthermore provided this guidance regarding any changes to the Scheduling Order:

> This Order shall control the disposition of this case unless it is modified by the Court upon a showing
> of good cause and by leave of court. Fed. R. Civ. P. 16(b). It is only under truly extraordinary
> circumstances that the Court will reset the trial date. If such a request is made, it must be made in
> writing and in accordance with the United States District Court for the Northern District of Texas
> Civil Justice Expense and Delay Reduction Plan and Local Rule 40.1 (motions for continuance must
> be signed by the party as well as by the attorney of record).

*Id.,* „ 14 (bolding provided).

Defendants did not raise any issues regarding the Scheduling Order within the ten days specified by the Court. Instead, on February 25, 2005, Defendants initiated discovery by noticing the deposition of Latvaaho. Yun Declaration, Exhibit 4. On March 8, 2005, Kelly's counsel took Latvaaho's deposition by videotape.

Subsequently, on April 20,2005, Kelly served his first set of interrogatories upon the Commission. Those interrogatories asked the Commission to state whether it makes certain contentions regarding defendants' communications and Golden State purchases in May 2002 and to describe the basis for the Commission's contentions. Similarly, on June 21,2005, Angel served his first set of interrogatories on the Commission asking it to state all facts relating to his communications with Kelly and trading in Golden State securities. Because it had not received any documents from Kelly, Angel and Buck and had not taken those defendants' depositions, the Commission objected to Kelly's and Angel's contention interrogatories as being premature.

Meanwhile, on June 21, 2005, Kelly and Angel each served their first sets of document requests upon the Commission. On July 25, 2005, the Commission served its responses to those document requests and produced the non-privileged responsive documents. Yun Declaration, Exhibits 5 and 6.

Kelly and Angel each filed separate motions to compel answers to their first sets of contention interrogatories. On August 31, 2005, the Court conducted a consolidated hearing on those two motions. Yun Declaration, Exhibit 7. During that hearing, one of the issues was whether it was appropriate to require the Commission to provide answers now based upon the information gathered during the investigation and to provide supplemental answers after it deposed Defendants in the near future. Regarding that issue, Kelly and Angel never indicated that they would try to halt discovery of their clients after receiving the Commission's responses to their contention interrogatories. *Id.,* „„ 3-4. Indeed, the Court advised defense counsel that they should provide the Commission with deposition dates for their clients and, if necessary, grant a short extension of the discovery cut-off so that Defendants' depositions could be taken. *Id.,* „ 4.

At the end of the hearing, the Court issued an order directing the Commission to answer Kelly's and Angel's contention interrogatories by September 9, 2005. Yun Declaration, Exhibit 7. In compliance with that order, the Commission faxed its amended responses to Kelly's and Angel's first set of interrogatories on September 9, 2005. Yun Declaration, Exhibits 8 and 9. Having responded to the contention interrogatories, the Commission then noticed Kelly's, Angel's and Buck's depositions for the end of September 2005 in Fort Worth, Texas. Later, at defense counsel's request, the depositions were postponed to October 26 and 27,2005 and the discovery cut-off was extended to November 3, 2005. *Id.,* Exhibits 10 and 11.

On October 17, 2005, Kelly's counsel advised the Commission that he was moving to stay the entire case, including the depositions, and that Kelly would not be appearing for deposition the following week. Kelly's counsel also stated that he desired a stay until the United States Attorney either indicted his client or agreed to close the criminal investigation. *Id.,* „ 6. When the Commission asked Kelly's counsel about the discovery cut-off date, he indicated that defense counsel would probably agree to extend the deadline to the end of the year so that the Court would have time to decide the stay motion. *Id.*

On October 19, 2005, Kelly's counsel sent his motion to stay papers to the Commission by email. On October 20, 2005, Angel's counsel provided the Commission with his joinder papers, as well as his authorization to extend the discovery cut-off to the end of December 2005. Because Kelly's and Angel's counsel advised the Commission that they would not attend the depositions scheduled for October 26 and 27, 2005, the Commission sent a notice to the Court on October 21, 2005 advising it that the discovery cut-off had been extended to December 30, 2005. This Court then stayed all discovery pending its hearing on the motion on November 15, 2005.

*LEGAL ARGUMENT*

## I. *DEFENDANTS' STAY MOTION COMES TOO LATE IN THE LITIGATION.*

Kelly asserts that he was advised in November and December 2004 of a possible criminal indictment. Kelly Brief at 4. Defendants therefore knew about possible criminal charges nearly one month before the joint report was submitted to the Court on January 19,2005 and nearly two months before the issuance of the Scheduling Order on February 18, 2005. Yun Declaration, Exhibits 2 and 3.

Given their communications with the United States Attorney, Defendants could have filed this stay motion back in January 2005, before discovery began and any dates were set by the Court. Alternatively, Defendants could have advised the Court in the joint report that the United States Attorney's Office was threatening criminal action and that they desired to have the Court postpone Defendants' depositions and/or the civil trial. Furthermore, Defendants could have advised the Court when the Scheduling Order was entered that the trial date was problematic in light of potential indictments.

But Defendants did not employ any of those procedural remedies in January or February 2005. Instead, Defendants decided to push this civil litigation forward by initiating discovery. Kelly served a deposition notice for Latvaaho on February 25, 2005, and then took Latvaaho's deposition on March 8, 2005. Kelly also served the Commission with contention interrogatories in April 2005 and document requests in June 2005, while Angel served his contention interrogatories and documents requests in June 2005.

When the Commission objected to their contention interrogatories as being premature, Kelly and Angel filed motions to compel further answers, with the hearing eventually taking place on August 31, 2005. In compliance with the Court's order at that hearing, the Commission provided amended answers to Kelly's and Angel's interrogatory answers on September 9, 2005. Only after obtaining discovery from the Commission and facing the prospect of being deposed are Defendants raising, for the first time, the need to stay discovery in this case because of indictments that were threatened nearly a year ago.

But the year-old threat of criminal indictments cannot be the type of " "exceptional circumstance" required by the Scheduling Order to continue - much less indefinitely stay - the April 10, 2006 trial date. Yun Declaration, Exhibit 3 at ,, 14. Such threatened indictments did not even warrant mention by the Defendants in the joint report, much less stop Defendants from conducting significant discovery. Additionally, the potential indictments do not prevent Defendants from examining witnesses, submitting documentary evidence, or providing testimony at trial.

Rather than being *bona fide* ""exceptional circumstances," the long threatened indictments have become a ploy by Defendants to gain a tactical advantage. Having taken the discovery they desired, Defendants now wish to prevent the Commission from deposing them. And having used this civil proceeding to gather information about the Commission's evidence and legal theories, Defendants now wish to deprive the Commission of its day in court by staying the trial. [1]

Defendants' inconsistent approach to this litigation should preclude granting a stay. Such a stay is equitable in character. As a result, the Court may refuse to grant a stay if it determines that Defendants' acceptance of the benefits of this civil proceeding also requires them, in good conscience, to accept the burdens of discovery and trial. Furthermore, after using the Court's resources and tying up its trial calendar, Defendants do not deserve discretionary relief based upon a ""concern" that they could have raised in January 2005.

## II. DEFENDANTS' FIFTH AMENDMENT RIGHTS DO NOT REQUIRE A *STAY OF THE COMMISSION'S INSIDER TRADING ACTION.*

Besides coming too late in this litigation, Defendant's motion also fails to satisfy the legal standards for obtaining a stay. Defendants assert that a stay is necessary to protect their ability to assert their Fifth Amendment privilege against self-incrimination. As demonstrated below, however, Defendants' Fifth Amendment concerns should not receive significant weight by the Court in deciding whether to grant a stay.

### A. *The Absence Of Indictments Supports Denying The Stay Motion.*

Despite the absence of any criminal proceeding, Defendants contend that they should not have to choose between (i) waiving their right to silence in the civil action - and thereby incriminating themselves in a possible criminal proceeding - or (ii) maintaining their silence - and thereby risk having an adverse inference drawn against them by the civil fact finder. But Defendants' Fifth Amendment argument is severely undercut by the absence of any criminal proceeding against any of them. *E.g. Federal Savings & Loan Ins. Corp. v. Molinaro,* 889 F.2d 899, 903 (9th Cir. 1989) (stating that in balancing the parties' interests, the basis for a stay is weaker where no indictment has been returned against the defendant); *S.E. C. v. Dresser Industries, Inc.,* 628 F.2d 1368, 1376 (D.C. Cir.), *cert. denied,* 449 U.S. 993, 101 S. Ct. 529, 66 L. Ed. 2d 289 (1980) (denying stay where indictment was only threatened).

Recently, in *Hernandez v. Fincher, supra,* 2005 U.S. Dist. LEXIS 7694 at *2-3, a court in the Northern District of Texas considered whether a private civil rights action against government employees should be stayed because a criminal investigation of the same alleged misconduct was underway. Because no criminal action was pending, the court denied the stay motion:

Courts have recognized that a stay of a civil action is most appropriate where a party has been indicted for the same conduct. [Citations omitted] In such situations, it is more likely that a defendant may make incriminating statements that implicate his Fifth Amendment rights. [Citation omitted] ....

... Absent any indictment, the private interests of [the two officers in protecting their Fifth Amendment rights are not entitled to significant weight. [Citations omitted] ....

