Pages 1-38

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
2                         SAN JOSE DIVISION

3

4   SECURITIES AND EXCHANGE        )  Case No.  18-cv-01603-EJD
    COMMISSION,                    )
5                                  )  San Jose, California
              Plaintiff,           )  Courtroom 5, 4th Floor
6        vs.                       )  Wednesday, November 6, 2019
                                   )
7   RAMESH SUNNY BALWANI,          )
                                   )
8              Defendant.          )
    _____)

9

10

                    TRANSCRIPT OF DISCOVERY HEARING
11          BEFORE THE HONORABLE NATHANAEL M. COUSINS
                    UNITED STATES MAGISTRATE JUDGE
12

13  APPEARANCES:

14  For Plaintiff:              SUSAN F. LaMARCA, ESQ.
                                JOHN K. HAN, ESQ.
15                              U.S. Securities
                                and Exchange Commission
16                              44 Montgomery Street, Suite 2800
                                San Francisco, California 94104
17                              (415) 705-2500

18  For Defendant:             WALTER F. BROWN, JR., ESQ.
                                Orrick Herrington & Sutcliffe LLP
19                              405 Howard Street
                                San Francisco, California 94105-2680
20                              (415) 773-5995

21                              AMANDA M. McDOWELL, ESQ.
                                Orrick Herrington & Sutcliffe LLP
22                              701 Fifth Avenue, Suite 5600
                                Seattle, Washington 98104
23                              (206) 839-4300

24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

2

```
 1   APPEARANCES:  (Cont'd.)

 2   For Defendant:              STEPHEN A. CAZARES, ESQ.
                                 Orrick Herrington & Sutcliffe LLP
 3                               77 South Figueroa Street, Suite 3200
                                 Los Angeles, California 90017
 4                               (213) 629-2020

 5   For Non-Party Food and      ALISON E. DAW, ESQ.
     Drug Administration:        United States Attorney's Office
 6                               Northern District of California
                                 150 Almaden Boulevard, Suite 900
 7                               San Jose, California 95113
                                 (408) 535-5082
 8
     (Telephonically)            MARCI NORTON, ESQ.
 9                               Office of Chief Counsel
                                 Food and Drug Administration
10                               10903 New Hampshire Avenue, Room 4510
                                 Building 31
11                               Silver Spring, Maryland 20903-1058

12   Transcription Service:      Peggy Schuerger
                                 Ad Hoc Reporting
13                               2220 Otay Lakes Road, Suite 502-85
                                 Chula Vista, California 91915
14                               (619) 236-9325

15

16

17

18

19

20

21

22

23

24

25
```

1    <u>SAN JOSE, CALIFORNIA  WEDNESDAY, NOVEMBER 6, 2019  11:14 A.M.</u>

2                            --oOo--

3            THE CLERK:  Calling Civil 18-1603, Securities and

4    Exchange Commission v. Ramesh Sunny Balwani.  Counsel, please

5    state your appearances for the record.

6            MS. DAW:  Alison Daw on behalf of the Food and Drug

7    Administration, Non-Party Witness.

8            THE COURT:  Good morning.

9            MS. DAW:  Good morning.

10           MR. BROWN:  Good morning, Your Honor.  Walter Brown,

11   Amanda McDowell, and Stephen Cazares on behalf of Mr. Balwani, who

12   is present.

13           THE COURT:  Good morning.  I see him.  Thank you.  Good

14   morning.

15           MS. LaMARCA:  Good morning.  Susan LaMarca and with me

16   John Han from the Securities and Exchange Commission.

17           THE COURT:  All right.  Good morning.  The Government's

18   got the Balwani team sandwiched here in the courtroom.

19           MS. DAW:  Should we switch sides?

20           THE COURT:  You can be where you are.  The jury will not

21   be biased by where people are standing and neither will I.  And if

22   I get confused, you can straighten me out.

23       And on the phone, let's get everyone's appearances.  Maybe

24   you've said it already, but just to confirm.

25           MS. NORTON:  Good morning, Your Honor.  This is Marci

1  Norton from the Office of Chief Counsel at the Food and Drug

2  Administration.

3          MS. LOVIS: (ph)  And Julie Lovis from the same office.

4          THE COURT:  All right.  Good morning to you both.  And

5  this is Judge Cousins speaking.  For the benefit of those on the

6  phone, I'll just say that we're in open court here in San Jose.

7  This is a public proceeding and so everything will be

8  presumptively public unless there's a basis to seal something.

9  There's court staff present.  We do have some other cases on

10  calendar today, so it could be that other attorneys and parties

11  walk in for the proceedings.

12          We are making a recording of the hearing.  An audio clip

13  should be available in the ECF system after the hearing.  The case

14  is referred from Judge Davila.  If anyone has an objection to my

15  discovery order, it must be made back to him within 14 days of my

16  order.

17          We have two discovery issues before the Court today.  I ruled

18  on one before the hearing.  At Docket 111 is the dispute

19  concerning Dr. Shuren and the discovery sought from him and the

20  protective order sought by the Government to limit or preclude

21  that deposition.

22          And then the second discovery brief is at 113 and that's

23  between the SEC and Mr. Balwani and that's concerning three

24  discreet discovery issues.

25          My suggestion, given that we've got counsel on the phone from

1    back East, is to talk about the Shuren deposition and topics

2    first, unless there's any reason to do it differently.

3        Mr. Brown, does that work for you?

4            MR. BROWN:  That would be fine, Your Honor.

5            THE COURT:  All right.  In anticipation of the hearing,

6    I asked for -- you all may be seated, if you wish.  You may stand.

7    It's good for your health to stand, but be comfortable, please.

8        So two aspects of the Shuren deposition.  One is to provide

9    me with the information that you seek to ask, and that goes to two

10   issues:  One, to see if there's something you need to ask Dr.

11   Shuren that you couldn't get from some other source and, secondly,

12   to help me to decide if there are reasonable limits as to what

13   you're going to ask about and how long it would take to ask those

14   questions.  If you had a hundred hours of questions, that would be

15   one thing.  If you had two hours of questions on topics, then that

16   at least would be helpful for Dr. Shuren and his team to know the

17   scope of what you're asking about.