*Id.* at * 5-7. As a result, the fact that indictments are merely possible, and not a reality, blocks the granting of Defendants' stay motion. *Id.*

### B. *Civil Enforcement Actions By Regulators Should Not Be Stayed.*

Even when a criminal case is pending, the courts frequently refuse to stay a civil proceeding that has been brought by a regulatory agency. In *Standard Sanitary Manufacturing Co. v. U.S.,* 226 U.S. 20, 52, 33 S. Ct. 9, 57 L. Ed. 107 (1912), the Supreme Court upheld the lower court's refusal to stay the civil antitrust proceeding while a criminal investigation was pending because the Sherman Act contemplated such simultaneous proceedings. Similarly, in *United States v. Kordel,* 397 U.S. 1, 11,90 S. Ct. 763, 25 L. Ed. 2d 1 (1970), the Supreme Court held that the Food and Drug Administration ("'FDA') could pursue a civil action while a criminal proceeding was pending because the FDA was charged with administering federal food and drug laws.

Courts of Appeals have also refused to stay a regulator's civil proceeding because of a criminal action. In *Keating v. Office of Thrift Supervision, supra,* 45 F.3d at 325-326, the court upheld an administrative law judge's refusal to delay a banking regulator's enforcement action while a state criminal proceeding was pending. The *Keating* Court found that the

" "Constitution does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings.'' *Id.* at 324. The *Keating* Court therefore rejected defendant's argument that having to choose between maintaining his silence under the Fifth Amendment or impeding his purported defense in the civil action required a stay. That court ruled:

*A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege.* Not only is it permissible to conduct a civil proceeding at the same time as a related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding.

*Id.* at 326 (emphasis added) (citing *Baxter v. Palmigiana,* 425 U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)).

The propriety of allowing regulatory and criminal actions to proceed at the same time has been recognized in securities enforcement cases brought by the Commission. *See S. E. C. v. First Financial Group of Texas, Inc., supra,* 659 F.2d at 666-67. As the leading *S.E.C. v. Dresser Industries, supra,* case reasoned:

> Effective enforcement of the securities laws requires that the SEC and Justice be able to investigate possible violations simultaneously. Dissemination of false or misleading information by companies to members of the investing public may distort the efficient workings of the securities markets and injure investors who rely on the accuracy and completeness of the company's disclosures. If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: It must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary.

*Id., 628 F.2d at 1377* (denying stay of Commission investigation). The courts have therefore refused to stay a Commission case while a criminal case is pending or threatened. *First Financial* Group, *supra,* 659 F.2d at 666-67; *S. E. C. v. Grossman,* 121 F.R.D. 207,209-10 (S.D.N.Y. 1987) (rejecting stay of insider trading case) (citing *S. E. C. v. Musella,* 38 Fed. R. Serv. 2d 426,427 (S.D.N.Y. 1983) (rejecting stay of insider trading case)). *See also S.E.C. v. Zimmerman,* 854 F. Supp. 896, 900 (N.D. Ga. 1993) (denying stay of Commission civil action in light of duty to enforce securities laws and protect securities markets) (citing *S. E. C. v. Horowitz & Ullman, P.C.,* 1982 W.L. 1576 \*3 (N.D. Ga. 1982)). This Court should follow the clear weight of case precedents and deny Defendants' motion to stay the Commission's action. [2]

### C. *Defendants' Interviews Undermine Their Fifth Amendment Claims.*

Defendants' assertion that a stay is necessary to protect their Fifth Amendment rights rests upon the false premise that they have not already broken their silence on the issues in this case. Like other privileges, the Fifth Amendment's protection against self-incrimination is subject to waiver. *Harrison v. U.S.,* 392 U.S. 219, 222, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968) (stating that a ""defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives''). And when a defendant waives his Fifth Amendment rights, that greatly undercuts his need for a stay based upon those rights. *E.g., Federal Savings and Loan Ins. Corp. v. Molinaro, supra,* 889 F.2d at 903 (rejecting stay where defendant had previously testified).

Before this case was filed, each of the Defendants gave a voluntary interview regarding their relationship with one another, the Golden State information they possessed and/or their trading in Golden State securities. On December 9, 2003, Kelly voluntarily gave an interview to a Commission attorney, an Assistant United States Attorney and a special agent of the Federal Bureau of Investigation. After being advised that he did not need to make any statements,

Kelly provided detailed oral statements regarding his knowledge of Citibank's acquisition of Golden State and his communications with Angel and Latvaaho. Gross Declaration, „„ 5-7.

Previously, on May 29,2002, Commission attorneys telephoned Angel regarding his trading in Golden State securities. After being advised that the interview would be recorded and that his participation was voluntary, Angel discussed his trading and did not assert his Fifth Amendment rights. *Id.,* „ 2 and Attachment 1. Similarly, on October 1, 2002, Commission attorneys telephoned Buck regarding his Golden State trading. Buck discussed his trading after being advised that the call was being recorded and that his participation was voluntary. *Id.,* „ 3 and Attachment 2. [3]

It is an open issue whether Defendants' voluntary interviews constitute waivers of their Fifth Amendment privilege. *See Barrett v. Acevedo,* 169 F.3d 1155, 1167-69 (8th Cir. 1999) (finding that defendant could not assert Fifth Amendment ”"act of production‘‘ privilege with respect to a personal diary that he had accidentally left at a restaurant and that he voluntarily admitted belonged to him during questioning by a police officer). Whether or not rising to the level of a waiver of their Fifth Amendment rights, Defendants' voluntary interviews nonetheless establish that they have already provided statements regarding the issues in this case. As a result, whatever is left of their right to remain silent is not sufficiently weighty to support a stay of this proceeding.

### III. *THE PUBLIC INTEREST FAVORS REJECTING THE STAY MOTION.*

While Defendants' interests in obtaining a stay are not entitled to much weight by the Court, the Commission's and the public's interest in continuing with the litigation are significant. The Commission's civil action against defendants such as Kelly, Angel and Buck is part of a statutory system for maintaining investor confidence in the securities markets.

On August 10, 1984, Congress adopted the ITSA and added Section 21(d)(2) to the Securities Exchange Act of 1934 (”"Exchange Act‘‘). Under Section 21 (d)(2), the Commission may bring a federal district court action whenever ”"it shall appear to the Commission that any person has violated any provision of this title ... by purchasing or selling a security while in possession of material nonpublic information ....‘‘ 15 U.S.C. § 78u(d)(2) (added by Public Law 98-376) (recodified at 15 U.S.C. § 78u-1(a) in 1990). Section 21(d)(2) also authorizes a new civil penalty against insider traders which ” "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase or sale ....‘‘ *Id.*

Notably, the Commission may bring insider trading civil actions even if a criminal prosecution is pending. Section 21(d)(2) provides that the *"”actions authorized by this paragraph may be brought in addition to any other actions that the Commission or the Attorney General are authorized to bring.‘‘ Id.* (emphasis added) (recodified at 15 U.S.C. § 78u-l(d)(3) in 1990). Congress' authorization of parallel civil and criminal proceedings to combat insider trading is manifested by the ITSA's amendment of Section 32 of the Exchange Act to increase criminal fines for securities violations from $10,000 to $100,000. 15 U.S.C. § 78ff. [4]

Congress adopted the ITSA to protect the securities markets by creating a stronger enforcement - and therefore deterrent - mechanism for dealing with insider trading. According to House Report 98-355:
The United States securities markets are liquid, efficient and fair. The prices of the vast majority of actively traded securities reflect available public information about companies and the economy. Capital formation and our nation's economic growth and stability depend on investor confidence in the fairness and integrity of our capital markets.

Insider trading threatens these markets by undermining the public's expectations of honest and fair securities markets where all participants play by the same rules. This legislation provides increased sanctions against insider trading in order to increase deterrence of violations.

H.R. Rep. No. 355, *supra,* at 2.

Congress authorized Commission actions seeking treble penalties because other relief, such as injunctions and disgorgement, were inadequate given the huge profits that tempt insiders:

> Although an injunction subjects a defendant to possible criminal contempt proceedings if he violates the law again, the injunction itself serves only a remedial function and does not penalize a defendant for the illegal conduct. Disgorgement of illegal profits has been criticized as an insufficient deterrent, because it merely restores a defendant to his original position without extracting a real penalty for his illegal behavior. The risk of incurring such penalties often fails to outweigh the temptation to convert nonpublic information into enormous profits.

*Id.* at 7-8. Staying this insider trading action would therefore impede the Commission's statutory mission of maintaining investor confidence by actively pursuing treble penalties in civil proceedings. As a result, the balancing of interests supports denying Defendants' stay motion.

### IV. *THE COURT SHOULD REFUSE TO ISSUE A PROTECTIVE ORDER.*

Although it is not discussed in Kelly's Brief, Defendants make an alternative request for a protective order prohibiting the Commission from taking their depositions until the criminal investigation has concluded. Kelly Motion, ¶ 7. For the reasons discussed above, Defendants should have sought such a protective order at the beginning of this litigation, rather than after taking the discovery they desired.

A protective order would be, in any event, impractical at this late stage of the litigation. The trial date is just five months away. Because of the proximity of trial, the extended discovery cut-off of December 30, 2005 is basically at the outer limits of what is reasonable; any further delay in taking Defendants' depositions would seriously risk depriving the Commission of its right to pretrial discovery.

### CONCLUSIONS

Defendants' stay motion is untimely and fails to demonstrate that the justification for delay exceeds the need for a prompt resolution of this civil enforcement proceeding. Similarly, there is no basis for issuing a protective order. The Court should therefore deny Defendants' motions.