18       So I'm going to start with you just to see if you have any

19   further information in those areas.  And then the other area was

20   if there are time limitations for the deposition or topics that

21   you would suggest, then that might get us into the area of

22   compromise.

23           MR. BROWN:  Thank you, Your Honor.  Just a couple of

24   preliminary comments.  We have provided the Court and counsel with

25   a notebook of documents that we may question Dr. Shuren about in

1  the deposition.  We provided --

2              THE COURT:  And I've received that.  Thank you.

3              MR. BROWN:  Yes.  And we provided an electronic copy

4  last night at least to FDA counsel.  We tried to give the copy to

5  Ms. Daw, but I'm learning this morning that it didn't go through

6  to her, but FDA counsel I believe received -- we did file those

7  same documents.  And it's a little unusual that we're giving a

8  road map in advance, but this is an important witness and we

9  understand that and we hope this helps crystallize the issues for

10  the Court.

11      The FDA production, I just want to --

12              THE COURT:  And let me say why I asked for that one --

13  two reasons -- actually, three reasons.  One was that we're

14  getting to the end of discovery, so you're going to be asking

15  these questions soon, if you're going to ask them, and whether

16  you're disclosing what you're going to ask now or after

17  deposition, they're going to be finding out soon.  That's number

18  one.

19      Number two is that they've asked me to preclude this

20  deposition, so I might -- I might preclude it unless I'm persuaded

21  that I should permit it.

22      And, third, Dr. Shuren is not a party.  The party you're

23  seeking this discovery from is not a party and so it's not an

24  aspect of them getting some unfair advantage over Mr. Balwani.

25  What I'm gauging is whether there is undue burden on them to have

1   to respond to -- so go ahead.  Sorry.

2          MR. BROWN:  Yeah.  So the FDA document production is not

3   complete yet.  I want to note that.  Just yesterday, Judge Davila

4   issued an order in the criminal case under Rule 16 of the Rules of

5   Criminal Procedure directing the Justice Department now to assume

6   responsibility for the ongoing document production from the FDA

7   and CMS, and responsive documents from that production are

8   directly relevant to the central issues in this case, which we're

9   going to discuss in a few minutes, and I think, as the Court

10  knows, there's an agreement among the parties that documents

11  produced in the criminal case would be produced here as well and

12  if we receive documents, we'd give them to the SEC.

13      But that order demonstrates the centrality of the FDA

14  communications concerning its regulation of Theranos, laboratory

15  design tests, and the truthfulness of Mr. Balwani's alleged

16  misrepresentations on those issues.  That's why this is highly

17  relevant.

18      It also illuminates, I would note, that we don't have all the

19  relevant documents at this moment, including some of the documents

20  that Judge Davila ordered the parties to search for yesterday.

21  There are some text messages, over a thousand potentially

22  corrupted or missing emails from one of the key witnesses, Alberto

23  Gutierrez, and I mention it all because we've attempted in good

24  faith to give you our best belief of what documents we would use

25  in the deposition.  There could be others that come up as we fine-

1   tune our craft and get more documents.

2       With respect to Dr. Shuren, he is the Director of the Center

3   for Devices and Radiological Health at the FDA.  He was personally

4   and substantially involved in key issues at the heart of the case,

5   and we believe that his testimony would not be redundant.  It is

6   relevant.  It is unique.  And it is not evidence we could plan to

7   obtain from other witnesses.

8       I don't intend to go through all the documents, --

9           THE COURT:  Thank you.

10          MR. BROWN:  -- thankfully today.  But I would like to

11  just have a handful.

12          THE COURT:  Tell me your best -- your best examples.

13          MR. BROWN:  All right.  So let me give you a couple.  So

14  the first is Tab 1, which is the reported interview of Alberto

15  Gutierrez, who really is I think the key witness -- the principal

16  interface with Theranos on the regulatory issues here.

17      And you'll see in Tab 1, I've highlighted a couple of

18  sections on pages 3 and 5, that Dr. Shuren and Gutierrez had

19  discussions about whether, first of all, FDA should send an FDA

20  expert to assist Theranos with its submissions, which is a path

21  that Mr. Gutierrez suggests Dr. Shuren was advocating for.

22      And in contrast, Gutierrez's desire for more formal meetings

23  of interaction resulting in an inspection, it ultimately occurred.

24      And as I think the Court knows, Mr. Gutierrez was the

25  Director of the Office of In Vitro Diagnostics and Radiological

1   Health.  He had a view on this issue.  Dr. Shuren appears to have

2   had a different view on the issue.

3       And it all I think bears on Mr. Balwani's state of mind.  If

4   you look at allegations -- in paragraphs 73 through 76 of the

5   complaint, allegations that Mr. Balwani misled investors about

6   whether FDA approval was mandatory or voluntary, we think the

7   dialogue that was going on between Dr. Shuren, Mr. Gutierrez on

8   these issues is very relevant.

9           THE COURT:  And why is it necessary to get discovery

10  beyond Mr. Gutierrez, who's the person interviewed here and you've

11  had other opportunities for discovery.

12          MR. BROWN:  Because Dr. Shuren apparently has a

13  different view than Mr. Gutierrez, and we'd like to understand

14  what that view is.  I think his view would tend to corroborate our

15  client's good-faith belief what he perceived the regulatory path

16  to be.  And we think it's very different.  The fact that they both

17  have opinions on it, you know, is -- is interesting, but they're

18  different opinions, and I think we are entitled to explore that.

19  He had an important role with respect to Theranos, and his view on

20  the appropriate path and the appropriate approach to Theranos

21  supports our client's reasonable belief of the type of path that

22  we hear Dr. Shuren describe.

23          THE COURT:  All right.  Do you want to hit me on a few

24  more of your best examples.