For its Complaint, plaintiff United States Securities and Exchange Commission (""Commission'') alleges against defendants Mark Kelly (""Kelly''), Chad Latvaaho (""Latvaaho''), Martin Angel (""Angel'') and John Buck (""Buck'') (collectively, ""Defendants''):

### INTRODUCTION

1. This is an insider trading case arising from Kelly's tip of information about a forthcoming corporate merger to two of his long-time friends so that they could profit by purchasing short-term call options. As the chief financial officer of Dallas-based Auto One Finance (""Auto One''), Kelly learned in early May 2002 that Citibank, F.S.B. (""Citibank'') was planning to acquire Auto One's parent company, Golden State Bancorp, and that he was to work at a Dallas hotel to assist

Citibank's representatives in conducting their due diligence. Rather than using that valuable, and highly confidential, information about the acquisition for its intended purpose of assisting Golden State Bancorp in consummating the merger, Kelly told Latvaaho and Angel that Golden State Bancorp was being acquired.

2. Latvaaho and Angel then purchased call options on Golden State Bancorp stock and tipped others about the merger. Latvaaho provided information about the acquisition to a friend, who then purchased Golden State Bancorp call options, while Angel told Buck about the acquisition. Buck purchased Golden State Bancorp call options and shares for himself, and also purchased Golden State Bancorp shares for two investment accounts under his control When Citibank announced its proposed acquisition of Golden State Bancorp in late May 2002, Latvaaho, Angel and Buck derived a combined profit of approximately $250,000 from their call option and stock purchases. Afterwards, Kelly arranged with Latvaaho and Angel to provide a false cover story for their insider trading by claiming that they purchased call options based upon their independent research of Golden State Bancorp, and not based upon Kelly's tip to them of the planned acquisition.

### JURISDICTION AND VENUE

3. The Commission brings this action pursuant to Sections 21(d), 21(e) and 21A of the Securities Exchange Act of 1934 (""Exchange Act''). 15 U.S.C. §§ 78u(d), 78u(e) and 78u-1. This Court has jurisdiction over the Commission's action pursuant to Sections 21(e), 21A and 27 of the Exchange Act. 15 U.S.C. §§ 78u(e), 78u-1 and 78aa.

4. Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein. Defendants directly and indirectly have engaged in transactions, acts, practices and courses of business that constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5 (2004).

5. Venue in the Northern District of Texas is proper pursuant to Section 27 of the Exchange Act. 15 U.S.C. § 78aa. Three of the Defendants resides in this District, and some of the alleged wrongful conduct occurred in the Northern District.

6. Assignment to the Dallas Division is appropriate because defendants Kelly, Angel and Buck reside in Dallas and because many of the pertinent events occurred there.

### GENERAL ALLEGATIONS

#### Kelly's Relationship With Angel, Latvaaho and Buck

7. Kelly joined Auto One, a Dallas-based automobile financing company, in 1994. At the time, Auto One was owned by Millard Morris. When he joined Auto One, Kelly met Angel and Buck, who were officers of Auto One, and the three worked together until 1997. Kelly and Angel also became best friends while working together, and have maintained their close friendship to the present time. Additionally, Kelly became friends with Latvaaho, who performed automobile repossessions for Auto One.

8. In 1996, Millard Morris sold Auto One to Golden State Bancorp, a Delaware corporation based in San Francisco, California. At the time, Golden State Bancorp was a.bank holding company that owned financial institutions including Glendale Federal Savings and CalFed Bank. Golden State Bancorp's common stock traded on the New York Stock Exchange under the symbol ""GSB'' and its options traded on the American Stock Exchange. Following the sale, Angel resigned from Auto One, and is now the president of Marine One Finance. Buck also resigned from Auto One, and is

now the president of Dumont Management Group. Both Marine One Finance and Dumont Management Group are owned by Millard Morris.

9. Kelly remained with Auto One following its sale to Golden State Bancorp, and became Auto One's chief financial officer in 1997. As chief financial officer, Kelly frequently had the assignment of conducting due. diligence into possible acquisitions by Auto One. Kelly worked closely with Randy Staff ("'Staff'"), a vice president of Golden State Bancorp, on some of those due diligence projects. Staff reported to Gerald Ford, the chief executive officer of Golden State Bancorp.

### Kelly's Knowledge of Citicorp's Proposed Acquisition

10. On April 3, 2002, Gerald Ford met with Robert Willumsted, the president of Citigroup, Inc., to discuss a possible acquisition of Golden State Bancorp by Citibank. Shortly after the meeting, Golden State Bancorp retained the Goldman Sachs investment banking firm to provide financial advice regarding a possible acquisition by Citibank.

11. On April 10, 2002, Gerald Ford met again with Willumsted to discuss the price and terms of a potential acquisition by Citibank of Golden State Bancorp. On April 26, 2002, Gerald Ford and Willumsted reached a tentative agreement on the price and terms of Citibank's potential acquisition of Golden State Bancorp.

12. Subsequently, on May 9, 2002, Auto One's president, Daniel Leonard ("'Leonard'"), told Kelly about Citibank's proposed acquisition of Golden State Bancorp. He instructed Kelly to clear his calendar so that Kelly would be available for due diligence meetings in Dallas, Texas with representatives of Citibank.

### Kelly Tips Angel and Latvaaho About the Proposed Acquisition

13. On the same day that he learned of the planned acquisition, Kelly spoke by telephone with Angel. During the telephone conversation, Kelly told Angel that they could not play golf that weekend because Kelly had to work. Kelly also told Angel that Golden State Bancorp was being acquired.

14. Based upon the information he received from Kelly, Angel purchased 330 call option contracts - representing the right to purchase 33,000 shares of Golden State Bancorp at a price of between $35 and $40 per share - during the period of May 10, 2002 to May 17, 2002. When he purchased those call option contracts, Angel was purchasing an ostensibly risky security because the price of Golden State Bancorp's stock was currently below $35 per share. As a result, unless Golden State Bancorp's share price increased within the next five weeks, Angel would lose all of his investment on the call option contracts.

15. Angel told co-workers about his conversation with Kelly and the news that Golden State Bancorp was being acquired. One of those co-workers was Buck, the good friend of both Kelly and Angel. Using the information from Kelly and Angel, Buck purchased 150 call option contracts - representing the right to purchase 15,000 Golden State Bancorp shares at a price between $35 and $40 per share - between May 10 and May 17, 2002. Like Angel's option purchase, Buck's investment was ostensibly risky because he would lose his money on the call option contracts unless Golden State Bancorp's stock price rose in the near future. Buck also purchased 2,000 shares of Golden State Bancorp. Buck furthermore purchased a total of 34,000 Golden State Bancorp shares for two investment accounts that he managed.

16. On May 9, 2002, Kelly also had a telephone conversation with his friend, Latvaaho. Kelly told Latvaaho that Kelly had to cancel a planned trip to a business conference and a future fishing trip. Kelly also told Latvaaho that Golden State Bancorp was being sold and that the transaction would be profitable for Kelly because he owned stocks and options. Kelly also told Latvaaho, who did repossession work for Auto One, that Latvaaho should not worry about having his repossession bills paid because the Golden State Bancorp's buyer was paying a large amount of money. On May 15,

2002, Latvaaho used the information provided by Kelly to purchase 100 call option contracts - representing the right to purchase 10,000 Golden State Bancorp shares at the price of $35 per share. Because Golden State Bancorp's stock was trading at under $35 per share, Latvaaho would lose his investment in the options contracts unless the price for Golden State Bancorp's stock rose above $35 per share in the next few weeks.

17. Latvaaho also told his friend, John Snyder (""Snyder"), that he was purchasing call option contracts on Golden State Bancorp shares and that Golden State Bancorp's stock was a good deal. Based on that information, on May 20, 2002, Snyder purchased 50 call option contracts - representing the right to purchase 5,000 Golden State Bancorp shares at $35 per share. Because Golden State Bancorp's stock was currently trading at under $35 per share, Snyder would lose his investment in the options contracts unless the price rose above $35 per share in the next few weeks.

18. After Citibank announced the proposed acquisition of Golden State Bancorp on May 21,2002 following the market's close, the price of Golden State Bancorp's shares rose eight percent the next day to a closing price of $39.34. Angel sold his Golden State Bancorp call option contracts that same day for a net profit on $62,437. Buck sold his Golden State Bancorp call option contracts and shares on May 22, 2002 for a net profit of $49,076. Buck also sold the Golden State Bancorp shares in the two accounts managed by him for a net profit of $106,601. Latvaaho sold his Golden State Bancorp call option contracts on May 22,2002 for a net profit of $30,857. Snyder sold his Golden State Bancorp call option contracts on May 22, 2002 for a net profit on $8,649.

### *Kelly Arranges A Cover-up Of His Tipping And His Friends' Insider Trading*

19. After Angel, Buck and Latvaaho traded in Golden State Bancorp, Kelly tried to coordinate an ""innocent" explanation for their trading. On or about May 20, 2002, Kelly e-mailed an article to Kelly about Golden State Bancorp. That article discussed speculation that Golden State Bancorp might be a take-over candidate. Kelly's purpose in sending the article to Angel was to try to provide Angel with a purported explanation for his decision to purchase Golden State Bancorp call option contracts after being tipped by Kelly.

20. Kelly also tried to provide Latvaaho with an explanation for his trading. Kelly told Latvaaho to say that Kelly had merely suggested that Golden State Bancorp might be a good investment and that Latvaaho then did his own research before investing in Golden State Bancorp. Kelly also said that onlya few people knew that he had passed along information about the proposed acquisition and that nothing could be proven against them if they all stuck to their story. Kelly also said that he would go to jail if Latvaaho disclosed the source of his information about Golden State Bancorp.