25          MR. BROWN:  All right.  So --

1          THE COURT:  I'll be looking through them while you talk.

2          MR. BROWN:  Yeah.  In Tab 3, this is demonstrating Dr.

3    Shuren's involvement and communications regarding Ms. Holmes'

4    request for a meeting with the Secretary of Health and Human

5    Services in April of 2015, which communications appear to reflect

6    different opinions again about Theranos and its effort to obtain

7    regulatory approval and other issues.

8          And if you look at the email chain, the Luciana Borio in the

9    email appears to have a favorable view of Theranos' efforts to

10   engage with regulators and with the Chief Scientist at FDA, among

11   other things, and we would like to understand Dr. Shuren's

12   involvement in these issues.  And I think the fact that Ms. Holmes

13   and Theranos and Mr. Balwani were voluntarily trying to engage

14   with regulators at the highest level, and at this high level --

15   which is where Dr. Shuren and the Secretary would be engaging --

16   we believe that very much bears on his -- his good faith, his

17   belief in a regulatory path, and Dr. Shuren's involvement in it.

18         THE COURT:  All right.  So what -- you've seen the

19   concern with the burden of this deposition.  What proposals do you

20   have to address the concerns of burden?

21         MR. BROWN:  So we spoke with counsel for the FDA --

22   well, we spoke with Ms. Daw.

23         THE COURT:  Uh-huh.

24         MR. BROWN:  And -- and proposed a time limitation.  We

25   proposed four hours.  We proposed taking the deposition in Silver

1   Spring, Maryland at Dr. Shuren's office or place of business.

2           THE COURT:  Uh-huh.

3           MR. BROWN:  We proposed limitations such that we would

4   not be asking about policy determinations or deliberations

5   unrelated to Theranos.   And those offers were proposed.   They

6   were, I think for reasons Ms. Daw can explain, unacceptable.  But

7   we felt that was a reasonable accommodation.

8       We understand Dr. Shuren is busy.   We understand he's an

9   important person.   But we believe this is very important

10  testimony.   It's crucial to Mr. Balwani's defense, and it's in

11  that spirit that we offered that compromise.

12          THE COURT:  All right.   Thanks very much.   Ms. Daw, why

13  -- why isn't that a reasonable compromise and please feel free to

14  tell me more about the particular burden on Dr. Shuren and

15  alternative methods of discovery that should be sufficient for Mr.

16  Balwani's defense.

17          MS. DAW:   I think the -- I haven't been able to go

18  through all the documents since I just got them about 20 minutes

19  ago, unfortunately, but -- and I'm not suggesting any malfeasance

20  on the part of Defendants with respect to that.   They had offered

21  to provide them early, which I appreciated, but for some reason it

22  didn't go through.

23      The documents that I have seen highlight the fact that they

24  do not need Dr. Shuren's testimony.   The documents, as you noted,

25  Exhibit Number 1 is an interview of Alberto Gutierrez.   Mr.

1    Gutierrez   is   more   than   capable   of   testifying   about   the
2    interactions that he had with Dr. Shuren.

3         The email chain at Tab 3, there is no indication that Dr.
4    Shuren even participated, other than the fact that he was cc'd on
5    that.

6         The test -- there's another issue and that has to do with
7    what policies are directly related to Theranos and what policies
8    are not.  I think that there is a significant disconnect between
9    what the Defendants believe is directly relevant to Theranos and
10   what the Agency believes is general policymaking that is subject
11   to the deliberative process privilege.  Their concern is that the
12   defense is attempting to depose Dr. Shuren in order to get insight
13   into policymaking issues that the Agency is simply going to object
14   to and instruct the witness not to answer, which is going to be a
15   waste of his time, Defendant's time, and significant expense for
16   the   attorneys   who   have   to   travel   to   participate   in   that
17   deposition.

18        In addition, the -- the defense keeps on saying he had a
19   substantial involvement.  The documents do not corroborate that he
20   had a substantial involvement.  It appears from what Counsel has
21   said today that Mr. Balwani is hoping to get some testimony
22   suggesting that Dr. Shuren agreed with his view of what the
23   regulation should have required.

24        Mr. Shuren's opinions today about what the test should have
25   required are not relevant to what information the FDA provided to

1   Mr. Balwani or to what misrepresentations Mr. Balwani then made to

2   investors.  So the -- while I understand that it would be perhaps

3   a feather in Mr. Balwani's cap to have an individual at the FDA,

4   assuming that Dr. Shuren has any positions that are favorable to

5   Mr. Balwani's position, it is not a sufficient reason to subject

6   a high-level employee to a deposition.

7        The test essentially is that once you establish the person's

8   high level, then the person wanting to take the deposition, the

9   party wanting to take the deposition, has to establish that that

10  information is not available from other parties.  These documents

11  don't establish that, and my suggestion would be that we hold the

12  issue in abeyance, if the Court is inclined to allow a deposition,

13  until after the other depositions have been taken.  And if there

14  remain questions that defense counsel believes that only Mr. --

15  Dr. Shuren, rather, can answer, that those questions be directed

16  to him in the form of written deposition questions rather than

17  subjecting him to the time of an oral deposition.

18         THE COURT:  The challenge to that approach -- and I

19  appreciate it.  It's definitely within the discretion of the Court

20  to approve that -- is that the document production from the FDA is

21  not complete yet.  So I don't know when it will be complete.  I

22  can ask you when it's going to be complete, but it's a matter of

23  dispute before Judge Davila presently.  And there has to be some

24  end to this process, and Judge Davila needs an end to it, and

25  that's because this is a case that has a criminal charge -- not

1 before the Court today -- but the discovery connects to that as

2 well.

3      And so we're -- I can hold it in abeyance to a certain point,

4 but there's going to be a deadline.  There's a deadline in fact

5 that's already passed in this case for the conclusion of

6 discovery, and the Court has extended it to allow this additional

7 discovery.  But effectively you're asking me for what would be an

8 extension on the extension, and I'm really not inclined to do that

9 in the present posture.

10      MS. DAW:  I understand that, Your Honor, but the FDA is

11 not a party to the case.