### *LEGAL CLAIMS*

### FIRST CAUSE OF ACTION

### (Insider Trading Against All Defendants)

21. The allegations in paragraphs 1 through 20, above, are incorporated herein by reference as though fully set forth.

22. By virtue of his employment as the chief financial officer of a Golden State Bancorp subsidiary and work on the acquisition due diligence for Golden State Bancorp, Kelly was an insider of Golden State Bancorp. Kelly therefore owed a fiduciary duty to Golden State Bancorp and its securities holders not to trade in Golden State Bancorp securities, either directly or indirectly, based on material, nonpublic information and not to use such information for his own benefit. Kelly breached that duty when he disclosed material, non-public information about Golden State Bancorp to Angel and Latvaaho on May 9, 2002 so that they could profit from the information. By reason of their long-time, close personal relationship, Kelly obtained a personal, non-monetary benefit by disclosing this information to Angel and Latvaaho so that Angel and Latvaaho could trade and tip others, including Buck.

23. By virtue of their familiarity with Kelly and his employment by a Golden State Bancorp subsidiary, Angel, Latvaaho and Buck knew or had reason to know that Kelly was acting in breach of his fiduciary duty to Golden State Bancorp and its securities holders by disclosing on May 9,2002, the material, non-public information about the acquisition of Golden State Bancorp. As a result, Angel, Latvaaho and Buck had the duty to refrain from misusing the non-public information about Golden State Bancorp by trading in the securities of Golden State Bancorp. Angel, Latvaaho and Buck breached that duty by purchasing Golden State Bancorp call options and/or stock between May 10, 2002 and May 15, 2002.

24. Angel also had the duty not to misuse the information by tipping other persons about the proposed acquisition so that those other persons could also trade in the securities of Golden State Bancorp. Angel breached that duty when he provided information about the acquisition of Golden State Bancorp to Buck so that Buck could purchase Golden State Bancorp securities.

25. Defendants, with scienter, directly or indirectly:
a. employed devices, schemes, or artifices to defraud;

b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities;


in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange.

26. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U. S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### *PRAYER FOR RELIEF*

WHEREFORE, the Commission respectfully requests that this Court:

A. Permanently enjoin Defendants and their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the final judgment of permanent injunction by personal service or otherwise, and each of them, from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder;

B. Enter an Order requiring Defendants to disgorge an amount equal to their illegal trading profits from the securities transactions complained of herein, plus prejudgment interest;

C. Enter an Order requiring Defendants to pay civil penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u 1]; and

D. Grant such other relief as this Court may deem just and appropriate.


### *DEMAND FOR JURY TRIAL*

Plaintiff Securities and Exchange Commission hereby requests a trial by jury.

### (1) (a) *Claims.*

This is an insider trading case arising out of the acquisition by Citibank, NA (""Citibank") of Golden State Bancorp (""GSB"). Plaintiff alleges that Mark Kelly, who was the Chief Financial Officer at Dallas-based Auto One Finance (a subsidiary of GSB), learned about the proposed acquisition in early May 2002. Kelly provided material nonpublic information about the proposed acquisition to two friends - Martin Angel and Chad Latvaaho -- so that they could profit from the information by purchasing securities. Angel then tipped Buck about the acquisition, and Angel, Buck and Latvaaho all purchased GSB common stock and/or call options for their own accounts. Buck also purchased Golden State Bancorp shares for two investment accounts under his control. When Citibank announced its proposed acquisition of Golden State Bancorp in late May 2002, Latvaaho, Angel and Buck derived a combined profit of approximately $250,000 from their call option and stock purchases. Afterwards, Kelly arranged with Latvaaho and Angel to provide a false cover story for their insider trading by claiming that they purchased call options based upon their independent research of GSB, and not based upon Kelly's tip to them of the planned acquisition.

### (1) (b) *Defenses.*

Kelly denies that he provided material non-public information to either Martin Angel or Chad Latvaaho. Mr. Kelly did not benefit and had no intention to benefit from the investments made by Chad Latvaaho, Martin S. Angel, and John R. Buck. In addition to any defenses raised by other defendants, Angel and Buck deniy that they possessed or traded on inside information.

(2)Time limit to file motions for leave to join other parties: February 28, 2005.

(3)Time limit to amend pleadings: June 30,2005.

(4)Time limit for motions, including dispositive motions: December 1, 2005.

(5)Time limit for designation of experts: July 31, 2005.

(6)Time limit for responsive designation of experts: August 31,2005.

(7)Time limit for objections to experts, e.g. *Daubert:* November 1, 2005

(8)Defendants plan to review documents produced by plaintiff, and all parties plan to conduct witness depositions. The parties propose that to complete all discovery by October 1, 2005.

(9)No proposed changes to discovery limits imposed by Local Rules or F.R.C.P.

(10)Jury is demanded. Proposed trial date: March 27, 2006. Parties believe that a jury trial can be completed in one week, including arguments and jury selection.

(11)Deadline for completing settlement negotiations: January 13, 2006.

(12)The parties do not assert objections to the disclosure requirements of F.R.C.P. 26(a).

(13)The parties do not consent to a trial before a Magistrate.

(14)The Commission prefers a mandatory settlement conference to be conducted by a Magistrate Judge or another Judge. The parties believe that a settlement conference would be more productive following the conclusion of discovery, perhaps by November 15, 2005.

(15)The parties do not have any other proposals regarding scheduling or discovery.

(16)The parties do not request a conference with the Court.

(17)No other matters under Rule 16(b) or (c) or 26 (c).

(17)No other matters under Rule 16(b) or (c) or 26 (c).

I, Janet L. Johnston, am a citizen of the United States, over 18 years of age, and am not a party in this action. On Jamuary 19,2005, I served a true and correct copy of:

REPORT REGARDING CONTENTS OF SCHEDULING ORDER

I served true and correct copies via UNITED STATES MAIL addressed to the following:

Bart Cousins Glast, Philips & Murray 2200 One Galleria Tower 13355 Noel Road, L.B. 48 Dallas, TX 75240 Attorney for Defendant Mark Kelly

Ben L. Krage Krage & Janvey, L.L.P. 2121 San Jacinto Street, Suite 2600 Dallas, Texas 75201 Attorney for Defendant Martin S. Angel

Daniel Bookin O'Melveny & Myers, LLP 275 Battery Street San Francisco, CA 94111 Attorney for Defendant John Richard Buck

Mark S. Werbner Sayles Werbner, PC 1201Elm Street Dallas, Texas 75270 Attorney for Defendant John Richard Buck

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: 3:04-CV-2098-M |
| | § | |
| MARK KELLY, MARTIN S. ANGEL, and | § | |
| JOHN R. BUCK, | § | |
| | § | |
| Defendants. | § | |

## *SCHEDULING ORDER*

Pursuant to Fed. R. Civ. P. 16(b) and 26, the local civil rules of this Court (except as modified herein), the Court's Civil Justice Expense and Delay Reduction Plan, and in consideration of any appropriate proposal submitted by the parties, the Court enters this Scheduling Order. Unless otherwise ordered or specified herein, all limitations and requirements of the Federal Rules of Civil Procedure, as amended, must be observed:

1. Trial Date: This case is set for jury trial on this Court's three-week docket beginning *April 10, 2006, at 9:00 a.m.* Counsel and the parties must be ready for trial on two (2) days notice at any time during this three-week period, unless the Court allows otherwise at the pretrial conference. Any potential conflicts which can now be contemplated must be called to the attention of the Court in writing within ten (10) days of the date of this Order.

2. Joinder of Parties: By March 28, 2005, all motions requesting joinder of additional parties shall be filed.

3. Amendment of Pleadings: By June 30, 2005, amendments of pleadings shall be filed. Motions for leave to amend need not be filed so long as the amendment is filed within the deadline set in this paragraph.

4. Dispositive Motions: All motions that would dispose of all or any part of this case, including motions for summary judgment, shall be filed by December 1, 2005. Cross-motions?? for summary judgment shall not, except in truly extraordinary circumstances, be permitted to be filed after the dispositive motion deadline. If the parties seek to extend the dispositive motion deadline closer to the trial date than 120 days, such an extension may mean that the Court may not be able to decide such motions before trial. Delay in deciding motions will not affect the trial date. Briefs in support of responses to summary judgment motions shall be subject to the page restrictions contained in Local Rule 7.2 (c). The inclusion of a dispositive motion deadline does not mean that the parties can file more than one motion for summary judgment. If such a motion was filed by a party, that party would have to seek leave to file any additional motion(s) for summary judgment.

5. Initial Designation of Experts: Unless otherwise stipulated or directed by Order, any party with the burden of proof on an issue shall file a written designation of the name and address of each expert witness who will testify at trial on such issue(s) and otherwise comply with Rule 26(a)(2), Fed. R. Civ. P. (""Rule 26(a)(2)''), on or before July 29, 2005.

6. Responsive Designation of Experts: Any party without the burden of proof on an issue but who wishes to utilize an expert witness shall file a written designation of the name and address of each expert witness who will testify at trial for that party on such issue(s) and shall otherwise comply with Rule 26(a)(2) on or before August 31, 2005.

7. Objections to Experts: Objections to the qualifications or competency of experts, sometimes referred to as *Daubert* motions, must be made in a written motion filed no later than November 1, 2005.

8. Pretrial Disclosures and Objections: Unless otherwise directed by Order, the parties must make the disclosures required by Rule 26(a)(3)(A)-(C), Fed. R. Civ. P. by March 20, 2006. Within seven (7) days thereafter, a party must serve and file a list disclosing

(i)any objections to the use under Rule 32(a) of a deposition designated by another party under Rule 26(a)(3)(B), and (ii) any objection, together with the grounds therefor, that may be made to the admissibility of materials identified under Rule 26(a)(3)(C), if any. Other than exhibits on file with the Court, the objecting party must attach to the objections the materials to which the objections are directed. Counsel, or the party if not represented by counsel, must confer about exhibits and deposition designations and make reasonable efforts to agree on admissibility prior to the pretrial conference, at which time the Court will rule on the admissibility of the exhibits.