12      THE COURT:  You're not a party to the case, but the

13 discovery being sought is needed to get to the next phase of the

14 case.

15      MS. DAW:  I understand that, and the FDA, I believe --

16 I have not had an opportunity to review Judge Davila's order.  It

17 was issued yesterday.  To the extent it requires additional

18 searching, the FDA is not going to know how long the production is

19 going to take until it knows what the universe of documents are

20 that result from those searches.  So it's unfortunately at this

21 point not something that they can predict.

22      THE COURT:  Uh-huh.

23      MS. DAW:  With respect to the issue of Dr. Shuren's

24 importance, there is information in the letter brief itself about

25 that and the attorneys on the phone are probably in a better

1  position to address that if the Court has any additional

2  questions.

3       THE COURT:  I don't have any questions.  If they want to

4  tell me something more about it, I'll give them two minutes to

5  tell me, but I've read the brief and I'll say that I've ordered

6  the depositions of many important, busy people in the past, and

7  I've heard those arguments in those cases, too.

8      If there's counsel on the phone who wants to speak to Dr.

9  Shuren's busy-ness, go ahead.

10       MS. NORTON:  Your Honor, this is Marci Norton.  I just

11  want to clarify the record.  The Agency has produced Dr. Shuren's

12  custodial file which he searched for terms that would be

13  responsive to the subpoena which included anything that -- any

14  document that had the word Theranos in it -- it was that broad --

15  and also documents regarding laboratory-developed tests.  So the

16  Agency has produced everything from Dr. Shuren's custodial file

17  that was responsive to the subpoena unless it was fully

18  privileged.

19      So I just wanted to clarify that.

20       THE COURT:  Thank you.

21       MS. NORTON:  You're welcome.

22       MS. DAW:  Also, Your Honor, I had neglected to let you

23  know that I believe that the Agency made a counteroffer of two

24  hours, and it was the Agency that requested that the deposition

25  take place at the FDA's location.  Defense was amenable to that,

1   but they were not amenable to two hours.

2          THE COURT:  All right.  Thank you.  Mr. Brown, you've

3   given me this 91-document set, and I understand your position is

4   that you may be getting additional information that would be

5   useful and you might wish to examine Dr. Shuren about.

6       To address the burden concern, would it be reasonable to

7   limit the document exhibits to the deposition to these 91

8   documents?

9          MR. BROWN:  Well, Your Honor, I think with the

10  understanding that we -- we may get more documents.

11         THE COURT:  Uh-huh.

12         MR. BROWN:  I mean, as I understand the state of

13  production, there may be some question about whether relying upon

14  the custodian to simply produce responsive documents is going to

15  be adequate.

16      There is no search apparently yet for text messages at all.

17  There are about a thousand emails from Mr. Gutierrez that

18  apparently have the content blank.  And so we may get additional

19  documents.  But I think certainly this is, you know, our best

20  good-faith belief of the universe of documents that would be

21  relevant to the deposition.

22         THE COURT:  All right.  And the FDA suggested that I

23  might hold this in abeyance until there's been other discovery.

24  Tell me your suggestion as to the timing of the depositions and

25  the discovery and to when it is you're seeking to take this

1   deposition.

2           MS. DAW:  The deposition is currently scheduled for the

3   6th of December, which is the last day that depositions are

4   currently scheduled.

5           THE COURT:  Okay.

6           MS. DAW:  But that -- none of them have happened yet, so

7   -- none of the depositions of FDA or CMS witnesses have happened

8   is what I meant to say.  There have been others.

9           THE COURT:  Thank you.

10          MR. BROWN:  Your Honor, I think, you know, with the

11  understanding that additional documents could come up, I think,

12  you know, we're prepared to go forward on the date scheduled.

13          THE COURT:  So December 6th.  As far as when you're

14  wanting to take it, that date still works for you?

15          MR. BROWN:  Right.  Can I address one issue --

16          THE COURT:  You may.

17          MR. BROWN:  -- on the deliberative process issue.  So

18  it's not our desire to ask about policy determinations

19  deliberative process with respect to other companies.  But you can

20  imagine a world where a particular question is somewhere in the

21  gray area, and I think the remedy there is for counsel to object,

22  counsel to instruct the witness that they believe it's

23  appropriate, and to -- to try to anticipate and rule on that in a

24  vacuum here without context is difficult.

25          It's not our desire to ask a bunch of questions and get

1    objections.   And if there was a line of questioning that the

2    Agency or counsel believed was objectionable, I think we can ask

3    a wrap-up question in such a way to compartmentalize that and move

4    on and not waste time.

5        But the Agency has waived the deliberative process with

6    respect to Theranos.  And it's our desire not to intrude upon the

7    deliberative process with respect to other companies.

8            THE COURT:  All right.  Thank you very much.  This is my

9    ruling on Docket 111, the letter brief concerning Dr. Shuren.

10   I'll grant in part and deny in part the relief sought, and these

11   are the limitations I'll set for the deposition of Dr. Shuren.

12       First, I find that there's a basis to take the deposition of

13   Dr. Shuren, that he possesses relevant information and that

14   information does go beyond information that could be learned from

15   other witnesses.  On the other hand, there is opportunity to learn

16   information from other witnesses.  This is not the only discovery

17   sought from USDA, and we're at the end of the discovery process

18   and it's noticed for the last day of the deposition time period.

19   So in other circumstances, I would very likely delay the

20   deposition to find out what more is learned.  But we're at the

21   end, so I'm not granting the defense request to postpone it --

22   when I say "defense" -- the USDA's request to --

23            MS. DAW:  FDA.

24            THE COURT:  FDA -- all these different acronyms -- FDA

25   We'll talk about the SEC in a moment -- the FDA's request to

1  postpone it further because it's already scheduled for the last

2  day of the time period.  And so I think that's a well-made request

3  and, under the law, it's tempting, but it's just where we are that

4  I'm not going to postpone it further.

5       So the limits I'll set are to limit the deposition to two

6  hours.  I think two hours is enough time to focus on the most

7  important questions, the most relevant questions that are

8  proportional to the needs of the case, and that's with recognition

9  that there's other discovery ongoing and other depositions taking

10  place before Dr. Shuren's deposition and because I find that he

11  does have very important other obligations to the public, and so

12  two hours is a balancing of Mr. Balwani's interests against Dr.