9. Completion of Discovery: By October 3, 2005, all factual and expert discovery shall be completed. The parties may agree to extend these discovery deadlines, provided (1) the extension does not affect the trial or pretrial material submission or dispositive motion dates, and (2) prompt written notice of the extension is given to the Court.

10. Settlement Status Report and Settlement Conference: Counsel, or the respective party if not represented by counsel, are directed to confer and file with the court by January 13, 2006, a joint report setting forth the status of settlement negotiations and the specific efforts made by the parties to resolve this case. If no efforts have been made, the parties must state the reasons why no settlement efforts have occurred. Counsel shall include in such report a statement about their views about ADR (timing and preference for provider, if any), and desire for a settlement conference to be conducted by the Magistrate Judge. Not later than March 20, 2006, the parties and their respective lead counsel must meet in person or by telephone conference to discuss settlement of this case. All parties must make a good faith effort to settle this case. At the conclusion of this conference, counsel must, within three business days, notify the Court in writing of the participants' names and capacities, and the results of the settlement conference.

11. Pretrial Materials:

### (a) By March 20, 2006, the following pretrial materials must be filed:

1. Pretrial Order: A joint pretrial order shall be submitted by Plaintiff's attorney which covers each of the matters listed in Local Rule 16.4 and which states the estimated length of trial. If an attorney for either party does not participate in the preparation of the joint pretrial order, the opposing attorney shall submit a separate pretrial order with an explanation of why a joint order was not submitted (so that the court can impose sanctions, if appropriate); however, failure to agree upon content or language is not an excuse for submitting separate pretrial orders, since each party may present its version of any disputed matter in the joint pretrial order. When the joint pretrial order is approved by the Court, it will control all subsequent proceedings in this case. Parties shall summarize their claims and defenses in the pretrial order.
2. Witness List: Each party must file a list of witnesses who may be called by each party in its case in chief. Each witness list shall contain a brief narrative summary of the testimony to be elicited from each witness, shall state whether the witness has been deposed, and whether the witness's testimony at trial is ""probable,'' ""possible,'' ""expert,'' or ""record custodian.'' A copy of this list must be furnished to the Court reporter prior to trial.

3. Exhibit List and Deposition Testimony: A list of exhibits and a designation of portions of depositions to be offered at trial shall be filed by each party. The list of exhibits shall describe the documents or items in numbered sequence. The documents or items to be offered as exhibits shall be numbered by attachment of gummed labels to correspond with the sequence on the exhibit list. In addition, counsel for each party intending to offer exhibits shall exchange a set of marked exhibits with opposing counsel and shall deliver a set of marked exhibits to the Court's chambers (except large or voluminous items that cannot be easily reproduced). Exhibits are to be placed in three-ring binders, including numbered tabs, and each binder is to be labeled with the style of case, case number, name of the party, and volume number of the binder. A copy of the exhibit list must be furnished to the court reporter prior to trial.

### (b) By March 27, 2006, the following must be filed.

1. Jury Instructions: Requested jury instructions (annotated) [1] and issues shall be filed by each party. The instructions and issues must be tailored to the specific case. They shall be submitted in hard copy and on disk in a Word Perfect format.

2. Proposed Voir Dire Questions: Proposed voir dire questions which the Court is requested to ask during its examination of the jury panel must be filed. The Court will submit to the jury a standard written questionnaire, a copy of which is available from chambers. The parties may, immediately upon receipt of a draft of same, propose necessary modifications to the form. The Court, after completion of its voir dire, will allow counsel additional time to conduct their own voir dire examination.

12. Objections to Pretrial Materials and Motions in Limine: In addition to the objections to exhibits, and designated deposition testimony referenced in Paragraph 8, objections to witness lists shall be filed by March 29, 2006. Motions in limine, if any, shall be filed by March 29, 2006 unless counsel, in the exercise of reasonable diligence, could not have known of the basis for the motion as of that date. The parties shall confer promptly to determine what limine items may be unobjectionable. Not later than twenty-four hours before the time scheduled for pretrial conference, the parties shall advise the court, in writing, of what limine items remain in genuine dispute.

13. Pretrial Conference: A pretrial conference in this case is set for Friday, April 7, 2006, at 10:00 a.m. Each party shall be represented by at least one attorney who will participate in the trial and who has authority to enter into stipulations and admissions that would facilitate the admission of evidence and reduce the time and expenses of trial. Fed. R. Civ. P. 16(b). The Court will consider at that time pretrial motions not previously decided, and procedures for trial will be discussed.

14. Modification of Scheduling Order: The parties may agree to modify the deadlines established by Paragraphs 2, 3, 5, 6, 7 and 9 of this Scheduling Order; provided, however, that objections to experts cannot be extended to a date less than twenty-eight (28) days before trial; and (2) any extensions to deadlines must be confirmed in writing and filed promptly thereafter with the Court. If the parties seek to extend any of the deadlines set forth in Paragraphs 4, 8, 11 or 12, they shall file their motions seeking such an extension before the deadline elapses. This Order shall control the disposition of this case unless it is modified by the Court upon a showing of good cause and by leave of court. Fed. R. Civ. P. 16(b). It is only under truly extraordinary circumstances that the Court will reset the trial date. If any such request is made, it must be made in writing and in accordance with the United States District Court for the Northern District of Texas Civil Justice Expense and Delay Reduction Plan and Local Rule 40.1 (motions for continuance must be signed by the party as well as by the attorney of record).

15. Parties: Whenever the name of any party, or the name of the parent of a corporate entity changes during the proceeding, counsel or, if applicable, an unrepresented party, shall advise the Court of such change, within twenty (20) days of the event. It shall be the responsibility of counsel or any unrepresented party to remain fully advised of any such developments.

16. Compliance with this Order: Counsel and the parties are expected to comply fully with this Order. Failure to comply will cause the Court to consider the entire range of sanctions available.

17. Inquiries: Questions relating to this Scheduling Order are to be directed to Ms. Lori Anne Montgomery, Courtroom Deputy (214/753-2421).

## NOTICE OF INTENTION TO TAKE *ORAL DEPOSITION OF CHAD LATVAAHO*

TO: Chad Latvaaho, by and through his counsel of record, Michael O. Freeman, Esq., Lindquist & Vennum, P.L.L.P., 4200 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402.

PLEASE TAKE NOTICE that pursuant to Rule 30(a) and Rule 30(b)(6) of the FEDERAL RULES OF CIVIL PROCEDURE, Defendants Mark Kelly and Martin S. Angel, will take the oral deposition of Chad Latvaaho at 10:00 a.m. on Tuesday, March 8, 2005, and continuing day to day thereafter until completed, at the offices of Lindquist & Vennum, P.L.L.P., 4200 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402.

You are notified that the testimony of Chad Latvaaho will be videotaped and recorded and transcribed by a court reporter and that the transcription of the deposition and the videotape recording may be introduced into evidence upon the trial of this case.

You are invited to attend and cross examine the witness.

### PLAINTIFF'S OBJECTIONS AND RESPONSES

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiff Securities and Exchange Commission (""Commission'') hereby objects and responds to the First Set of Document Requests by defendant Mark Kelly (""Kelly''):

### General Objections

The Commission generally objects to Kelly's First Set of Document Requests as being premature. The Commission has not had the opportunity to depose the defendants in this case or to obtain their documents. Discovery from the defendants is necessary to identify all of the information and documents that are responsive to defendants' discovery.

### Specific Objections and Responses

### Request No. 1:

All notes and memoranda taken by Kevin Gross on December 9, 2003.

### Objections and Response:

The Commission specifically objects to Request No. 1 on the grounds that it asks for documents covered by the work product doctrine. Although supplementing its Rule 26 disclosures to name Kevin Gross (""Gross''), a staff attorney for the Commission, on the limited issue statements made by Kelly during the December 2003 interview, the Commission has not definitively identified Gross as a trial witness. Such an identification cannot be made until the Commission takes Mr. Kelly's deposition and determines what testimony, if any, Mr. Kelly will provide regarding the December 2003 interview. Should Mr. Kelly provide accurate testimony regarding his admissions during the December 2003 interview, there will be no need for Mr. Gross' testimony at trial. As a result, the Commission still has not waived the attorney work product with respect to Mr. Gross' notes of the December 2003 interview.

If the Commission decides to use Mr. Gross to testify for the limited purpose of describing certain admissions made by Mr. Kelly during the December 2003 interview, the Commission does not intend to have Mr. Gross' interview notes admitted into evidence. Instead, the Commission might use Mr. Gross' interview notes for the purpose of refreshing his recollection or as a prior recollection recorded in the event that Mr. Gross is unable to remember fully the admissions made by Mr. Kelly.

If it uses the notes to refresh Mr. Gross' recollection, the Commission would, in accordance with Evidence Rule 612, make available for the Court's *in camera* inspection Mr. Gross' notes of the interview so that the Court may determine what part, if any, of those notes should be provided to defense counsel. Fed. R. Evid. 612; *S.E.C. v. Cavanagh,* 1998 U.S. Dist. LEXIS 3713 at *8-9 (S.D.N.Y. March 23, 1998) (ruling that Commission staff attorney's notes of interview of defendant were covered by work product doctrine and refusing to order production of documents until staff attorney provided

testimony about the interview) (citing *United States v. Nobles,* 422 U.S., 239-40, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975) (ordering production of investigator notes of interview only after the investigator testified at trial about the interview).

### Request No. 2:

All notes, memoranda or documents to be referred to by Kevin Gross " "describing the statements and admissions made by Defendant Mark Kelly during the interview in the office of the United States Attorney in Dallas, Texas on December 9, 2003."