13  Shuren's and the Agency's interests.

14       It will be set in Silver Spring, Maryland to accommodate the

15  burden on the witness, and it will be limited to, as Mr. Brown

16  articulated, no questions of policy determinations that are

17  unrelated to Theranos; in other words, the policy questions FDA

18  related to Theranos.

19       This question of a deliberative process privilege, it's not

20  really ripe yet because I haven't seen the questions.  But I

21  wouldn't quash the entire deposition just because there might be

22  some questions that come up and have a privilege, whether it's

23  that privilege or another privilege.  That can be addressed at the

24  deposition.  And if there's a dispute that comes out at the

25  deposition, you can come back and we can figure out how to resolve

1    it.

2        So one of the purposes in having this disclosure on the

3    exhibits was to get the parties thinking about what deliberative

4    process privilege objections there could be -- and I encourage you

5    to confer with each other before the deposition, and it may be

6    that you can resolve or at least particularize, you know, which

7    documents and which areas are going to be subject to a dispute and

8    maybe you can resolve those disputes and not have them take much

9    time at the deposition.

10        So that's part of the reason I ordered this disclosure ahead

11    of time, is so you cannot be surprised at the deposition, you

12    know, what the Balwani team is asking about.

13        And I'm not going to -- because there's the potential for

14    more production and further identification of documents, I'm not

15    going to limit it to these particular documents, but it was with

16    the objective of limiting the burden to Dr. Shuren in preparing to

17    give him this set of documents in advance, although that's not

18    required for a deposition under the Rules.

19        Just a final observation as far as why I'm granting this.  A

20    little different from some cases just applying what's referred to

21    as the Apex Doctrine.  There's a criminal charge in this set of

22    cases, and so the interests of Dr. -- excuse me -- the interests

23    of Mr. Balwani go beyond just a traditional case of wanting

24    discovery from a third party or a busy witness.  He's got some

25    constitutional rights which are in play in this case, and so, to

1  me, that is an additional weight on the side of permitting the

2  discovery that might not be present in other cases where there's

3  a burden that is asserted.

4       So, in conclusion, the limitations are two hours, Silver

5  Spring, Maryland, limitation on the policy determinations to

6  connect to those related to Theranos, and the parties to confer

7  about and to make any objections about deliberative process

8  privilege if they come up at any deposition.

9            MS. DAW:  Could I ask a point of clarification?

10           THE COURT:  You may.

11           MS. DAW:  When you say Silver Spring, Maryland, are you

12  granting a request of the Agency to have it at their facility

13  or --

14           THE COURT:  Yes.

15           MS. DAW:  Okay.

16           THE COURT:  If that's where you want to have it, yes.

17           MS. DAW:  Yes.

18           THE COURT:  All right.  So it will be --

19           MS. DAW:  Thank you.

20           THE COURT:  -- at the Agency's facility at a time to be

21  worked out by the parties for December 6th.

22       All right.  No fees are costs are awarded on the discovery

23  issue 111.  Thank you very much.

24           MS. DAW:  Thank you, Your Honor.

25           THE COURT:  All right.  And, Mr. Brown, I'm going to

1  return to you the --

2          MR. BROWN:  You don't want to keep that, huh?

3          THE COURT:  Well, I don't want to have anybody say I've

4  got some super-confidential information, so I was giving it back

5  to you.

6      All right.  We've got a line change for the Government and

7  for Mr. Balwani's team.  So the next discovery brief is 113, and

8  I was handed up a single document.  Did you get a copy of it as

9  well, Mr. Balwani's --

10         MS. LaMARCA:  I just got it this morning as well, Your

11  Honor.

12         THE COURT:  All right.  And it's titled "Mr. Balwani's

13  Proposal for Request Nos. 4 and 5," and those are two of the three

14  requests which are at issue here.  The other one is No. 11.

15         MS. LaMARCA:  Correct.

16         THE COURT:  All right.  So on this one, has there been

17  any conferring between the parties about how we might resolve the

18  issues?

19         MS. LaMARCA:  No, we haven't.  I, like Your Honor, got

20  this document just as we entered the courtroom.

21         THE COURT:  All right.  Give me one moment and you look

22  at it, too, --

23         MS. LaMARCA:  Sure.

24         THE COURT:  -- while I look at it and then I want to get

25  your reaction to this proposal.

1          MS. NORTON:   Your Honor, excuse me.   This is FDA

2     counsel.   May we be excused?

3          THE COURT:   You may be excused.   I'm sure it would be

4     entertaining to stick around until the end of the hearing, but I

5     bet you have other work to do.   So, yes, thank you for joining us

6     today.

7          MS. NORTON:   Thank you.

8          THE COURT:   Have a good day.

9          MS. NORTON:   Thank you.   Bye-bye.

10     (Court and Counsel reviewing document.)

11          THE COURT:   All right.   Have you had a chance to review

12     the updated proposal as to 4 and 5?

13          MS. LaMARCA:   I have, Your Honor.

14          THE COURT:   All right.   So what do you think?

15          MS. LaMARCA:   So my reaction is I think it misses the

16     point on two scores.   The first is timing, obviously, as we all

17     are discussing the fact that the Defendant would like to push off

18     the timing of producing any of this information.

19          But with that in mind, the way these descriptions are worded

20     seem to be sort of baking in that timing issue to a later date.

21     So, for instance, when they say "Documents sufficient to show,"

22     you know, this or that, it seems to be that -- for instance,

23     "Documents sufficient to show any present income received by Mr.

24     Balwani," I'm guessing that what it means -- and you can translate

25     for me -- is documents sufficient to show as of whenever they're

1   providing this information what his income at that moment happened

2   to be.  So that's very different than what we asked for in our

3   discovery.   And we think we're entitled to something very

4   different now.