### Objections and Response:

The Commission's general objections are incorporated herein by reference. The Commission specifically objects to Request No. 2 on the grounds that it seeks documents covered by the work product doctrine. Subject to these objections, the Commission refers to its Objections and Responses to Request No. 2, above.

### Request No. 3:

All notes, memoranda and reviewed by Kevin M. Gross describing statements and admissions made by Defendant Kelly during the interview at the office of the United States Attorney in Dallas, Texas on December 9, 2003.

### Objections and Response:

The Commission incorporates by reference its general objections and its Objections and Responses to Request No. 1, above. The Commission specifically objects to Request No. 3 on the grounds that it seeks documents covered by the work product doctrine and the law enforcement privilege belonging to other government entities. Because Mr. Gross will not use any other materials if a decision is made to have him testify, the Commission also specifically objects to Request No. 3 on the grounds that it will not lead to the discovery of admissible evidence.

## PLAINTIFF'S OBJECTIONS AND RESPONSES

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiff Securities and Exchange Commission (""Commission") hereby objects and responds to the First Set of Document Requests by defendant Martin S. Angel (""Angel"):

### General Objections

The Commission generally objects to Angel's First Set of Document Requests as being premature. The Commission has not had the opportunity to depose the defendants in this case or to obtain their documents. Discovery from the defendants is necessary to identify all of the information and documents that are responsive to defendants' discovery.

### Specific Objections and Responses

### Request No. 1:

Any notes made by any person during the interview of Mark Kelly on December 9, 2003.

#### *Objections and Response:*

The Commission specifically objects to Request No. 1 on the grounds that it asks for documents covered by the work product doctrine and the law enforcement privilege. It also calls for materials that belong to, and are controlled by, other government agencies. Although supplementing its Rule 26 disclosures to name Kevin Gross (""Gross"), a staff attorney for the Commission, on the limited issue statements made by Mark Kelly (""Kelly") during the December 2003 interview, the Commission has not definitively identified Gross as a trial witness. Such an identification cannot be made until the Commission takes Mr. Kelly's deposition and determines what testimony, if any, Mr. Kelly will provide regarding the December 2003 interview. Should Mr. Kelly provide accurate testimony regarding his admissions during the December 2003 interview, there will be no need for Mr. Gross' testimony at trial. As a result, the Commission still has not waived the attorney work product with respect to Mr. Gross' notes of the December 2003 interview.

If the Commission decides to use Mr. Gross to testify for the limited purpose of describing certain admissions made by Mr. Kelly during the December 2003 interview, the Commission does not intend to have Mr. Gross' interview notes admitted into evidence. Instead, the Commission might use Mr. Gross' interview notes for the purpose of refreshing his recollection or as a prior recollection recorded in the event that Mr. Gross is unable to remember fully the admissions made by Mr. Kelly.

If it uses the notes to refresh Mr. Gross' recollection, the Commission would, in accordance with Evidence Rule 612, make available for the Court's *in camera* inspection Mr. Gross' notes of the interview so that the Court may determine what part, if any, of those notes should be provided to defense counsel. Fed. R. Evid. 612; *S.E.C. v. Cavanagh,* 1998 U.S. Dist. LEXIS 3713 at *8-9 (S.D.N.Y. March 23, 1998) (ruling that Commission staff attorney's notes of interview of defendant were covered by work product doctrine and refusing to order production of documents until staff attorney provided testimony about the interview) (citing *United States v. Nobles,* 422 U.S., 239-40, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975) (ordering production of investigator notes of interview only after the investigator testified at trial about the interview). Based upon the work product doctrine and the law enforcement privilege belonging to other government agencies, the Commission cannot produce any other notes from the December 2003 interview.

#### *Request No. 2:*

Any notes of any interview by the United States government or any of its agencies of Martin Angel.

#### *Objections and Response:*

The Commission specifically objects to Request No. 2 on the grounds that it seeks documents covered by the work product doctrine and that are not reasonably calculated to lead to the discovery of admissible evidence. During the Commission's investigation, an interview of Mr. Angel was conducted by telephone. That interview was tape recorded, and a transcript of the recording was previously provided to defense counsel as part of the Commission's Rule 26 disclosures. Staff attorney notes of the interview constitute materials covered by the work product doctrine, and would not lead to the discovery of admissible evidence in light of the existence of the transcript of the interview.

#### *Request No. 3:*

Any notes by any person regarding any interview by the United States government or any of its agencies of John Buck.

#### *Objections and Response:*

The Commission specifically objects to Request No. 3 on the grounds that it seeks documents covered by the work product doctrine and that are not reasonably calculated to lead to the discovery of admissible evidence. During the Commission's investigation, an interview of Mr. John Buck (""Buck") was conducted by telephone. That interview was tape recorded, and a transcript of the recording was previously provided to defense counsel as part of the Commission's Rule 26 disclosures. Staff attorney notes of the interview constitute materials covered by the work product doctrine, and would not lead to the discovery of admissible evidence in light of the existence of the transcript of the interview.

### *Request No. 4:*

Any writings that refer to Angel's trading in Golden State Bancorp stock or options.

### *Objections and Response:*

The Commission specifically objects to Request No. 4 as being premature in light of the outstanding document requests to Mr. Angel and the pending need to schedule and take Mr. Angel's deposition. Subject to that objection and further discovery, the Commission responds that the documents currently in its possession reflecting Mr. Angel's trading are the account statements that were previously produced to defense counsel as part of the Commission's Rule 26 disclosures.

### *Request No. 5:*

Any communications by mail or email between Kelly and Angel including the email described in paragraph 19 of the complaint.

### *Objections and Response:*

The Commission specifically objects to Request No. 5 as being premature in light of the outstanding document requests to Mr. Angel and Mr. Kelly and the pending need to schedule and take Mr. Angel's and Mr. Kelly's depositions. Subject to that objection and further discovery, the Commission responds that to the extent that they have not already been produced, the Commission will produce responsive emails that it received from Mr. Kelly's employer during its investigation.

### *Request No. 6:*

Any ""articles" that discussed speculation that Golden State Bancorp might be a take over candidate that existed in the SEC's possession prior to the filing of the complaint.

### *Objections and Response:*

The Commission specifically objects to Request No. 6 on the grounds that it calls for the production of materials covered by the work product doctrine and that are not reasonably calculated to lead to the discovery of admissible evidence. Whether or not the Commission had articles in its possession prior to filing the complaint is irrelevant to any issue in the case.

### *Request No. 7:*

The article alleged in paragraph 19 of the complaint.

*Objections and Response:*

To the extent not already produced, the Commission will provide that article.

*Request No. 8:*

Any writings that support the SEC's allegation that Kelly received a personal, non-monetary?? benefit by making the Tip to Angel.

*Objections and Response:*

The Commission specifically objects to Request No. 8 as being premature in light of the outstanding document requests to Mr. Angel and Mr. Kelly and the pending need to schedule and take Mr. Angel's and Mr. Kelly's depositions. Subject to that objection and further discovery, the Commission responds that it is unaware of documents responsive to that particular request.

*ORDER*

Pursuant to the District Court's *Order of Referral,* filed June 28, 2005, Defendant Mark Kelly's *Motion to Compel Meaningful Responses to Interrogatories,* filed June 24, 2005, has been referred to this Court for hearing, if necessary, and for determination. Also before the Court, pursuant to the District Court's *Order of Referral,* filed August 9,2005, is *Defendant Martin Angel's Motion to Compel Meaningful Responses to Interrogatories,* filed August 3, 2005. In addition, before the Court are *Plaintiff Securities and Exchange Commission's Memorandum of Points and Authorities in Opposition to Defendant Mark Kelly's Motion to Compel Answers to Interrogatories,* filed July 14, 2005, and *Plaintiff Securities and Exchange Commission's Memorandum of Points and Authorities in Opposition to Defendant Martin S. Angel's Motion to Compel Answers to Interrogatories,* filed August 17, 2005.

A hearing on these motions was held on Wednesday, August 31, 2005. After consideration of the pleadings, evidence, oral argument, and applicable law, and for the reasons stated on the record during the hearing, the Court determines that the motions should be, and are hereby, GRANTED. Accordingly,

Plaintiff's objections to Defendant Mark Kelly's and Defendant Martin Angel's interrogatories are overruled. Plaintiff shall provide full and complete responses to Defendant Mark Kelly's and Defendant Martin Angel's interrogatories no later than 5:00 p.m. on Friday, September 9, 2005.

All relief not expressly awarded herein is denied.

SO ORDERED on this 31st day of August, 2005.

*PLAINTIFF'S FIRST AMENDED RESPONSES*

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and in accordance with the Court's order on August 31, 2005, plaintiff Securities and Exchange Commission (""Commission") hereby provides these amended responses to defendant Mark Kelly's First Set of Interrogatories:

*Preliminary Statement*

The Commission previously objected to Kelly's First Set of Interrogatories as being contention interrogatories whereby the Commission is asked to state its contentions and the factual and legal bases for its contentions. *E.g., In re Convergent Techs. Sec. Litig.,* 108 F.R.D. 328, 332 (N.D. Cal. 1985) (describing contention interrogatories). On August 31, 2005, the Court overruled that objection. In light of the Court's determination, the Commission provides these amended responses to Kelly's First Set of Interrogatories. Although providing the following amended responses, the Commission still has not had the opportunity to depose defendants Mark Kelly (""Kelly''), Martin S. Angel (""Angel'') and John R. Buck (""Buck'') (collectively, ""Defendants''). The following amended responses are therefore based upon Kelly's unsworn statements during an interview in December 2003, the inferences that may be reasonably derived from those statements and the application of legal principles to those statements. As a result, further amended responses might be necessary once those depositions are completed.