5            THE COURT:  And --

6            MS. LaMARCA:  Sure.

7            THE COURT:  -- on the issue of as of when, when is it

8   "as of when"?  When do you want the --

9            MS. LaMARCA:  So our "as of when" would be now.  And for

10  some of this, that means -- for one question, the first question,

11  which was 4, it was as of now, the time frame.   The second

12  question, 5, is a broader time frame.  It was a question about his

13  portfolio between 2015 and the present.

14            THE COURT:  Uh-huh.

15            MS. LaMARCA:  So that was a -- that's basic documents

16  like brokerage records, things like that that we routinely get.

17  The "as of now" information about his net worth was for the

18  purposes of us looking at that today, seeing -- it's important to

19  us today because today at the end of discovery, we can make a

20  motion tomorrow essentially for a motion for summary judgment, for

21  instance, and seek our remedies that we want.

22       It's also important when the defense tells us that in the

23  future, which they have in this meet-and-confer process, Mr.

24  Balwani's net worth might change.  To the SEC, that's a little bit

25  of a mixed message in that when things change, the first thing we

1 as lawyers think of as -- our client's going to ask, How did they

2 change? Why did they change? What was the change? And that's

3 critical because it -- it means a lot in terms of the types of

4 remedies that are satisfactory to our client, whether in a court-

5 litigated action or a settlement, but it's also a fairness

6 objective that we try to meet in meting out remedies or penalties

7 or anything like that.

8         So it is actually a critical component how a person's net

9 worth might change. And if it changed for, you know, good reasons

10 versus not so great reasons, like if a person sort of decided to

11 gamble away their fortune to just see, you know, whether they

12 could live it all on red, that would be one thing. Or if a person

13 legitimately spent that money on things that he needed to spend

14 that money on, that's a different animal entirely.

15         So those are important questions for us.

16         The other thing that this ends up doing, this proposal that

17 the Defendant put together, is it essentially allows us to get the

18 same discovery we are always entitled to in collecting on a

19 judgment. If Mr. Balwani's liability is established, as this last

20 line in this document says, well, we can always take discovery on

21 a judgment to collect. This is different. We're talking about

22 discovery that's important to getting the remedies we need in our

23 case in the first place, discovery that the Defendant has already

24 conceded is relevant. He simply doesn't like that he has to give

25 it up.

1    There's already protective orders in place, though, and the

2  Defendant has lived with those protective orders, has agreed to

3  them four times now in this case without ever voicing any concern

4  and, in fact, the first time we heard any concern about what we

5  might do with the information was in the letter brief itself.  We

6  didn't even hear about it in any meet-and-confer or in response to

7  our document requests.

8    So that's our -- where this piece of paper departs from what

9  we're looking for.

10         THE COURT:  And address for me issue -- the Request

11  Number 11.

12         MS. LaMARCA:  Sure.

13         THE COURT:  And what -- what your views are on that.

14         MS. LaMARCA:  Sure.

15         THE COURT:  Which has two parts to it.

16         MS. LaMARCA:  Yeah.  Request Number 11 is the one that

17  seeks the documents that are I thought a little bit less

18  contested, but I may be wrong about that.  Those are documents

19  that are communications between the Defendant and any witnesses in

20  this case since he left Theranos.

21         THE COURT:  Uh-huh.

22         MS. LaMARCA:  That's a commonly-requested item.  We

23  waited until after Mr. Balwani's deposition to pursue this further

24  with the defense because we thought we might be able to get that

25  a different way.  And Mr. Balwani asserted his Fifth Amendment

1  right, so we did not get that at his deposition.

2      We want to know if Mr. Balwani has a continuing personal

3  relationship with people who he's identified as potential

4  witnesses, who we've identified as potential witnesses, who are

5  related to Theranos so that we know if there are biases that we

6  are not aware of, so that we know if people have personal

7  connections or business connections, connections that don't

8  necessarily have to do with their work together when they were at

9  Theranos.  And it's a very common request that we make case after

10 case.

11     THE COURT:  And what's the end point for -- what's the

12 time period for what you're seeking?

13     MS. LaMARCA:  We are seeking those from September 2016,

14 which is a couple of months I believe at this point after Mr.

15 Balwani left Theranos, through the present, and the present I

16 guess would be August of 2019 I think is when the document

17 requests were sent.

18     THE COURT:  And who are the -- and the -- who are the

19 persons that you're seeking that --

20     MS. LaMARCA:  So the persons who we were seeking are the

21 persons identified -- and it's a long list, so I can't really name

22 them all -- but the persons who were identified in the Defendant's

23 response to interrogatory requests from us about essentially who

24 the witnesses are in his defense.  He had raised some affirmative

25 defenses that we sought his witnesses for, and those persons as

1   well who are described in his initial disclosures.  Those are just

2   the -- the initial disclosure people largely overlap with the

3   other folks.   And they include as well the people who we

4   identified in our initial disclosures as Theranos-related

5   individuals.

6           THE COURT:  All right.  Thank you.

7           MS. LaMARCA:  Sure.

8           THE COURT:  I understand your position.  What do you

9   recommend?

10          MS. McDOWELL:  Amanda McDowell for Mr. Balwani.

11          THE COURT:  Thank you.

12          MS. McDOWELL:  I do want to respond to some of Ms.

13  LaMarca's points and also address further the proposal we've

14  submitted today which we've put a lot of thought into and

15  attempted to tailor this to the theory of relevance proposed by

16  the SEC.  So maybe I'll start with that and the timing issue.

17      The SEC contends that they need information, personal

18  financial information, about Mr. Balwani, to the extent there's

19  ever a finding of liability against him and the Court is

20  considering a civil monetary penalty at the remedy stage.  And

21  under the statute, that would be a separate determination made by

22  the Court either after a jury verdict in this case or after a

23  motion for summary judgment that the SEC prevails on.  We think

24  this information may never become relevant at all because we

25  believe there will be no finding of liability against Mr. Balwani.