*Specific Amended Responses*

*Interrogatory No. 1:*

Describe in detail what the SEC contends Kelly told Angel in their telephone conversation as alleged in paragraph 13 of the Complaint.

*Amended Responses:*

In a telephone conversation with and/or telephone message for Angel, Kelly told Angel that he would not be able to play golf with Angel on that weekend as planned. Kelly also told Angel that the reason for not playing golf was that Auto One Finance (""Auto One'') and Cal Fed Bank/Golden State Bancorp (""Golden State'') were being sold and that he would therefore have to work that weekend. Kelly told Angel that he didn't know if he (Kelly) would even have a job after the acquisition. When Angel asked if just Auto One was being sold, Kelly told Angel that ""the whole enchilada,.'' i.e, Golden State and Auto One, was being sold.

*Interrogatory No. 2:*

Does the SEC contend that Angel purchased 330 call option contracts solely as a result of what he was told by Kelly?

*Amended Responses:*

The Commission is not legally required to contend that a piece of material non-public information is the sole reason for a tippee's stock trading, so long as the material non-public information was a basis or reason for the trading. Additionally, trading by a tippee while in possession of material nonpublic information gives rise to a presumption that the trading was based upon that information. As a result, the Commission does not make the contention inquired about.

*Interrogatory No. 3:*

Does the SEC contend Kelly knew or believed that Angel would purchase call option contracts or shares of Golden State Bancorp based on what he told Angel in the telephone conversation as alleged in paragraph 13 of the Complaint?

*Amended Responses:*

The Commission contends that Kelly knew, believed, or was reckless in not knowing that Angel would trade based upon the information provided to him.

*Interrogatory No. 4:*

If the answer to the foregoing Interrogatory is in the affirmative, please state the facts upon which the SEC bases such contention.

*Amended Responses:*

Kelly and Angel were best friends and had worked together at Auto One before it was acquired by Golden State. Kelly knew that Angel was an active stock trader and discussed his investments with Kelly. Based upon his position with Auto One and his prior work conducting due diligence for Auto One on other transactions, Kelly knew that information about the acquisition of Golden State was confidential and could not be disclosed to any outsider except for a legitimate business purpose. In cancelling the planned golf game for the upcoming weekend, Kelly did not have any need or legitimate business purpose for telling Angel that the reason for his having to work was because Auto One and Golden State were being acquired. As a result, a reasonable inference from Kelly's unnecessary and unauthorized disclosure of the acquisition was that Kelly provided inside information to Angel so that Angel could profit by using the information to trade.

*Interrogatory No. 5:*

Does the SEC contend that Kelly encouraged Angel to purchase call option contracts or shares of Golden State Bancorp?

*Amended Responses:*

The Commission incorporates by reference its amended response to Interrogatory No.

4. The Commission does not contend, and does not need to contend, that Kelly specifically recommended or instructed the purchase of Golden State securities by Angel.

*Interrogatory No. 6:*

If the answer to the foregoing Interrogatory is in the affirmative, please state the facts upon which the SEC bases such contention.

*Amended Responses:*

See amended responses to Interrogatories Nos. 5 and 6.

*Interrogatory No. 7:*

Does the SEC contend that Kelly disclosed material non-public information to Angel at any time other than in the telephone conversation described in paragraph 13 of the Complaint?

*Amended Responses:*

As indicated in its amended response to Interrogatory No. 1, the information about the acquisition may have been conveyed in a telephone conversation and/or telephone messages. The Commission does not currently contend that material non-public information was conveyed about the acquisition by Kelly to Angel on any other date.

*Interrogatory No. 8:*

If the answer to the foregoing Interrogatory is in the affirmative, please state the facts upon which the SEC bases such contention including the dates of each disclosure and the content of each disclosure.

*Amended Responses:*

Not applicable.

*Interrogatory No. 9:*

Describe in detail what the SEC contends Kelly told Latvaaho in the conversation of May 9, 2002, as alleged in paragraph 16 of the Complaint.

*Amended Responses:*

Kelly told Latvaaho that he would not be able to go fishing with him or attend an upcoming business conference because Golden State was being sold. Kelly also told Latvaaho that he hoped this would be a good deal because he owned Golden State stock. When Latvaaho asked Kelly if Latvaaho needed to worry about getting his bills paid, Kelly responded that billions of dollars were being paid for Golden State and that Latvaaho therefore did not need to worry about being paid for repossessing automobiles..

*Interrogatory No. 10:*

Does the SEC contend that Kelly disclosed material non-public information to Latvaaho at any time other than in the telephone conversation on May 9, 2002 described in paragraph 16 of the Complaint?

*Amended Responses:*

No.

*Interrogatory No. 11:*

If the answer to the foregoing Interrogatory is in the affirmative, please state the facts upon which the SEC bases such contention including the dates of each disclosure and the content of each disclosure.

*Amended Responses:*

Not applicable.

### Interrogatory No. 12:

Does the SEC contend that Kelly knew or believed that Latvaaho was going to purchase call option contracts or shares of Golden State Bancorp based upon what he told Latvaaho in the May 9, 2002 telephone conversation as alleged in paragraph 16 of the Complaint?

### Amended Responses:

The Commission contends that Kelly knew, believed, or was reckless in not knowing that Latvaaho would trade based upon the material nonpublic information provided in the conversation.

### Interrogatory No. 13:

If the answer to the foregoing Interrogatory is in the affirmative, please state the facts upon which the SEC bases such contention.

### Amended Responses:

Kelly and Latvaaho were good friends. Kelly knew that Latvaaho was an active stock trader and they discussed investments. Based upon his position with Auto One and his prior work conducting due diligence for Auto One, Kelly knew that information about the acquisition of Golden State was confidential and could not be disclosed to any outsider except for a legitimate business purpose. In telling Latvaaho that he would be attending the conference, Kelly did not have any need or legitimate business purpose for telling Latvaaho that Golden State was being acquired, that Kelly hoped to do well on his Golden State stock and that billions of dollars were being paid for Golden State. As a result, a reasonable inference from Kelly's unnecessary and unauthorized disclosure of this information was that Kelly provided inside information to Latvaaho so that Latvaaho could profit by using the information to trade.

### Interrogatory No. 14:

Does the SEC contend that Kelly encouraged Latvaaho to purchase call option contracts or shares of Golden State Bancorp?

### Amended Responses:

The Commission incorporates by reference its amended response to Interrogatory No. 13. The Commission does not contend, and does not need to contend, that Kelly specifically recommended or instructed the purchase of Golden State securities by Latvaaho.

### Interrogatory No. 15:

If the answer to the foregoing Interrogatory is in the affirmative, please state the facts upon which the SEC bases such contention.

*Amended Responses:*

See amended responses to Interrogatories Nos. 13 and 14.

*Interrogatory No. 16:*

Does the SEC contend that Kelly encouraged Angel to purchase call option contracts or shares of Golden State Bancorp?

*Amended Responses:*

See amended responses to Interrogatories Nos. 5 and 6.

*Interrogatory No. 17:*

If the answer to the foregoing Interrogatory is in the affirmative, please state the facts upon which the SEC bases such contention.

*Amended Responses:*

See amended responses to Interrogatories Nos. 5 and 6.

*Interrogatory No. 18:*

Describe the monetary benefit, if any, which the SEC contends Kelly received or was to receive from Angel for the alleged disclosure made on May 9, 2002 or any time.

*Amended Responses:*

The Commission does not contend that Kelly was to receive any monetary benefit tied specifically to the disclosure of information about Golden State.

*Interrogatory No. 19:*

Describe the personal, non-monetary benefit, if any, which the SEC contends Kelly received or was to receive from Angel for the alleged disclosure made on May 9, 2002 or for a disclosure made at any other time.

*Amended Responses:*

Kelly made a gift of the material nonpublic information about the acquisition to Angel based upon the personal value to him of their long-term friendship.

*Interrogatory No. 20:*

Describe the monetary benefit, if any, which the SEC contends Kelly received or was to receive from Latvaaho for the alleged disclosure made on May 9, 2002 or any time.

*Amended Responses:*

After the trading and public announcement of the acquisition of Golden State, Latvaaho paid some of the expenses associated with a fishing trip that Latvaaho arranged for himself and Kelly. Latvaaho also told Kelly that he made some money buying Golden State stock, and left cash for Kelly in a bag during that trip.

*Interrogatory No. 21:*

Describe the personal, non-monetary benefit, if any, which the SEC contends Kelly received or was to receive from Latvaaho for the alleged disclosure made on May 9, 2002 or for a disclosure made at any other time.

*Amended Responses:*

Kelly made a gift of the material nonpublic information about the acquisition to Latvaaho based upon the personal value to him of their long-term friendship.

*Interrogatory No. 22:*

State the facts on which the SEC bases its contention that Kelly's purpose in sending an article to Angel was to try to provide Angel with an explanation for his decision to purchase Golden State Bancorp call option contracts.

*Amended Responses:*

Kelly provided the article to Angel after he learned of Angel's purchase of Golden State securities. Because Kelly at that point knew that Angel has purchased Golden State securities following their telephone conversation about the merger, the reasonably intended purpose of the article was to provide Angel with an explanation for purchasing the Golden State securities that was separate from the material nonpublic information that Kelly had provided to Angel.

*Interrogatory No. 23:*

Does the SEC contend that Latvaaho bought call option contracts of Golden State Bancorp based solely on what he was told by Kelly in their telephone conversation of May 9, 2002?