1          What our proposal letter attempts to do is give the SEC the

2    information that they're requesting at exactly the time when a

3    court may be interested in reviewing Mr. Balwani's net worth.  And

4    I think it's important to note why this all matters, and that's

5    because  Mr.  Balwani  would  suffer,  Your  Honor,  substantial

6    prejudice if forced to turn over these documents prematurely when

7    they have no relevance at all to any finding of liability for any

8    merits determination in this case.

9          And that's because, Your Honor, as you noted earlier, Mr.

10   Balwani is not just a civil defendant in this case, but he's also

11   a criminal defendant with constitutional rights.  And Mr. Balwani

12   seeks the Court's protection today to ensure that he's not forced

13   to turn over documents that will, in essence, give the Government

14   an  opportunity  to  size  him  up  and  assess  his  resources  and

15   continued appetite or financial ability to continue litigating.

16         And the second reason that Mr. Balwani would be prejudiced by

17   turning over these documents prematurely at a time where they're

18   not  relevant  is  because  these  are  his  personal,  private

19   information -- communications, financial information, and it's

20   simply  not  relevant  to  any  claims  or  defenses  that  will  be

21   addressed by the Court or by a jury at the merits of this case.

22         So we believe this proposal is comprehensive and would give

23   the  Commission  and  the  Court  the  material  they  need  when  it

24   matters.   And  if  Mr.  Balwani  were  to  turn  over  this  material

25   today, it would be stale and, frankly, unusable at the time that

1  a court, if ever, would be considering it.

2          THE COURT:  Isn't that the SEC's problem if -- you could

3  argue it's unusable if you got to that phase and you could tell

4  the Court, "Well, they asked for it back in -- as of August 2019

5  and we gave them what they asked for and it's no good now."  So

6  that wouldn't be prejudicial to Mr. Balwani if the SEC was stuck

7  with it.

8          MS. McDOWELL:  It could, Your Honor, if his net worth

9  has changed at the time the Court is considering a civil monetary

10  penalty.  There are times a court considers it because the

11  defendant affirmatively raises it.  His -- you know, his net worth

12  could dramatically change between now and if the Court were ever

13  to consider this at a remedy stage, so he could be prejudiced if

14  stale documents relating to his net worth are being used to

15  determine the appropriate amount of a remedy imposed against him

16  if we ever are at that stage.

17          THE COURT:  All right.  Ms. LaMarca, a question for you

18  as to the prejudice of providing this information now --

19          MS. LaMARCA:  Yes.

20          THE COURT:  -- which is what you'd like me to do.  Other

21  discovery in the case, you've been providing to the DOJ for use in

22  the criminal case, as I understand it.  Is there -- would it

23  address the concern about potential prejudice if this information

24  in response to 4 and 5 was not provided to counsel in the criminal

25  case?

1        MS. LaMARCA:  I don't know but let me just say --

2        THE COURT:  Yeah.

3        MS. LaMARCA:  I don't know if that would satisfy the

4  Defendant's prejudice request or argument.  I did not hear the

5  prejudice argument at all, as I mentioned, until we saw it in the

6  letter, so we never had any discussion about it.  And we have

7  given a great deal of information to people in the criminal side

8  so that they can make the determination because, as Your Honor may

9  appreciate, there is often an argument made -- and we saw it made

10  with respect to the FDA -- that if it's in any -- if information

11  is held by any component of the Government, then the Government

12  prosecutors must give it -- must seek it out and find it.  So to

13  sort of take away that problem, we have literally just provided it

14  and, frankly, we assume that is given out to both Defendants in

15  the criminal case.  So I don't know how that plays -- I've got to

16  admit I'm just not a criminal litigator.  I've never done criminal

17  law.

18      So -- on the other hand, I will say we were a little

19  surprised to see that -- that argument made in the briefing before

20  Your Honor because so much has passed from the SEC and from the

21  Defendant and -- for instance, talking about personal financial

22  information, many, many, many witnesses in this case, a lot of

23  investors, have been asked about their portfolios, about the

24  information that they have regarding transactions in securities

25  way beyond Theranos, and that information has been provided to the

1  Defendant, has been provided to the SEC, and we have passed that

2  on as well consistent with our routine uses and consistent with

3  the Defendant's understanding of how we were using this

4  information because he then again -- I assume he got it in the

5  criminal case but, in addition, he saw the protective orders that

6  allowed for this.

7       So this is not unique to the Defendant.  Yes, it's personal

8  financial information.  Yes, there are protective orders here.

9  But this is all being overseen by the Court.  I don't think

10 there's any misuse and I don't agree with the -- that it's an

11 unfair or unexpected tactic or use of the information that someone

12 other than myself might see it.  As long as those people are

13 lawyers who are supervised by the Court, I don't have a fear that

14 anything would -- untoward would happen with this information.

15      THE COURT:  And as far as what the SEC would like me to

16 order here, which is production of responsive documents for 4, 5,

17 and 11, when would you like me to order those produced by?

18      MS. LaMARCA:  We expect that they should be available if

19 it's -- we haven't heard anything about a burden in just producing

20 them -- but within 30 days.

21      THE COURT:  All right.  Ms. McDowell, anything further?

22      MS. McDOWELL:  Yes.  The proposal to preclude the DOJ

23 from receiving this, in our view this wouldn't go far enough

24 because the SEC is simply not entitled to this material at this

25 point.  It's not relevant.

1      And I do want to just note that a separate remedies phase is

2   entirely routine in cases of this matter.  We provided one example

3   in our letter brief.  I am prepared to provide the Court today

4   with additional citations, if necessary.  What we often see in

5   those remedies phases is the Court sets an additional discovery

6   schedule.  There's a full-blown remedies hearing.  The Court may

7   even conduct a separate bench trial on the issue of remedies.  So

8   the Commission will certainly get this information if and whenever

9   it becomes relevant.