*Amended Responses:*

The Commission is not legally required to contend that a piece of material non-public information is the sole reason for a tippee's stock trading, so long as the material non-public information was a basis or reason for the trading. Additionally, trading by a tippee while in possession of material nonpublic information gives rise to a presumption that the trading was based upon that information. As a result, the Commission does not make the contention inquired about.

*Interrogatory No. 24:*

Does the SEC contend that Angel bought call option contracts of Golden State Bancorp based solely on what he was told by Kelly in their telephone conversation of May 9, 2002?

*Amended Responses:*

See amended response to Interrogatory No. 2.

## PLAINTIFF'S FIRST AMENDED RESPONSES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Court's order of August 31, 2005, plaintiff Securities and Exchange Commission (""Commission'') hereby provides amended responses to the following Interrogatories by defendant Martin S. Angel (""Angel''):

### Preliminary Statement

The Commission previously objected to certain of Angel's First Set of Interrogatories as being contention interrogatories whereby the Commission is asked to state its contentions and the factual and legal bases for its contentions. *E.g., In re Convergent Techs. Sec. Litig.,* 108 F.R.D. 328, 332 (N.D. Cal. 1985) (describing contention interrogatories). The Commission also asserted a relevance and work product objection to two other interrogatories, while answering three of the interrogatories. On August 31,2005, the Court overruled the Commission's objections. In light of the Court's rulings, the Commission provides these amended responses to those Interrogatories that were not previously answered. Although providing the following amended responses, the Commission still has not had the opportunity to depose defendants Mark Kelly (""Kelly''), Angel and John R. Buck (""Buck'') (collectively, " "Defendants''). As a result, further amended responses might be necessary once those depositions are completed.

### Amended Responses

### Interrogatory No. 3:

If the Tip from Kelly to Angel was by a personal, oral conversation (either in person or by telephone), please describe as best you are able the exact contents of that conversation.

*Amended Responses:*

In a telephone conversation with and/or telephone message for Angel, Kelly told Angel that he would not be able to play golf with Angel on that weekend as planned. Kelly also told Angel that the reason for not playing golf was that Auto One Finance (""Auto One'') and Cal Fed Bank/Golden State Bancorp (""Golden State'') were being sold and that he would therefore have to work that weekend. Kelly told Angel that he didn't know if he (Kelly) would even have a job after the acquisition. When Angel asked if just Auto One was being sold, Kelly told Angel that ""the whole enchilada,.'' i.e, Golden State and Auto One, was being sold.

### Interrogatory No. 5:

Identify all factual bases for your belief (if any you have) that Angel knew or believed that the information contained in the Tip was not available to the public at that time or was otherwise confidential.

*Amended Responses:*

At the time of the Tip, neither Golden State nor Citibank had issued any announcement or press release regarding their merger agreement. Additionally, Golden State had not issued any announcement or press release at the time of the Tip that it had entered into an agreement to be acquired by any entity. Furthermore, during his telephonic interview by the Commission's staff, Angel falsely denied that he knew anyone at Golden State, when he in fact knew Kelly, the chief financial officer of a Golden State subsidiary. Angel's false statement during the Commission's investigation supports the inference that he knew he had illegally traded upon inside information when he purchased Golden State securities.

### *Interrogatory No. 6:*

Describe the personal non-monetary benefit obtained by Kelly for giving Angel the Tip as alleged in paragraph 22 of the complaint.

### *Amended Responses:*

Kelly made a gift of the material nonpublic information about the acquisition to Angel based upon the personal value to him of their long-term friendship.

### *Interrogatory No. 7:*

Describe the facts in your possession that support the allegation in paragraph 23 of the complaint that Angel knew or had reason to know that Kelly was action in breach of his fiduciary duty to Golden State Bancorp and its securities holders by giving Angel the Tip.

### *Amended Responses:*

Kelly and Angel were long-time friends and had worked together at Auto One prior to its sale to Golden State. Angel knew that Kelly was the chief financial officer of Auto One. Angel therefore knew - and is legally charged with knowing - that Kelly owed a fiduciary duty to Auto One not to use any information or other property belonging to Auto One - as well as its parent, Golden State - for any purpose other than to promote the legitimate business needs of Auto One and/ or Golden State and to keep confidential important nonpublic information about Auto One and Golden State. At the time he received the information about the acquisition of Auto One and Golden State, Angel could not have known of any public announcement or release regarding the acquisition because no such announcement or release had been made. Angel therefore knew that he had received confidential, nonpublic information about Auto One and Golden State from Kelly despite there not being any legitimate business purpose or need for Kelly to share such confidential, nonpublic information with him. As a result, Angel knew, is charged with knowing, or was reckless in not knowing that he had received inside information about Auto One and Golden State in violation of Kelly's fiduciary duty to those entities. During his telephonic interview by the Commission's staff, Angel falsely denied that he knew anyone at Golden State, when he in fact knew Kelly, the chief financial officer of a Golden State subsidiary. Angel's false statement during the Commission's investigation supports the inference that he knew he had illegally traded upon inside information when he purchased Golden State securities.

### *Interrogatory No. 8:*

Describe all of the material, non-public information about the acquisition of Golden State Bancorp that Kelly provided to Angel.

*Amended Responses:*

See amended responses to Interrogatories Nos. 3, 5 and 7. The information from Kelly that Auto One and Golden State were being acquired and that he needed to cancel a weekend golf outing to work (implicitly or explicitly on the acquisition) constituted material nonpublic information, particularly given the stature (as the chief financial officer of Auto One) of Kelly when he provided that information to Angel. Information about an unannounced acquisition was provided to Angel by an obviously reliable, high ranking and knowledgeable source within one of the acquired entities. Angel then told co-workers, including Buck, that Kelly said that Golden State was being acquired. Angel's conveyance of the information indicates his recognition of its value.

### *Interrogatory No. 9:*

Did Angel have any other information regarding a potential acquisition of Golden State Bancorp shares beyond the information provided to him by Kelly in the Tip? If so describe that information and its source.

### *Amended Responses:*

At the current time, the Commission lacks sufficient information to identify any other sources of information for Angel about a potential acquisition. The Commission notes, however, that only information that was publicly announced by Golden State or Citibank regarding the acquisition would relieve defendants of liability for insider trading.

### *Interrogatory No. 10:*

Describe the number of occasions in which Kelly provided Angel with the Tip. For each occasion, identify the date and nature of the contact (personal, telephone or otherwise).

### *Amended Responses:*

Based upon the statements made by Kelly during his interview in December 2003 and the telephone records provided to it, the Commission currently contends that there were one or more telephone voice mails and/or telephone conversations between Kelly and Angel on May 9, 2002.

### *Interrogatory No. 11:*

At the time the SEC filed the complaint, was the SEC aware that Angel had traded options prior to May 2002?

### *Amended Responses:*

Yes.

### *Interrogatory No. 12:*

Prior to filing the complaint, was the SEC aware that prior to the date that Angel received the alleged Tip from Kelly, he purchased 600 shares of Golden State Bancorp?

*Amended Responses:*

Yes

### PLAINTIFF'S AMENDED NOTICES OF VIDEOTAPED DEPOSITIONS

PLEASE TAKE NOTICE THAT pursuant to Rules 26(b) and 30 of the Federal Rules of Civil Procedure, plaintiff Securities and Exchange Commission (""Commission") will take the depositions upon oral examination of defendants Mark Kelly, Martin S. Angel and John R. Buck at the Offices of the Securities and Exchange Commission, Burnett Plaza, Suite 1900, 801 Cherry Street, Unit #18, Fort Worth, Texas 76102, telephone: (817) 978-3821, on the following amended dates and at the following times:

Mark Kelly, Wednesday, October 26, 2005 at 9:00 a.m.

Martin S. Angel, Wednesday, October 26, 2005 at 2:00 p.m.

John R. Buck, Thursday, October 27, 2005 at 10:00 a.m.

Such depositions will continue day to day, during normal business hours, until completed.

Please take further notice that these depositions will be recorded orally and stenographically by a certified short hand reporter who is authorized to administer oaths and will also be recorded on video tape.

### NOTICE OF EXTENSION OF DEADLINE

In accordance with the Court's Scheduling Order of February 18, 2005, paragraphs 9 and 14, the parties notify the Court that they have agreed to extend the discovery cutoff until November 3, 2005.

Footnotes

1   Defendants' tactical goal is self-evident: They wanted to use discovery in this civil case to learn information that they could not have gathered in a criminal proceeding. Having used discovery in this case for that purpose, they now want to turn around and improperly claim that this case imposes an undue burden upon them. But Defendants should not be allowed to have it both ways. If this case really did impose a burden upon them due to the threatened indictments, they should have acted in a principled fashion by moving at the outset of this case to stay the civil proceedings.

2   If indictments had actually been filed, the Commission would not have objected to having the criminal trial take place before the civil enforcement trial.

3   As the Commission stated during the motion to compel hearing, it considers some of Defendants' statements during these interviews to be contradictory and/or false. The Commission therefore desires to cross-examine Defendants during deposition and trial regarding those statements.

4   There is no question that the criminal prosecution and incarceration of insider traders serves an important role in maintaining investor confidence and deterring the misuse of nonpublic information. However, the higher burden of proof in criminal proceedings might make a conviction difficult, especially if circumstantial evidence is involved. As a result, the deterrent effect of civil actions (with a lower burden of proof) and treble penalties is necessary to prevent insider trading. The potential for both a criminal acquittal and a civil liability verdict supports allowing both actions to proceed in parallel.

1   ""Annotated" means that whenever possible, *each* proposed instruction or conclusion of law shall be accompanied by citation to statutory or case authority, or pattern instructions. The parties should, to the extent possible, rely principally on Fifth Circuit and Supreme Court cases, Northern District precedents, and Fifth Circuit pattern instructions.

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.