10      And I do just want to make one other point about Request 5

11  while we're --

12        THE COURT:  Uh-huh.

13        MS. McDOWELL:  -- talking about Requests 4 and 5.  The

14  Commission is seeking material and Mr. Balwani's investment

15  portfolio from 2015 to the present.  And that time period is not

16  tied in any way to the time period in the complaint.  The majority

17  of Theranos investors were done investing by 2013 and '14.  So the

18  SEC is missing two critical years if these requests were actually

19  tied to their theory of relevance that they set forth in their

20  discovery brief on materiality.

21      If I could, I haven't had a chance to address Request 11.

22        THE COURT:  Go for it.

23        MS. McDOWELL:  So we appreciate the Commission's offer

24  to limit the individuals requested.  By our count, that's still

25  over a hundred individuals they're seeking communications from.

1   And the problem that their proposal doesn't address is that the

2   breadth of their request still covers purely personal

3   communications that are in no way tethered to Theranos or this

4   case.  So, you know, text messages or instant messages that say,

5   you know, "Happy Birthday," "How's your daughter doing," "Merry

6   Christmas," the SEC hasn't -- simply hasn't shown why they're

7   entitled to that.  This is simply a fishing expedition with

8   respect to -- with respect to Ms. LaMarca.

9        And our proposed compromise is that we will produce

10  communications and messages to the individuals identified by the

11  SEC, but we would redact and withhold purely personal

12  communications that have nothing to do with Theranos or this case.

13            THE COURT:  All right.  Ms. LaMarca, on tha -- let's go

14  back to 11.

15            MS. LaMARCA:  Sure.  First, I think the difficulty for

16  us is we haven't heard that there was any actual burden at all in

17  producing these records, whether they are considered personal or

18  somehow not personal.  It's hard for me to understand what is --

19  how you draw the line between personal and not personal when they

20  -- these people don't work together anymore.  And what we're

21  seeking and what we've tried to describe to the Defendant is

22  simply what are the relationships today between these people.

23  That's what we want to know.

24        If I might very quickly hit on this point about a separate

25  remedies phase.

1          THE COURT:  Uh-huh.

2          MS. LaMARCA:  That is not the norm in our cases.  There

3   is not separate discovery that occurs after liability in our

4   cases.  The one example that the defense suggested in their letter

5   brief was a settlement on -- which required a judgment regarding

6   liability, and the parties left open the potential for ongoing

7   discovery.   That is a totally different animal than phasing

8   discovery in a remedies phase.  We don't do that.  We haven't seen

9   it.  And we would be entitled, if we brought a motion for summary

10  judgment tomorrow, to ask for our remedies in that motion.  But we

11  can't do that if we don't know what -- or we would be hamstrung,

12  and unfairly so, if we don't know the information that we need to

13  make that -- that pitch to the Court.

14         THE COURT:  All right.  Thank you.  Here's my ruling as

15  to Docket 113 with the requested issue being Nos. 4, 5, and 11.

16  I'll start with 4 and 5.  They're grouped together.

17     As to these, the SEC's request to compel is granted.  I find

18  the information sought is relevant and proportional to the needs

19  of the case.  And Mr. Balwani's request to postpone production

20  until there's been a finding of liability is denied in this

21  posture and for these reasons.

22     You are right that in some cases, the Court in its discretion

23  does structure there to be later discovery and a later phase, but

24  that's not been ordered in this case and so that's not the

25  operational  structure  we're  working  under  right  now.

1    Theoretically, it could be.  That's -- there's a deadline, which

2    has already passed, for the conclusion of discovery, and I find

3    this information sought is relevant to the remedies being sought

4    and its production now will help the parties to assess it and give

5    the SEC an opportunity, if it wishes to, to bring -- to use it on

6    a motion for summary judgment and to be prepared, if it gets to

7    that phase of the case, to make a presentation to the Court using

8    the information sought.

9        On the other hand, as to the assertions of prejudice, there

10   are existing protective orders in the case that will regulate the

11   use and distribution of that information, so that diminishes the

12   burden -- not just the burden in the sense of production, but the

13   consequence to Mr. Balwani is diminished by the protection of

14   those protective orders.  And I find that that's sufficient under

15   the circumstances to protect his interests.

16       As to Request 11, the SEC's request to compel is also

17   granted, with one limitation.  There are approximately a hundred

18   witnesses.  As to part two, the communications with other

19   identified witnesses, I will order the SEC by this Friday,

20   November 8th, to identify ten witnesses, to limit this to the ten

21   most important witnesses from your point of view.  It doesn't have

22   to be most important, but the ones that you want this request to

23   be limited to, and the responsive information for 11 and 4 and 5

24   all must be produced within 30 days of today, at the SEC's

25   request.

1     And as to 11, I find the information is relevant and

2  proportional to the needs of the case.  Again, the burden is not

3  a burden of dollars and cents of producing it but of a privacy

4  concern and -- and an assertion that communications post-

5  employment are not relevant.  But I am persuaded by the SEC that

6  there could be something in there that goes to bias, and the

7  drawing line between personal and non- -- not relevant to

8  Theranos, I think that could be a very fuzzy line under the

9  circumstances of all the different witnesses and parties in the

10  case.  And given that there could be relevant information there,

11  I think that's too fuzzy of a line to draw.  So that's why I'm not

12  setting that limitation proposed by Mr. Balwani.

13     No fees and costs awarded.

14     So, in conclusion, I've granted the SEC's request as to 4, 5,

15  and 11, with only the limitation in 11 of having the SEC identify

16  ten witnesses rather than a hundred and to communicate that by

17  this Friday to Balwani's counsel.

18          MS. LaMARCA:  We will do so.  Thank you.

19          THE COURT:  All right.  Thank you very much.  That

20  concludes the matter.

21          ALL:  Thank you, Your Honor.

22  //

23  //

24  //

25  //

1          (Proceedings adjourned at 12:07 p.m.)

2

3          I, Peggy Schuerger, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   provided to me of the proceedings in the above-entitled matter.

6

7   _____          November 17, 2019
    Signature of Approved Transcriber    Date

8
    Peggy Schuerger
9   Typed or Printed Name
    **Ad Hoc Reporting**
10  Approved Transcription Provider
    for the U.S. District Court,
11  Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25